Christopher W. Mixson, Esq. (Nev. Bar No. 10685)
Wolf, Rifkin, Shapiro, Schulman & Rabkin LLP
5594-B Longley Ln.
Reno, NV 89511
(775) 853-6787
cmixson@wrslawyers.com

Allison N. Melton (CO Bar No. 45088), *pro hac vice application to be submitted*
Center for Biological Diversity
P.O. Box 3024
Crested Butte, CO 81224
(970) 309-2008
amelton@biologicaldiversity.org

*Attorneys for Plaintiff*
*(additional counsel on signature page)*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
SOUTHERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY;  ) | Case No. _____ |
| ) | |
| Plaintiffs,  ) | **COMPLAINT FOR** |
| ) | **DECLARATORY AND** |
| v.  ) | **INJUNCTIVE RELIEF** |
| ) | |
| UNITED STATES BUREAU OF LAND  ) | |
| MANAGEMENT,  ) | |
| ) | |
| Defendant.  ) | |
| _____ ) | |

**INTRODUCTION**

1.      Plaintiff Center for Biological Diversity ("the Center") challenges the decisions of Defendant United States Bureau of Land Management ("BLM") authorizing and allowing the Rhyolite Ridge and South Infill mineral exploration projects on federal lands in central Nevada. The two projects are located in the BLM's Tonopah Planning Area, within Esmeralda County.

2.      The BLM's regulations limit "Notice" operations to causing surface disturbance of 5 acres or less, and require a "Plan of Operations" for mineral exploration projects that exceed 5 acres.  43 C.F.R. § 3809.21.  The BLM's regulations prohibit the segmentation of a project area through the filing of a series of Notices for the purpose of avoiding the filing of a Plan of Operations.  43 C.F.R. § 3809.21(b).

3.      On October 19, 2018, the BLM authorized two Notice operations within the Rhyolite Ridge Project Area: (1) the Rhyolite Ridge Exploration Project, which totals 4.98 acres, and (2) the South Infill Exploration Project, which totals 4.04 acres.  These two projects were unlawfully segmented to keep each project under 5 acres and thereby avoid the requirement to file a Plan of Operations, in violation of the BLM's regulations.  43 C.F.R. § 3809.21(b).

4.      If the mineral exploration within the Rhyolite Ridge Project Area was not unlawfully segmented into two separate projects, and a Plan of Operations prepared as required, the BLM would also have been required to prepare an Environmental Impact Statement, or at least an Environmental Assessment, to analyze the environmental impacts of the project pursuant to the National Environmental Policy Act ("NEPA"), 43 U.S.C. § 4332(C).

5.      Environmental review pursuant to NEPA is particularly important for this mineral exploration because it substantially threatens the world's only population of Tiehm's buckwheat

(*Eriogonum tiehmii*), a critically endangered plant that is found only within the Rhyolite Ridge

Project Area.

6.      In authorizing the two notices, the BLM has also not ensured, as the Federal Land

Policy Management Act requires, that the exploration projects will not result in unnecessary or

undue degradation.  43 U.S.C. § 1732(b); 43 C.F.R. § 3809.1(a);

7.      Implementation of this mineral exploration is currently ongoing at both sites

within the Rhyolite Ridge Project Area.  This implementation is causing significant irreparable

harm to the critically endangered Tiehm's buckwheat population that is found only on these

affected public lands BLM manages.

8.      The Center seeks declaratory relief that the BLM violated the agency's own

regulations, the Federal Land Policy and Management Act ("FLPMA"), and the National

Environmental Policy Act ("NEPA") in approving and authorizing this mineral exploration.  The

Center also seeks injunctive relief to prohibit any further implementation of this mineral

exploration unless and until the BLM demonstrates full compliance with the law.

### JURISDICTION AND VENUE

9.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action

arises under the laws of the United States, including FLPMA, 43 U.S.C. §§1701, *et seq*.; NEPA,

42 U.S.C. §§ 4331, *et seq*.; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, *et*

*seq*.

10.      Venue is proper pursuant to 28 U.S.C. § 1391(e) because Defendant BLM has

offices in this judicial district, and a substantial part of the events or omissions giving rise to the

claims in this Complaint occurred in this judicial district, and a substantial part of the property

that is the subject of this case is situated in this judicial district.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

11. Venue is proper in the Southern Division of this District, as the challenged decisions impact federal land and resources in Esmeralda County. *See* L.R. 6-1, 8-1.

12. An actual justiciable controversy exists between Plaintiff and Defendant. The requested relief is proper under 28 U.S.C. §§ 2201-02, and 5 U.S.C. §§ 705 & 706. The challenged agency actions are final and subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706.

## PARTIES

13. Plaintiff Center for Biological Diversity ("the Center") is a non-profit corporation headquartered in Tucson, Arizona, with offices and staff in a number of states, including Nevada. The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center is actively involved in protecting threatened and endangered species, and their habitat. The Center has approximately 70,000 members throughout the United States and the world.

14. The Center brings this action on its own behalf, and on behalf of its members. The Center has members who regularly use and enjoy the federal public lands managed by the BLM within the Tonopah Planning Area, including the lands within and near the Rhyolite Ridge Project Area.

15. The Center has members who regularly use and enjoy the Tonopah Planning Area, including the lands within and near the Rhyolite Ridge Project Area, for a variety of purposes, including hiking, photographing scenery, plants and wildlife, spiritual renewal, and engaging in other vocational, scientific, and recreational activities. The Center's members derive health, recreational, inspirational, religious, scientific, educational, and aesthetic benefits from their activities within these public lands.

3

16.     The Center's members intend to continue to regularly use and enjoy the Tonopah Planning Area, including the lands within and near the Rhyolite Ridge Project Area, frequently and on an ongoing basis in the future, including this fall and winter.  At least one member of the Center has a concrete and specific plan to go hiking and take photographs of the imperiled Tiehm's buckwheat within and near the Rhyolite Ridge Project Area in December, 2019.

17.     The health, recreational, inspirational, religious, scientific, educational, and aesthetic interests and benefits of the Center and its members have been and will continue to be adversely affected and irreparably injured if BLM's ongoing violations of FLPMA and the APA continue.  These are actual, concrete injuries caused by the BLM's violations of FLPMA and APA.  The Center and its members' injuries will be redressed by the relief sought.

18.     Defendant United States Bureau of Land Management ("BLM") is an agency within the United States Department of the Interior.  The BLM and its officers are responsible for the lawful management of the federal lands within the Tonopah Planning Area.

## STATUTORY AND REGULATORY BACKGROUND

### I.     Federal Land Policy and Management Act and BLM Regulations

19.     FLPMA is the basic "organic act" for management of the BLM public lands.  In managing the public lands, FLPMA requires the BLM to take any action necessary to prevent unnecessary or undue degradation of the lands.  43 U.S.C. § 1732(b).

20.     The BLM has promulgated regulations intended to prevent unnecessary or undue degradation of public lands by operations authorized by the mining laws.  43 C.F.R. § 3809.1(a).

21.     For regulatory purposes, BLM divided mining operations into three categories according to the size and location of the operations.  43 C.F.R. § 3809.10.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22.     Mineral exploration operations that will result in only negligible disturbance of federal lands, and do not involve the use of mechanized earth-moving equipment, truck-mounted drilling equipment, or explosives, are identified as "Casual" use operations.  43 C.F.R. § 3809.5.

23.     "Notice" mineral exploration operations are those that will cause a cumulative surface disturbance of five acres or less.  43 C.F.R. § 3809.21.  Prior to commencing notice mineral exploration operations, the operator must provide notice to the BLM that describes the proposed activities.  43 C.F.R. § 3809.301.  Additionally, the notice must provide that reclamation of disturbed areas will be completed, and that measures will be taken to prevent unnecessary or undue degradation of the lands during operations.  *Id*.

24.     After BLM has received notice of a notice mineral exploration operation, the agency reviews the notice to see if it is complete.  43 C.F.R. § 3809.311(a).  If the notice is incomplete, BLM will inform the operator in writing of the additional information that it must submit to BLM.  43 C.F.R. § 3809.311(b).  If the operator cannot demonstrate that it will prevent unnecessary or undue degradation, it may not conduct the operations.  43 C.F.R. § 3809.311(c).

25.     For mining or mineral exploration operations that will cause a cumulative surface disturbance of more than five acres, and for operations proposed in specifically designated areas of preservation, the operator must provide a "Plan of Operations," that must be approved by the BLM.  43 C.F.R. § 3809.411.  Prior to approving the Plan of Operations, BLM must prepare an Environmental Assessment or Environmental Impact Statement pursuant to NEPA.  *Id*.; BLM Handbook H-3809-1, § 4.4.1.3.2 (NEPA Analysis); 42 U.S.C. § 4332(C).

26.     Under FLPMA, BLM must develop land use plans for the public lands under its control, 43 U.S.C. § 1712, and all resource management decisions must be in accordance with those plans.  *Id*. § 1732(a), 43 C.F.R. § 1610.5-3(a).  *See Norton v. S. Utah Wilderness Alliance*,

542 U.S. 55, 69 (2004) (this requirement "prevent[s] BLM from taking actions inconsistent with the provisions of a land use plan"); *Ore. Natural Res. Council v. Brong*, 492 F.3d 1120, 1128 (9th Cir. 2007) (holding BLM decision is "inconsistent with the [Land Use] Plan and, consequently, violate FLPMA").

27.     If a proposed action is not consistent with the land use plan, BLM must either rescind the proposed action or amend the plan. See 43 C.F.R. §§ 1610.5-3, 1610.5-5.

28.     Courts have applied this "consistency" requirement to mining plans of operations and required that plans of operations adhere to the mandatory requirements of governing land use plans. *Mineral Policy Center v. Norton*, 292 F.Supp.2d 30, 49 (D.D.C. 2003).

**II.     National Environmental Policy Act**

29.     The National Environmental Policy Act ("NEPA") requires federal agencies to prepare a detailed environmental impact statement ("EIS") for major federal actions that may significantly impact the quality of the human environment.  42 U.S.C. § 4332(2)(C).

30.     The Council on Environmental Quality ("CEQ") has promulgated regulations implementing NEPA, which are binding on all federal agencies.  40 C.F.R. § 1507.1.

31.     NEPA is our basic national charter for protection of the environment.  40 C.F.R. § 1500.1(a).  The purpose of the NEPA is to ensure "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience that may also play a role in both the decisionmaking process and implementation of that decision."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332,

349 (1989).  "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken."  40 C.F.R. § 1500.1(b).

32.     As a preliminary step, an agency may prepare an Environmental Assessment to decide whether the environmental impacts of a proposed action are significant enough to warrant preparation of an Environmental Impact Statement.  40 C.F.R. § 1508.9.

33.     An Environmental Impact Statement must be prepared if substantial questions are raised as to whether a project may cause significant degradation of some environmental factor. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).

34.     An agency cannot break a project into small component parts to avoid a "significance" determination and the requirement to prepare an Environmental Impact Statement. 40 C.F.R. § 1508.27(b)(7).

35.     Connected actions, cumulative actions, and similar actions must be considered together in a single NEPA document.  40 C.F.R. § 1508.25.

**III.     Administrative Procedure Act**

36.     Pursuant to the APA, a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  5 U.S.C. § 702.

37.     Agency action made reviewable by statute and final agency actions for which there is no adequate remedy in court are subject to judicial review.  5 U.S.C. § 704.

38.     The APA directs a court to compel agency action unlawfully withheld or unreasonably delayed; and to hold unlawful and set aside agency action found to be arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with the law, or agency action that is undertaken without observance of procedure required by law.  5 U.S.C. § 706.

**FACTUAL ALLEGATIONS**

I.      **The Rhyolite Ridge Mining Project**

39.     Ioneer is an Australian company with an office in Reno, Nevada, that is proposing the development of a hardrock lithium and boron open-pit mining operation on the west slope of the Silver Peak Range in Esmeralda County, Nevada, approximately 40 miles south-west of Tonopah.  This project is known as the Rhyolite Ridge Mining Project.

40.     Ioneer holds unpatented mining claims for the Rhyolite Ridge Mining Project through its wholly-owned subsidiary Paradigm Minerals USA.

41.     The Rhyolite Ridge Mining Project is expected to produce 20,200 tons of lithium carbonate and 173,000 tons of boric acid each year during its 30-year operational life.

42.     A pre-feasibility of the Rhyolite Ridge Mining Project was completed in October 2018.

43.     The Rhyolite Ridge Mining Project is made up of two lithium-boron deposits, North Basin and South Basin, which are located 4 kilometers apart.

44.     In March 2019, a draft "2019 Tiehm buckwheat survey plan" was prepared for Ioneer and submitted to the BLM Battle Mountain District Tonopah Field office.  Based on information and belief, this draft plan pertains to the Rhyolite Ridge Mining Project, not to the two exploration projects described further below.  The survey plan does not provide measures or direction for avoiding, mitigating, or minimizing harm to Tiehm's buckwheat and/or the plants habitat.  The survey plan proposes a novel, untested experiment to transplant ten soil plugs

8

containing this extremely rare plant species to evaluate the feasibility of successfully

transplanting individuals that are within the planned areas of disturbance.

**II.      The Rhyolite Ridge Exploration Project**

45.    Within the Project Area of the Rhyolite Ridge Mining Project, Ioneer proposed to

proceed with mineral exploration activities in a project identified as the Rhyolite Ridge

Exploration Project.

46.    The BLM authorized operations for the Rhyolite Ridge Exploration Project on

October 19, 2018.

47.    The total surface disturbance for the Rhyolite Ridge Exploration Project is 4.98

acres.

48.    The Rhyolite Ridge Exploration Project includes 11 "larger" constructed drill sites

(100 feet long by 50 feet wide), five "smaller" constructed drill sites (82 feet long by 50 feet

wide), two groundwater well sites, and 24 test pit excavations.

49.    Sumps approximately 20 feet long by 10 feet wide by 6.75 feet deep will be

excavated within the site disturbance to collect drill cuttings and manage waste fluids.

50.    The test pits will be excavated within working areas with the dimensions of 30 feet

long by 30 feet wide.

51.    Approximately 18,302 linear feet of overland travel routes will be utilized with a

disturbance width of six feet.

52.    Reclamation activities for the Rhyolite Ridge Exploration Project will likely be

completed in the summer of 2021.

**III.    The South Infill Exploration Project**

53.    Within the Project Area of the Rhyolite Ridge Mining Project, Ioneer also proposed to proceed with mineral exploration activities in a project identified as the South Infill Exploration Project.

54.    The BLM authorized operations for the South Infill Exploration Project on October 19, 2018.

55.    The total surface disturbance for the South Infill Exploration Project is 4.04 acres.

56.    The South Infill Exploration Project includes up to 20 constructed drill sites, with up to two drill holes drilled at any given site; approximately 2,275 linear feet of new road construction; sumps that are 20 feet by 10 feet, and 6.75 feet deep, to collect drill cuttings and manage waste fluids; and one water bladder laydown area that is 61 feet long by 50 feet wide.

57.    Ioneer anticipated that mineral exploration activities would commence as early as February 2019, and that reclamation activities would likely be completed in the summer of 2020.

58.    The BLM has developed "Biological Resource Conditions" for one specific "bulk material excavation" within the South Infill Exploration Project.  These conditions are unlikely to prevent significant disturbance to the Tiehm's buckwheat if this excavation occurs.

**IV.    Tiehm's Buckwheat**

59.    Tiehm's buckwheat is an extremely rare plant species in the buckwheat family that is found only in an isolated location in the Rhyolite Ridge area of the Silver Peak Range mountains of central Nevada.

60.    The Tiehm's buckwheat occupies approximately 21 acres of habitat spread across a three-square mile area.

61.     There is only one population of Tiehm's buckwheat, consisting of 6 sub-populations, and totaling from 20,000 to 43,000 individual plants.

62.     Extensive surveys have not found any additional populations of Tiehm's buckwheat.

63.     The entire population of Tiehm's buckwheat, and all of its habitat, are located within the Project Area of the Rhyolite Ridge Mining Project.

64.     The BLM has designated the Tiehm's buckwheat as a Sensitive Species.  BLM, Nevada Sensitive and Status Species List, 40 (2017).

65.     The 1994 Tonopah Resource Management Plan and Final Environmental Impact Statement ("1994 RMP") defines Sensitive Species as "[p]lant and animal species occurring on public lands and requiring special management attention in order to protect them and in order to prevent irreparable damage to the important resources or other natural systems or processes on which it depends."  U.S. Dep't of Interior, BLM Battle Mountain District, Tonopah Resource Mgmt. Plan and Final Envt'l Impact Statement, Glossary 1-2 (1994).

66.     The BLM's Record of Decision ("ROD") that implemented the 1994 RMP states BLM is to "[p]rotect, restore, enhance, or expand habitat for threatened, endangered, or Nevada BLM Sensitive Species" and that there are to be "no incompatible land uses."  U.S. Dep't of Interior, BLM Battle Mountain District, Tonopah Resource Mgmt. Plan Record of Decision, 1 (1997).  "Habitat for all . . . Nevada BLM Sensitive Species (plant and animal) will be managed to maintain or increase current populations of these species. . . .  BLM policy is to provide sensitive species with the same level of protection as is provided for candidate species . . .."  ROD at 9-10.  The ROD also established that "[i]t is BLM policy to . . . ensure that actions

authorized or funded do not contribute to the need to list any of these species as threatened or endangered." ROD at 28.

67.   As part of its duties to prevent unnecessary or undue degradation and irreparable harm to public land resources under FLPMA, BLM has established a national policy to protect designated Sensitive Species. The policy provides guidance for the conservation of Sensitive Species and the ecosystems upon which they depend on BLM-administered lands. U.S. Dep't of the Interior BLM, Special Status Species Mgmt. Manual 6840, at 3 (2008) ("Special Status Species Manual").

68.     The objectives of the BLM special status species policy are:

> A. To conserve and/or recover ESA-listed species and the ecosystems on which they depend so that ESA protections are no longer needed for these species.
> B. To initiate proactive conservation measures that reduce or eliminate threats to Bureau sensitive species to minimize the likelihood of and need for listing of these species under the ESA.

Special Status Species Manual 6840, at 3.

69.     BLM has specifically acknowledged its duty to safeguard the public's interest in protecting Sensitive Species:

> It is in the interest of the BLM to undertake conservation actions for such species before listing is warranted. It is also in the interest of the public for the BLM to undertake conservation actions to improve status of Sensitive Species so sensitive recognition is no longer warranted. By doing so, BLM will have greater flexibility in managing public lands to accomplish native species conservation objectives and other legal mandates.
> . . .
> In compliance with existing laws, including the BLM multiple use mission as specified in the FLPMA, the BLM shall designate Bureau sensitive species and implement measures to conserve these species and their habitats, including ESA proposed critical habitat, to promote their conservation and reduce the likelihood and need for such species to be listed pursuant to the ESA.

Special Status Species Manual at 36.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

70.    In approving the exploration projects, BLM failed to meet these requirements and as such, failed to meet the protective requirements of FLPMA.

71.    On June 1, 2019, Center staff visited the Rhyolite Ridge Project Area, and observed Tiehm's buckwheat in full bloom, surveying all six populations with a noted desert botanist. Center staff observed impacts from mineral exploration activities including road-building and well pad grading, within meta-populations of the buckwheat. While the activity appeared recent, there was no evidence of ongoing activity nor equipment or personnel present.

72.    On June 10, 2019, Center staff visited the BLM's Tonopah field office and became concerned about the authorized mineral exploration activities within Tiehm's buckwheat habitat after examining notices.  At that time, however, there was no indication of current or ongoing activities, and BLM staff were unable to elaborate as to whether further activities were going to occur.

73.    On June 12, 2019, as required by regulations implementing the Endangered Species Act, *see* 50 C.F.R. § 424.14(b), the Center provided formal 30-day notice to the State of Nevada that the Center intended to file a petition to designate as endangered and designate critical habitat for Tiehm's buckwheat.  The notice, copies of which were also sent to BLM and the U.S. Fish and Wildlife Service, explained that Tiehm's buckwheat is an extremely rare plant with a highly restricted habitat in the Silver Peak Range of Esmerelda County, Nevada, and under threat by mineral exploration activities and a proposed mining project.  The Center urged the state, BLM, and the U.S. Fish and Wildlife Service to work together to cease all exploration activities within or adjacent to Tiehm's buckwheat habitat until proper environmental review could be conducted and the petition could be evaluated.

74.   On August 29, 2019, Center staff again visited the Rhyolite Ridge Project Area and noted no further activity since the June 1st visit.

75.   On October 7, 2019, having received no response to its June 12, 2019 letter, the Center submitted a petition to the U.S. Fish and Wildlife Service, requesting that Tiehm's buckwheat be designated as an endangered species under the Endangered Species Act.  The Center requested that its petition be considered on an emergency basis due to the dire threat posed by the exploration activities and proposed Rhyolite Ridge Mining Project.

76.   On October 27, 2019, Center staff again visited the Rhyolite Ridge Project Area and discovered a substantial increase in ongoing mineral exploration activities.  Center staff observed trucks, heavy equipment, and personnel on-site, and that substantial excavation and grading had been conducted for new roads and exploration activities, with pipeline laid, wells pumped, wastewater pits filled, and other evidence of substantial exploration activities ongoing in the immediate area of Tiehm's buckwheat.

77.   On October 29, 2019, the Center sent a letter to the BLM notifying the agency of these ongoing activities, and requesting that the BLM immediately instruct Ioneer to cease and desist exploration activities in the area until the U.S. Fish and Wildlife Service reviews the Center's petition to list the Tiehm's buckwheat under the Endangered Species Act, and the BLM prepares a NEPA analysis of the exploration activities.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

BLM Violated FLPMA and the BLM's Regulations

78.   The Center hereby incorporates by reference all preceding paragraphs.

79.     The BLM's regulations limit "Notice" level mining operations to five acres or less.  43 C.F.R. § 3809.21(a).  For operations five acres or greater, BLM requires a Plan of Operations, which triggers the need for an Environmental Assessment or Environmental Impact Statement under NEPA.  43 C.F.R. § 3809.411; BLM Handbook H-3809-1, § 4.4.1.3.2 (NEPA Analysis); 42 U.S.C. § 4332(C).

80.     The BLM's regulations explicitly forbid segmenting a project area by filing a series of notices for the purpose of avoiding filing a Plan of Operations.  43 C.F.R. § 3809.21(b).

81.     The Rhyolite Ridge Exploration Project and the South Infill Exploration Project are both located within the Project Area for the proposed Rhyolite Ridge Mine Project.

82.     The Rhyolite Ridge Exploration Project and the South Infill Exploration Project were both proposed by Ioneer, which is also the same mining company that proposes the Rhyolite Ridge Mine Project.

83.     The Rhyolite Ridge Exploration Project and the South Infill Exploration Project are each individually just under the 5-acre limit, with one 4.98 acres in size.

84.     If the Rhyolite Ridge Exploration Project and the South Infill Exploration Project were considered together, they would easily exceed the five-acre limit and require a mine Plan of Operations, and NEPA review.

85.     The BLM approved and authorized the Rhyolite Ridge Exploration Project and the South Infill Exploration Project on the very same day.

86.     The BLM violated its own regulations in segmenting and allowing the segmentation of the Rhyolite Ridge Project Area into two Notice mine operations, the Rhyolite Ridge Exploration Project and the South Infill Exploration Project, which cumulatively will impact well over five acres.  43 C.F.R. § 3809.21(b).

87.     In violating 43 C.F.R. § 3809.21(b) in approving and authorizing the Rhyolite Ridge Exploration Project and the South Infill Exploration Project, the BLM failed to take action necessary to prevent unnecessary or undue degradation of the lands, in violation of FLPMA.  43 U.S.C. § 1732(b); 43 C.F.R. § 3809.1.

88.     The BLM's approval and authorization of the Rhyolite Ridge Exploration Project and the South Infill Exploration Project was arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law.  5 U.S.C. § 706(2). The court should therefore hold unlawful and set aside BLM's approval and authorization of these two projects. *Id*.

## SECOND CLAIM FOR RELIEF

### BLM Violated NEPA and the CEQ's NEPA Regulations

89.     The Center hereby incorporates by reference all preceding paragraphs.

90.     Under the CEQ NEPA regulations, an agency cannot break a project into small component parts to avoid a "significance" determination and the requirement to prepare an Environmental Impact Statement.  40 C.F.R. § 1508.27(b)(7).

91.     Additionally, connected actions, cumulative actions, and similar actions must be considered together in a single NEPA document.  40 C.F.R. § 1508.25.

92.     In allowing and authorizing the proposed mineral exploration within the Rhyolite Ridge Project Area to be segmented into the Rhyolite Ridge Exploration Project and the South Infill Exploration Project, the BLM violated NEPA.  40 C.F.R. § 1508.27(b)(7); 40 C.F.R. § 1508.25.

93.     The BLM's approval and authorization of the Rhyolite Ridge Exploration Project and the South Infill Exploration Project was arbitrary, capricious, an abuse of discretion, not in

accordance with law, and without observance of procedure required by law.  5 U.S.C. § 706(2).

The court should therefore hold unlawful and set aside BLM's approval and authorization of

these two projects.  *Id.*

## THIRD CLAIM FOR RELIEF

### BLM Violated FLPMA

94.     The Center hereby incorporates by reference all preceding paragraphs.

95.     Under FLPMA, the BLM in managing public lands "shall . . . take any action

necessary to prevent unnecessary or undue degradation of the lands."  43 U.S.C. § 1732(b).

96.     As part of BLM's duty to prevent unnecessary or undue degradation, BLM

established a national policy to protect designated sensitive species.  U.S. Dep't of the Interior

BLM, Special Status Species Mgmt. Manual 6840 at 3 (2008) ("Special Status Species

Manual").  The Tonopah RMP and ROD also require that all sensitive species are managed as if

they are candidate species, which requires the BLM, among other things, to "ensure that actions

authorized or funded do not contribute to the need to list any of these species as threatened or

endangered."  ROD 9-10, 28.

97.     In approving and authorizing the Rhyolite Ridge Exploration Project and the

South Infill Exploration Project in the only Tiehm's buckwheat population known in the world,

BLM did not ensure that the projects would not result in unnecessary or undue degradation to the

Tiehm's buckwheat, in violation of FLPMA.  43 U.S.C. § 1732(b).

98.     All site-specific resource management decisions must be in accordance with the

applicable RMP.  43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a).  The BLM's approval and

authorization of the Rhyolite Ridge Exploration Project and the South Infill Exploration Project

is inconsistent with the RMP's requirements for sensitive species, in violation of FLPMA.  *Id.*

17

99.     The BLM's approval and authorization of the Rhyolite Ridge Exploration Project and the South Infill Exploration Project was arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law.  5 U.S.C. § 706(2). The court should therefore hold unlawful and set aside BLM's approval and authorization of these two projects.  *Id*.

## RELIEF REQUESTED

WHEREFORE, the Center respectfully requests that this Court:

A.     Declare that the BLM has violated FLPMA, the BLM's regulations, and the Tonopah RMP in approving and authorizing the Rhyolite Ridge Exploration Project and the South Infill Exploration Project;

B.     Declare that the BLM has violated NEPA in approving and authorizing the Rhyolite Ridge Exploration Project and the South Infill Exploration Project;

C.     Enjoin any further implementation of the Rhyolite Ridge Exploration Project and the South Infill Exploration Project;

D.     Vacate the Rhyolite Ridge Exploration Project and the South Infill Exploration Project;

E.     Award to the Center its costs, expenses, expert witness fees, and reasonable attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

F.     Grant the Center such further relief as may be just, proper, and equitable.

Dated October 30, 2019                    Respectfully submitted,

*/s/ Christopher W. Mixson*
Christopher W. Mixson, Esq. (Nev. Bar No. 10685)
Wolf, Rifkin, Shapiro, Schulman & Rabkin LLP
5594-B Longley Ln.
Reno, NV 89511
(775) 853-6787

cmixson@wrslawyers.com

Allison N. Melton (CO Bar No. 45088)
Center for Biological Diversity
P.O. Box 3024
Crested Butte, CO 81224
(970) 309-2008
amelton@biologicaldiversity.org
(*pro hac vice application to be submitted*)

Marc D. Fink (MN Bar # 343407)
Center for Biological Diversity
209 East 7th Street
Duluth, Minnesota 55805
(218) 464-0539
mfink@biologicaldiversity.org
(*pro hac vice application to be submitted*)

Roger Flynn (CO Bar # 21078)
Western Mining Action Project
P.O. Box 349, 440 Main Street, #2
Lyons, CO 80540
(303) 823-5738
wmap@igc.org
(*pro hac vice application to be submitted*)

*Attorneys for Plaintiff*

19