E. LEIF REID
Nevada Bar No. 5750
LReid@LRRC.com
JOSH M. REID
Nevada Bar No. 7497
JReid@LRRC.com
JOEL D. HENRIOD
Nevada Bar No. 8492
JHenriod@LRRC.com
LEWIS ROCA ROTHGERBER CHRISTIE LLP
3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169
Telephone: (702) 949-8200
Facsimile: (702) 949-8398

SVEND A. BRANDT-ERICHSEN
Admitted Pro Hac Vice
sbrandterichsen@nossaman.com
NOSSAMAN LLP
719 Second Avenue
Suite 1200
Seattle, WA 98104
Telephone: (206) 395-7630

*Attorneys for Intervenor*
*Ioneer USA Corporation*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | Case No.:  2:19-cv-01915-GMN-EJY |
| Plaintiff, | |
| vs. | **INTERVENOR IONEER USA CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |
| UNITED STATES BUREAU OF LAND MANAGEMENT, | |
| Defendant. | |
| IONEER USA CORPORATION, | |
| Intervenor. | |

Ioneer USA Corporation ("Ioneer") has completed its exploration activities under the notices at issue in this case at two separate mineral occurrences on its mining claims on federal lands managed by the Defendant, the Bureau of Land Management ("BLM"), in Esmeralda

1   County, Nevada.  Thus, the requested injunction is now moot, and the Court can and should deny

2   the Motion on that basis alone.

3       Ioneer's exploration evaluated the potential to mine lithium, a critical mineral designated

4   by the U.S. Department of Interior, and boron. The mine, if developed, will secure a domestic

5   source of this strategic commodity critical to the production of electrical vehicles and renewable

6   energy storage.

7       From the outset, Ioneer was aware of the presence of Tiehm's buckwheat, a "BLM

8   Sensitive Species" at some of its mining claims. Ioneer applied considerable resources to study the

9   plant and develop protection plans to ensure that the plants thrive during Ioneer's activities and

10  after the exploration is complete. Ioneer's protection of the Tiehm's buckwheat is an unqualified

11  success. Not a single plant has been harmed.

12      The Center for Biological Diversity ("Plaintiff") cannot and does not dispute this success,

13  but seeks to enjoin the exploration project. After excising the hyperbole, Plaintiff's Motion

14  proffers two untenable arguments. First, Plaintiff claims that an environmental analysis was

15  required because the two exploration areas, combined, covered an area greater than five acres

16  making such analysis a requirement. Wrong. The two areas of exploration served different

17  purposes and were separated geographically and geologically from one another. BLM exercised

18  the discretion afforded it to determine that each exploration project was a "notice-level" project

19  not requiring an environmental analysis.

20      Second, Plaintiff cannot and does not demonstrate any harm, much less irreparable harm to

21  the plant. Plaintiff makes unsupported claims regarding species extinction, but offers only one

22  fact. That is, exploration activities occurred between different locations of Tiehm's buckwheat

23  sub-populations. This demonstrates that Ioneer successfully avoided the plants.  Plaintiff's

24  conclusory, speculative hypotheticals notwithstanding, it offers no evidence that Ioneer's

25  exploration activities caused or will cause any harm.  The plant is thriving in soil disturbed during

26  exploration activities which predate Ioneer's work at the site.

27      At every step of the process, Ioneer worked with BLM to protect the Tiehm's buckwheat.

28  If the exploration data confirms that a mine could be established, BLM will exercise its obligation

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

Lewis Roca
ROTHGERBER CHRISTIE

2

1    under the law and perform an environmental analysis, which will consider the effect of a mine on

2    the Tiehm's buckwheat. It is pure speculation today to enunciate the environmental impacts of a

3    yet-to-be developed mine at the exploration stage. An environmental analysis is not required for

4    limited, Notice-level activities.  Due to Ioneer's extensive efforts protecting the plants, there is no

5    threat to the species. Plaintiff cannot succeed on the merits if no harm has occurred and no harm

6    will occur. An injunction is unnecessary unless the sole reason for an injunction is to irreparably

7    harm Ioneer and the public by delay in bringing online a domestic source of a mineral critical to

8    the future of electric vehicles and renewable energy production.

9         All four factors to be considered in analyzing a preliminary injunction weigh heavily

10   against enjoining the project. Plaintiff's Motion should be denied.

11                        **COUNTERSTATEMENT OF FACTUAL BACKGROUND**

12   *The Rhyolite Ridge Area and The South Infill Area Are Distinct Exploration Projects*

13        In 2017, Ioneer purchased unpatented mining claims on federal lands managed by BLM in

14   Esmeralda County, Nevada. These lands were disturbed over several decades by Ioneer's

15   predecessors.  Ioneer conducted exploration in two separate exploration areas, the Rhyolite Ridge

16   Area and the South Infill Area. Ioneer simultaneously conducted baseline environmental studies

17   necessary to develop a future lithium and boron quarry on its mining claims. *See* Ex. A ¶ 18.

18   Extensive exploration and development activities occurred in the project areas for decades from

19   early in the 20th Century through 2011, pre-dating Ioneer's activities, and those disturbances are

20   clearly evident today.  *See id.* ¶ 10.

21        Ioneer[1] filed a Notice for the Rhyolite Ridge Exploration Area with the BLM Tonopah

22   Field Office on August 28, 2018. On September 21, 2018, Ioneer submitted a modified Notice for

23   the Rhyolite Ridge Exploration Area "to avoid any potential impacts to cultural resources," and

24   before it began exploration activities. *See* Ex. B. The September 21, 2018 Notice is the original

25   notice under which Ioneer began exploration activities—this notice contained all of the elements

26   required in 43 C.F.R. § 3809.301. *See id..* There are no known Tiehm's buckwheat plants within

27   the Rhyolite Ridge Exploration Area. *See* Ex. E ¶ 12. At the Rhyolite Ridge Area, Ioneer

28

---

[1] This Notice was filed under the name of Ioneer's related entity, Paradigm Minerals USA Corp.

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

Lewis Roca
ROTHGERBER CHRISTIE

1    conducted exploration activities to determine whether lithium or boron mineralization was present.

2    Activities at the Rhyolite Ridge Exploration Area focused on mineral exploration along with

3    related geotechnical and hydrogeological exploration holes. To date, no significant lithium or

4    boron mineralization has been discovered in the area.  This area is the likely location for future

5    processing plant and storage areas. This exploration work was critical to establish whether there is

6    mineralization present or if the area is suitable for processing facilities. *See* Ex. A ¶ 14.

7         On October 1, 2018, Ioneer[2] filed a Notice for the South Infill Exploration Area with the

8    BLM Tonopah Field Office. *See* Ex. C. The South Infill Exploration Area is located in an area that

9    is geographically and geologically separate from the Rhyolite Ridge Exploration Area, and is

10   believed to contain significant lithium and boron mineralization. *See* Ex. A ¶ 14.  Activities at the

11   South Infill Area were located where there is significant lithium and boron mineralization and this

12   project was focused on defining the extent of the resource along with related exploration holes

13   necessary to evaluate the type, extent, quality and quantity and value of the minerals present. *See*

14   *Id.* The October 1, 2018, Notice contained all of the elements required in 43 C.F.R. § 3809.301.

15   *See* Ex. C (10-1-18 Notice)*.* Ioneer has submitted four revised Notices for the South Infill

16   Exploration Area, and Ioneer recently completed exploration activities under the October 7, 2019,

17   (Revision #4) Notice. *See* Ex. D.  The South Infill Exploration Area includes land near known

18   Tiehm's buckwheat sub-populations. *See* Ex. E ¶ 12.

19        The two projects are approximately 1.5 miles apart. *See* Ex. A ¶ 13. The two projects are

20   geologically distinct, meaning that the lithium and boron minerals in the Rhyolite Ridge Area do

21   not extend to the lithium and boron minerals in the South Infill Area. *See id.* The mineralization is

22   not continuous. The sedimentary rocks that host the lithium and boron minerals in each area are

23   separated by older volcanic rocks that do not contain the same lithium and boron minerals.  The

24   older volcanic rocks that separate the two areas form a prominent topographic ridge rising

25   approximately 300 feet above the surrounding area. *Id.* The access routes to the sites are also

26   different. The timing for commencement of activities and completion of Ioneer's activities as well

27

28

---

[2] This Notice was filed under the name of Ioneer's related entity, Paradigm Minerals USA Corp.

Lewis Roca
ROTHGERBER CHRISTIE

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

as the performance of reclamation at the two areas are different. *Id.* These are two different exploration projects searching for critical minerals in distinct deposits.

**Ioneer Protected the Tiehm's Buckwheat**

**Ioneer's Baseline Studies**

Prior to commencing exploration activities, Ioneer was aware of the Tiehm's buckwheat at the project. *See id.* ¶ 17. Tiehm's buckwheat is a desert plant that grows in nine isolated sub-populations located in and around the Silver Peak Mountain Range in Esmeralda County, Nevada. *Id.* ¶ 19. A "BLM Sensitive Species" since 2017, the plant is not a threatened or endangered species under the Endangered Species Act, nor has its habitat been designated as an Area of Critical Environmental Concern by the BLM or any other federal agency. *See, e.g.*, Mot. 4-5. Ioneer, in coordination with the BLM, has made, and will continue to make, considerable effort to ensure that Ioneer's exploration activities and future development plans avoid impacts to Tiehm's buckwheat. *E.g.*, *id.* ¶¶ 16–18, 20–25; Ex. E ¶¶ 5-11.

Ioneer, in consultation with the BLM, completed a comprehensive characterization of the extent, makeup, and distribution of Tiehm's buckwheat through multi-seasonal baseline studies.[3] *See* Ex. E ¶ 5. These efforts included extensive field surveys, aerial drone surveys, soil analyses, seed collection and testing, and statistical analysis of collected data to establish baseline conditions for the demographics and densities of the known Tiehm's buckwheat sub-populations and a method for monitoring trends over time. *See id.* ¶ 6. Ioneer retained the services of well-respected botanical experts to develop protections to ensure the persistence of the plant in natural conditions. *See* Ex. A ¶ 21.

**Ioneer's Exploration Projects Have Not Harmed Tiehm's Buckwheat**

It is undisputed that there are no Tiehm's buckwheat plants within the Rhyolite Ridge Exploration Area. *See* Ex. A3; *see also* ECF No. 10-14 (Pl.'s map). Within the South Infill Exploration Area, Ioneer limited its exploration activities near any Tiehm's buckwheat sub-populations. For those activities, Ioneer and its biological consultants coordinated with the BLM

---

[3] Plaintiff's Emergency Petition to List Tiehm's buckwheat as an Endangered or Threatened Species acknowledges that the Ioneer's 2019 survey of Tiehm's buckwheat (performed by its consultant EM Strategies) was "the most comprehensive survey to date." ECF No. 10-6 at 9.

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

Lewis Roca
ROTHGERBER CHRISTIE

109935366.1

Lewis Roca
ROTHGERBER CHRISTIE

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

1   to protect against any impact to the plants. Pursuant to 43 C.F.R. § 3809.420-421, "to prevent

2   unnecessary or undue degradation" from Ioneer's exploration activities, the BLM sent Ioneer a

3   March 18, 2019, letter outlining Biological Resource Conditions (the "BRCs")for exploration

4   activities near Tiehm's buckwheat sub-populations in the South Infill Exploration Area. *See* Ex. _

5   (3-18-19 letter). These BRCs include a BLM pre-inspection of to-be-disturbed areas to confirm

6   that no Tiehm's buckwheat plants would be impacted. *See id.* at 2. Due to these proactive efforts,

7   Ioneer's exploration activities have caused no known impacts to any Tiehm's buckwheat plants.

8   *See* Ex. A ¶ 16; Ex. E ¶ 11.

9       In fact, Ioneer has carefully maintained its activities substantially separated from the

10  Tiehm's buckwheat. With only three exceptions, Ioneer has maintained at least 200 feet separation

11  between its activities and the nearest population. In those three cases, Ioneer's exploration

12  activities were conducted within 50 feet of Tiehm's buckwheat. In each case, before Ioneer

13  commenced activities, it identified the nearby plants and put in place appropriate protective

14  measures to ensure that Tiehm's buckwheat plants were not disturbed. Ex. A ¶ 16. The Tiehm's

15  buckwheat are not at risk from Ioneer's exploration projects.

16                              **LEGAL BACKGROUND**

17      The BLM manages the federal lands under its jurisdiction under a broad multiple use

18  mandate granted by the Federal Land Policy and Management Act ("FLPMA"). 43 U.S.C. § 1701

19  *et. Seq.* FLPMA charges the BLM with protecting environmental, ecological, and recreational

20  values while also providing for "multiple use and sustained yield" management. *See* 43 U.S.C.

21  § 1701(a)(1)-(8). FLPMA's definition of "multiple use" calls for the "combination of balanced and

22  diverse resource uses that takes into account the long-term needs of future generations for

23  renewable and nonrenewable resources, including, but not limited to, recreation, range, timber,

24  minerals, watershed, wildlife and fish, and natural scenic, scientific, and historical values." *Id.*

25  § 1702(c).

26      To conduct mining and exploration operations on BLM administered public lands one

27  must comply with the BLM Mining Regulations found in 43 C.F.R. subpart 3809. *See* 43 C.F.R.

28  §§ 3809.2 (scope of regulations), 3809.5 (definitions of "Exploration," "Operations," "Public

109935366.1

Lands"). The BLM classifies operations on public lands in one of three categories. The first

category is "Casual use," which is defined as "activities ordinarily resulting in no or negligible

disturbance of the public lands or resources" and requires no notice or application to the BLM. 43

C.F.R. § 3809.5 and 43 C.F.R. § 3809.10(a). The second category is "Notice-level operations," 43

C.F.R. § 3809.10(b), which are "exploration[4] [activities] causing surface disturbance of 5 acres or

less of public lands on which reclamation has not been completed." 43 C.F.R. § 3809.21(a). Those

wishing to conduct Notice-level operations must file a notice with the BLM meeting the

requirements of 43 C.F.R. § 3809.21 at least 15 calendar days before commencing exploration

activities. *Id*. The third category, "Plan-level operations," includes all activities that do not qualify

as casual use or notice level activities, including all mining, and must be conducted under a plan of

operations approved by the BLM. *See* 43 C.F.R. §§ 3809.10-11.

## ARGUMENT

### I.     PLAINTIFF'S CLAIM FOR INJUNCTIVE RELIEF IS MOOT

"A case m[ay] become moot if subsequent events ma[ke] it absolutely clear that the

allegedly wrongful behavior c[annot] reasonably be expected to recur." *United States v.

Concentrated Phosphate Ass'n*, 393 U.S. 199, 203 (1968). Where the defendant's subsequent acts

comply with the plaintiff's requested terms, the motion is moot. *Vanke v. Block*, 77 F. App'x 948,

949 (9th Cir. 2003); *see also County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (injunctive

claims generally rendered moot when defendant complies and there is no legitimate concern about

future adverse action); *N. Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466, 469 (9th Cir. 1986) (finding

moot a dispute related to an injunction prohibiting mining activities because the defendant

"voluntarily . . . agreed to comply with the injunction order"); 13A C. Wright, A. Miller & E.

Cooper, Federal Practice and Procedure § 3533.2, at 238–39 (2d ed. 1984) (individual issues may

be mooted by defendant's voluntary compliance).

Here, Ioneer has completed both notice-level exploration projects and terminated the

respective notices. On December 5, 2019, Ioneer provided BLM with the cessation notices

[4] "Exploration" is defined as "creating surface disturbance greater than casual use that includes sampling, drilling, or developing surface or underground workings to evaluate the type, extent, quantity, or quality of mineral values present. Exploration does not include activities where material is extracted for commercial use or sale." 43 C.F.R. § 3809.5

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

Lewis Roca
ROTHGERBER CHRISTIE

109935366.1

required by 43 C.F.R. § 3809.332. Ex. F (stating that "Ioneer has ceased all operations under the [Rhyolite Ridge Exploration Project]"); Ex. G (South Infill termination letter) (stating the same for the South Infill Exploration Project). Because Ioneer terminated the notices at issue in this case, no further exploration activities can occur under those notices.

Plaintiff's Motion asks the Court to enjoin Ioneer from continuing these projects. Specifically, Plaintiff seeks to "[e]njoin any further implementation of the Rhyolite Ridge Exploration Project and the South Infill Exploration Project" and to "[v]acate the Rhyolite Ridge Exploration Project and the South Infill Exploration Project." Compl. at 18. Ioneer has voluntarily provided the relief Plaintiff requests. And because the notices are now terminated, there is no risk that Ioneer could recommence any operations under the notices about which Plaintiff complains. The Court need not read any further to rule on Plaintiff's Motion.  As there is no conduct left to enjoin, the Motion should be denied as moot.

## II.   ALTERNATIVELY, PLAINTIFF IS UNLIKELY TO PREVAIL ON THE MERITS—BLM AND IONEER COMPLIED WITH THE LAW

As addressed above, Plaintiff cannot succeed on the merits, because its claims are moot. Ioneer has terminated the notices and ceased all exploration activities.  Nevertheless, even if exploration activities were to continue (which is not possible now under the Notices), Plaintiff fails to demonstrated a likelihood of success on the merits.

### A.   The Two Exploration Projects Comply with BLM Regulations

The South Infill Exploration Area and the Rhyolite Ridge Exploration Area are separate projects exploring two different mineralized bodies that are geologically and geographically separate. *See, e.g.*, Compl. ¶ 43; *see also*  Ex. _ (map). The nearest surface disturbance between the two exploration areas is approximately 1.5 miles apart. *See* Ex. A at exhibit 3. While there is no BLM regulation or guidance for the distance separation between exploration projects for them to be considered separate, the plain language of 43 C.F.R. § 3809.21(b) places a prohibition on segmenting "*a project area* by filing a series of notices for the purpose of avoiding filing a plan of operations." (Emphasis added). Rhyolite Ridge and South Infill are different project areas.

Lewis Roca
ROTHGERBER CHRISTIE

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

109935366.1

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

Lewis Roca
ROTHGERBER CHRISTIE

1    The State of Nevada mining regulations found in NAC Chapter 519A closely follow the

2  BLM regulations for exploration projects and provide specific distance guidance. NAC 519.035

3  provides that "[a]ll land disturbed and left unreclaimed by an operator within a 1-mile radius of the

4  center of the project must be considered in order to determine whether exploration activities

5  should be considered part of the same exploration project." The South Infill Exploration Area and

6  the Rhyolite Ridge Exploration Area, which are approximately 1.5 miles apart, would be

7  considered separate exploration projects under this standard.

8    Tellingly, Plaintiff's Motion provides nothing to support the argument that it is a violation

9  of law to allow two separate and distinct Notice-level exploration projects to be conducted

10  simultaneously by the same company.

11    In *LKA International, Inc.*, 175 IBLA 225 (2008), the IBLA reviewed whether an operator

12  could conduct exploration activities on claims a half mile from its existing mine under a Notice.

13  The IBLA found that the Notice-level exploration project did not violate 43 C.F.R. § 3809.21(b)'s

14  segmentation prohibition, and that it did not consist of "a series of notices" intended to evade the

15  requirement for a plan of operations. *Id*. at 233-234.

16    The BLM Mining Regulations only prevent operators from filing multiple notices within

17  the <u>same</u> exploration area to evade the plan of operations requirement. Like *LKA International*, the

18  regulations do not prevent owners of mining claims like Ioneer from conducting Notice-level

19  exploration activities in separate and distinct project areas. Plaintiff's argument fails.[5]

20

21

22

23

_____

24  [5]  Plaintiff also argues that Ioneer's groundwater test wells are "[s]ignficant activities [that] are being conducted under
Ioneer's Notices that not qualify as mineral exploration." Mot. 13-14. While Plaintiff did not make this argument in its

25  Complaint, this argument nevertheless fails.  "Exploration" is defined as "creating surface disturbance greater than
casual use that includes sampling, ***drilling***, or developing surface or ***underground workings*** to evaluate the type,

26  extent, quantity, or quality of mineral values present." 43 C.F.R. § 3809.5 (emphasis added). Combined, the two
exploration areas have three groundwater monitoring wells with a casing diameters of four inches. *See* Exs. B, C, D.

27  As stated on the Ioneer's Notices for both exploration areas, "the depth of the water table in the areas of proposed
drilling is unknown," *see* Ex. D at 3, Ex. C at 2, and determining the depth and chemistry of the groundwater is an

28  essential factor in evaluating the extent, quantity and quality of the mineral values present within a mining claim. See
Ex. A ¶ 14. These wells constitute "underground workings" under the regulation.

109935366.1

**B.**     **The BLM Did Not Violate FLPMA**

        *1.*     *Unnecessary or Undue Degradation*

BLM complied with FLPMA's requirement to manage public lands and to "take any action necessary ***to prevent unnecessary or undue degradation of the lands***." *See* Mot. at 17 (emphasis added) (citing 43 U.S.C. § 1732(b)). FLPMA does not define "unnecessary or undue degradation." The Supreme Court has held that when a "statute is silent or ambiguous with respect to the specific issue, the reviewing court must defer to the agency's construction of the statute so long as it is reasonable." *Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 37 (D.D.C.2003) (citing *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843 (1984)). BLM's Mining Regulations (43 C.F.R. § 3809) provide significant guidance. In fact, the Ninth Circuit adopted the BLM's Mining Regulations' definition that "'unnecessary or undue degradation' means any harmful activity that is either not 'reasonably incident' to an approved mining operation or that violates a state or federal law relating to environmental or cultural resource protection." *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 723–24 (9th Cir. 2009) (citing 43 C.F.R. § 3809.5).

In *Mineral Policy Center*, plaintiffs challenged the BLM Mining Regulations implementing FLPMA's mandate "to prevent unnecessary or undue degradation." Plaintiffs contended that the new regulations were too weak to satisfy the FLPMA's statutory mandate. 292 F. Supp. 2d at 32-33. The district court held that the BLM Regulations, including those for Notice-level exploration projects, complied with FLPMA's statutory mandate by exercising case-by-case discretion to protect the environment through the process of: (1) approving or rejecting individual mining plans of operations; (2) regulating in response to the requisite Notices that operators must submit before commencing exploration activities not requiring a plan of operations; (3) requiring financial guarantees for costs for mining activities; and (4) linking performance standards to those set forth in existing laws and regulations. *Id*. at 43 and 52.

The BLM provided to Ioneer Biological Resource Conditions for exploration activities near a Tiehm's buckwheat sub-population. *See* Ex. H. These BRCs include a BLM pre-inspection of areas to be disturbed to confirm that no Tiehm's buckwheat plants would be impacted. *See id.* at

*3993 Howard Hughes Pkwy., Suite 600*
*Las Vegas, NV 89169-5996*

Lewis Roca
ROTHGERBER CHRISTIE

10

2. Thus, the BLM reviewed the South Infill Notice and, pursuant to its authority under 43 C.F.R. § 3809.420-421, provided conditions that Ioneer must meet "to prevent unnecessary or undue degradation." Due to these proactive efforts, Ioneer's exploration activities have caused no known impacts to any Tiehm's buckwheat plants. *See* Ex. A ¶¶ 11, 16, 18.

### 2. The Exploration Projects Comply with the Tonopah Resource Management Plan

The BLM adopted the Tonopah Resource Management Plan ("TRMP") in October 1997 which is applicable to Ioneer's two Notice-level exploration projects. *See generally* ECF No. 10-12; *see also* Compl. ¶ 1. Tiehm's buckwheat was designated as a BLM Sensitive Species in 2017. The TRMP states that "[i]t is BLM policy to carry out the management of Nevada BLM Sensitive Species consistent with multiple-use for conservation of these species and their habitats and ensure that actions authorized or funded do not contribute to the need to list any of these species as threatened or endangered." *See generally* Ex. I.

Ioneer's Notice-level exploration activities have not impacted Tiehm's buckwheat plants. *See, e.g.*, Ex. A ¶ 16 (Rowe Decl.). Plaintiff's exhibit—the May 1995 "Current Knowledge and Conservation Status of Eriogonum tiehmii Reveal (Polygonaceae), Tiehm Buckwheat"—found that Tiehm's buckwheat colonized habitat previously impacted by exploration activities of Ioneer's predecessors. ECF No. 10-9 at 16.

### C. BLM Was Not Required to Conduct NEPA Review of Ioneer's Notice-Level Exploration Projects

The Ninth Circuit concluded that neither BLM's oversight of Notice-level operations nor its regulatory involvement with them, such as enforcing the unnecessary and undue degradation standard, is sufficient to trigger NEPA review. *Sierra Club v. Penfold*, 857 F.2d 1307, 1314 (1998) (9th Cir. 1975). NEPA is triggered only when an agency is considering a "major Federal action" which significantly affects the environment. *See* 42 U.S.C. § 4332(C); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 US 7, 15-16 (2008); *Dep't of Transp.  v. Pub. Citizen*, 541 US 752, 763 (2004). As observed by the district court in *Sierra Club v. Penfold*, and agreed with by the D.C. District Court, the "BLM uses the Notices as the basis for limited enforcement review and to

109935366.1

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

Lewis Roca
ROTHGERBER CHRISTIE

target the distribution of information"; Notices are a mere "ministerial reminder . . . to encourage

miners to comply with their legal responsibilities." *Mineral Policy Ctr.*, 292 F. Supp. 2d at 56

(quoting *Sierra Club v. Penfold*, 17 Envtl. L. Rep. 21,058, 21,058-60 (D. Alaska 1978)). As such,

Notice-level exploration projects are undertaken by private actors without federal funds or

approval, and are consequently, not "major Federal actions" within the bounds of NEPA. *See*

*Mineral Policy Ctr.*, 292 F. Supp. 2d at 56 . BLM's approval of Notice operations without first

conducting NEPA review "as a matter of law . . . does not constitute a major Federal action within

the scope of NEPA." *Penfold*, 857 F.2d at 1214.

   In an apparent attempt to circumvent the well-established law of this Circuit regarding

NEPA and Notice operations, Plaintiff advances a NEPA claim that is entirely derivative of its

FLPMA argument—that the two distinct exploration projects are really a single action. Mot. at 14-

16. This argument is unsupported by the facts as explained above: the two projects are separate

and not a single action. Plaintiff's argument also relies on several mischaracterizations of NEPA's

requirements.

   Plaintiff begins by pointing out that "significance" for NEPA purposes cannot be avoided

by breaking a project down "into small component parts." Mot. at 14-15. But "significance" is a

measure of the intensity of the impacts of an action. 40 C.F.R. § 1508.27(b). For NEPA purposes,

it relates to the depth of the environmental review required—an Environmental Assessment (EA)

for actions that will not have a significant impact, 40 C.F.R. § 1508.9, or an Environmental Impact

Statement (EIS) for actions "significantly affecting the quality of the human environment." *See* 42

U.S.C. § 4332(C); 40 C.F.R. § 1502.3; *Ocean Advocates v. U.S. Army Corps of Engrs*., 402 F.3d

846, 864 (9th Cir. 2005). Separately analyzing individual components of the same action is

prohibited so that projects that should require an EIS receive that level of review.  *See Highway J*

*Citizens Group v. Mineta*, 349 F.3d 938, 962 (7th Cir. 2003). But the choice between preparing an

EA or an EIS only comes into play if there is a "major federal action" to review and the Ninth

Circuit already has determined that BLM's oversight of Notice operations is not a "major federal

action." *Penfold*, 857 F.2d at 1214.

1    Plaintiff likewise cites to other NEPA concepts that determine the scope of environmental

2    review—direct, indirect, and cumulative environmental impacts.  Mot. at 15-16.  These concepts

3    all relate to the information that must be included in an EA or EIS.  *See* 40 C.F.R. §§ 1502.16,

4    1508.8, 15-8.25(c). They do not relate to whether an agency is required to prepare an EA or EIS.

5    Plaintiff also argues that the two exploration projects should be considered "connected,"

6    "cumulative," or "similar" actions, all terms defined by 40 C.F.R. § 1508.25.  The only support

7    Plaintiff offers for this claim is the fact the projects are in the same region and conducted by the

8    same operator, as well as the suggestion—which is incorrect, as demonstrated above—that the

9    activities are "similar." Mot. at 15-16. This is, again, an argument for considering the impacts of

10   the two exploration projects in a single NEPA document, not for requiring NEPA review.

11   The D.C. District Court recently had occasion to consider NEPA segmentation analysis in

12   detail, in connection with challenges to a proposed pipeline. *Standing Rock Sioux Tribe v. U.S.*

13   *Army Corps of Engineers*, 301 F. Supp. 3d 50 (D.D.C. 2018). The court explained: "The initial

14   task in addressing a segmentation claim is identifying the 'overall plan' or 'major federal action'

15   that has allegedly been sub-divided." 301 F. Supp. 3d at 66. Here there is no overriding "major

16   federal action": the two exploration projects are independent of each other.

17   The district court in *Standing Rock Sioux Tribe* focused its analysis on NEPA's definition

18   of "connection action" and the question of whether the separate federal decisions concerning the

19   pipeline had independent utility. *Id*. At 67-71. "Connected actions" are not only closely related to

20   other actions, as Plaintiff suggests, but are identified based on three factors: they (i) automatically

21   trigger other actions which may require environmental impact statements; (ii) cannot or will not

22   proceed unless other actions are taken previously or simultaneously; and (iii) are interdependent

23   parts of a larger action and depend on the larger action for their justification. 40 C.F.R. §

24   1508.25(a)(1). The two exploration projects satisfy none of those three tests and they are not

25   "connected actions" for NEPA purposes.

26   The two exploration projects have independent utility. One project, the South Infill Project,

27   is focused on verifying the type, extent, quantity and quality of the minerals discovered to date.

28   The Rhyolite Ridge Project is geographically and geologically separated from the South Infill

13

109935366.1

1   Project as demonstrated above and its focus is on determining whether the data collected to date

2   which shows no significant mineralization, is correct.

3        Moreover, potential future mining activities are not a connected action as defined by

4   NEPA regulations. Actions are "connected actions" under the "independent utility" test where

5   they are "inextricably intertwined" such that neither would exist but for the other. *Nw. Res. Info.*

6   *Ctr., Inc. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060, 1068 (9th Cir. 1995) (describing

7   "connected actions" as actions that are akin to "links in the same bit of chain," contrasted with

8   those that are "separate segments of chain," and thus not "connected actions" under NEPA

9   regulations (citing *Sylvester v. U.S. Army Corps of Eng'rs*, 884 F.2d 394, 400 (9th Cir. 1989)).

10  Exploration projects are not "inextricably intertwined" with mining projects.  There have been

11  many exploration projects which, for a variety of reasons did not later become mining projects.

12       Nothing about BLM's consideration of Ioneer's Notice-level exploration projects triggers

13  NEPA review.

14  **III.    PLAINTIFF WILL NOT SUFFER IRREPARABLE HARM IF EXPLORATION CONTINUES**

15       "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be

16  granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Lopez v.*

17  *Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972

18  (1997)). The party seeking an injunction has the burden to prove that irreparable harm would

19  result without the issuance of an injunction. *E.g.*, *Winter.*, 555 U.S. at 20 (holding that "[a]

20  plaintiff seeking a preliminary injunction must establish . . . that he is likely to suffer irreparable

21  harm in the absence of preliminary relief"); *Defs. of Wildlife v. United States Army Corps of*

22  *Engineers*, 730 F. App'x 413, 415 (9th Cir. 2018) (holding that the movant "had the burden of

23  proving some irreparable harm that would result specifically from the construction of the proposed

24  project").

25       It is not sufficient to simply show that irreparable harm would result from an alleged

26  environmental injury; that environmental injury must be "sufficiently likely" to occur.[6] *Amoco*

27  *Prod. Co. v. Vill. Of Gambell, AK*, 480 U.S. 531, 545 (1987). Put another way, where the harm,

28

---

[6] Plaintiff concedes this is the proper test to apply.  (*See* Mot. at 19:17–19).

Lewis Roca
ROTHGERBER CHRISTIE

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

however irreparable, is not "sufficiently likely" to occur, no injunction can issue. *See id.* Plaintiff complains that the Tiehm's buckwheat will be harmed by the continuation of the exploration project. Plaintiff sets itself a very difficult burden, as Ioneer's exploration projects have not harmed the plant (see above) and the exploration projects of Ioneer's predecessors have seemingly helped the plant. S*ee* Plaintiff's exhibit at ECF No. 10-9 at 16. Plaintiff has not met its burden of showing otherwise.

### A.   Plaintiff Has Not Met Its Burden of Showing Irreparable Harm

Plaintiff has failed to show that <u>any</u> harm will result to the Tiehm's buckwheat, let alone irreparable harm. Noticeably absent from the Motion is any allegation that even a single Tiehm's buckwheat plant has been damaged during the exploratory activities that have occurred. (*See generally* Motion at 19–22). Plaintiff comes close by commenting that "newly improved roads came within a few meters of individual plants." (*Id.* at 21:3–4). This is not harm. Instead, Plaintiff's arguments range from overbroad and untenable statements suggesting destruction of the entire desert ecosystem to strained and unsubstantiated claims of the *potential* for harm.[7]

As an example of the former, i.e., the "sky is falling" argument, Plaintiff claims that irreparable harm results from <u>any</u> disturbance to the desert, stating that "in a desert ecosystem, . . . once the desert is disturbed, it can never be restored." (*See* Mot. at 19:20–21). If merely disturbing the desert is considered irreparable harm, then *no* mining activities could ever be conducted in the desert. This is absurd. *See Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 321–322 (2014) (refusing to apply certain permitting requirements to motor-vehicle greenhouse-gas emissions because it would lead to absurd results).[8]

Where Plaintiff does address the issue (i.e., harm to the Tiehm's buckwheat), it is unable to demonstrate any actual and credible harm that has occurred or will occur. A movant cannot show irreparable harm "by relying on unsupported and conclusory statements regarding harm [it] *might*

[7] It is important to note that the descriptions of the photographs in the Attachments to the Declaration of Patrick Donnelly are misleading. Several of the descriptions state that they show disturbances "into" certain Tiehm's buckwheat sub-populations, but the locations of these photographs are not within any Tiehm's buckwheat sub-population, nor were they taken within habitat that Tiehm's buckwheat would occupy.  *See* Ex. E ¶ 18.
[8] Similarly, Plaintiff's expert argues that "the ongoing mineral exploration by itself poses an extinction risk if these activities are allowed to continue." (Mot. at 21:15–15 (quoting Fraga Decl. ¶ 16)).  But Plaintiff offers no support for this conclusory statement.

15

109935366.1

Lewis Roca
ROTHGERBER CHRISTIE

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

1  suffer." *Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir.

2  2013). Plaintiff argues that activities such as the creation of roads and widening of existing roads

3  are "disrupting the connectivity within and between populations." (Mot. at 20:19–26 (quoting Dr.

4  Fraga Decl.)). Plaintiff elaborates by stating that these dirt roads harm the plant "by interrupting

5  pollinator services and seed dispersal." (Mot. at 21:5). Though Plaintiff bases this assertion on the

6  statement of its retained expert, it neglects to explain *how* dirt roads would inhibit these

7  processes.[9]

8          In fact, the evidence suggests that the Tiehm's buckwheat has thrived in areas of disturbed

9  desert soil. Ex. E ¶ 17. ("The trenches from exploration activities conducted 80-40 years ago have

10  been colonized by Tiehm's buckwheat."). Plaintiff implicitly concedes this fact. Exhibit 5 to

11  Plaintiff's motion is a comprehensive study on the Tiehm's buckwheat in the area of these

12  exploration projects, which states,

13          All sites except 5 have been impacted by trenches, mine shafts, or mining claim
             markers associated with mineral exploration activities. The trenches and mine
14          shafts do not appear to be recent activities as ***plants of Eriogonum tiehmii have
             colonized some of the bottoms of the trenches as well as the edges of the debris
15          piles***.

16  James D. Morefield, *Current Knowledge and Conservation Status of Eriogonum tiehmii Reveal

17  (Polygonaceae)*, (May 1995), Ex. 5 to Mot. (emphasis added).

18          The lack of a NEPA or FLPMA agency review cannot create a presumption of irreparable

19  harm. (*See* Mot. at 22:5–21). "The failure of an agency to evaluate the environmental impact of a

20  proposed action is, itself, insufficient to establish irreparable harm." *Amoco Prod. Co.*, 480 U.S. at

21  544–45; *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 569 (9th Cir. 2000). Plaintiff cites

22  to *S. Fork Band Council of W. Shoshone v. U.S. Dep't of Interior* for the contrary assertion, but

23  there, it was undisputed that a NEPA evaluation was required to address the "serious effects of

24  processing refractory ore and exhausting scarce water resources," and the NEPA study that <u>was</u>

25  <u>conducted</u> was woefully inadequate. 588 F.3d at 727–28. *Shoshone* does not stand for the

26  proposition that irreparable injury is presumed where a NEPA evaluation is not conducted. In any

27

28  [9] It is currently unknown how Tiehm buckwheat is pollinated or how its seeds are dispersed. Ex. E ¶ 15.  But however these processes occur, it is unlikely they are stymied by a dirt road.  In any event, it is Plaintiff's burden to show otherwise.

16

109935366.1

1   event, the U.S. Supreme Court in *Amoco*, firmly held otherwise. *Amoco Prod. Co.*, 480 U.S. at

2   544–45.

3         Finally, in an apparent "Hail Mary" attempt to establish concrete and probable irreparable

4   harm, Plaintiff claims that one solitary member of its group, who visits BLM lands to "find

5   spiritual renewal, and photograph natural scenery," would not visit this area "if Tiehm's

6   buckwheat became extinct." (Mot. at 21:28–22:1). Yet, Plaintiff supplies NOTHING to indicate

7   that the plant will become extinct.  Ioneer's work with the BLM and the biological experts to

8   implement seed collection and banking, as well as propagation, Ex. E ¶ 10, will prevent extinction.

9   One would think that the quoted individual would be pleased to know that someone is investing in

10  the long term health of this plant so important to their spiritual renewal.

11        Plaintiff misses the point. Plaintiff's argument is based upon the unfounded assumption

12  that Ioneer's exploration activities will cause the extinction of the Tiehm's buckwheat. But, by

13  law, this cannot be assumed. It is Plaintiff's burden to prove that this outcome is "sufficiently

14  likely" to occur without the injunction. Because Plaintiff has utterly failed to meet this burden, its

15  Motion must be denied.

16     **B.      Ioneer Is Protecting the Tiehm's Buckwheat**

17        Ioneer expended substantial resources to protect the Tiehm's buckwheat during its

18  exploration activities. Ioneer has been aware of the Tiehm's buckwheat population located within

19  the area of its mining claims prior to commencing its exploration activities. Ex. A ¶ 17. As part of

20  Ioneer's efforts to apply for and secure mandatory permits for a future mining project, in

21  consultation with the BLM, Ioneer completed a comprehensive characterization of the extent,

22  makeup, and distribution of Tiehm's buckwheat through multi-seasonal baseline studies. *Id.* ¶ 18.

23  These efforts have included extensive field surveys, aerial drone surveys, soil analyses, seed

24  collection and testing, and statistical analysis of collected data to establish baseline conditions for

25  the demographics and densities of the known Tiehm's buckwheat population and a method for

26  monitoring trends over time. *Id.*

27        Subsequently, Ioneer retained the services of two botanical experts, Dr. Roger Rosentreter

28  and Ms. Ann DeBolt, to augment Ioneer's biological team, led by senior Nevada-based botanists,

Lewis Roca
ROTHGERBER CHRISTIE

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

17

Ms. Kris Kuyper and Ms. Michelle Tucker, to develop protection measures to ensure the persistence of the plant in natural conditions. *Id.* ¶ 21. These specialists are well-respected within the botanical sciences and all are members of the Eriogonum Society, a professional association whose members have particular expertise in evaluating, propagating, and protecting various types of buckwheat. *Id.*

Ioneer is funding research by the University of Nevada, Reno on pollination, seedling propagation and transplanting, plant/soil relationships, and the impact of dust on plant photosynthetic rates to better understand the biology of the Tiehm's buckwheat and other rare plants in Nevada. *Id.* ¶ 22. This research will inform those charged with mitigating any impacts caused by development of any future mining project.

Ioneer is developing a protection plan for Tiehm's buckwheat, incorporating the findings from the baseline field studies as well as findings from other endemic buckwheat protection efforts within Nevada. *Id.* ¶ 24. As part of this protection plan, several activities are being completed to support its implementation, including: seed collection and banking; transplant of seedlings propagated at the Nevada Division of Forestry nursery into unoccupied habitat; demographic monitoring to document trends in Tiehm's buckwheat population and to evaluate their stability; and the Development of a Habitat Study Model that allows Ioneer's specialists to search for new plant populations. *Id.* ¶ 25.

As a result of these efforts, not a single Tiehm's buckwheat plant has been impacted by Ioneer's exploration activities. *Id.* ¶ 16. Plaintiff demonstrated nothing to support that these efforts will not continue to be successful throughout the exploration activities.

## IV.   THE BALANCE OF EQUITIES WEIGHS HEAVILY IN FAVOR OF IONEER

District Courts must "give serious consideration to the balance of equities." *Winter*, 555 U.S. 7. "Both the economic and environmental interests are relevant factors, and both carry weight in this analysis." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014). Where a plaintiff establishes a mere *possibility* that some environmental harm will occur, the equitable considerations do not automatically weigh in favor of an injunction:

18

[T]he Supreme Court has **not** established that, as a rule, any potential environmental injury merits an injunction. Indeed, in *Amoco Production Company*, the Supreme Court concluded that economic concerns—the loss of $70 million that an oil company had committed to exploration—outweighed environmental concerns when the claimed injury to subsistence resources from exploration "was not at all probable."

*The Lands Council v. McNair*, 537 F.3d 981, 1004–05 (9th Cir. 2008) (citing *Amoco Prod. Co.*, 480 U.S. at 545). Accordingly, the district court must "balance [] the environmental and economic concerns" to determine if injunctive relief is equitable. *See High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642 (9th Cir. 2004).

### A.   Plaintiff's Interests Would Suffer No Harm if the Exploration Project Continues

Plaintiff's motion is silent on the balance of harms if an injunction is not issued. (*See* Mot. at 22–23). Its only allusion to any potential harm is another unsubstantiated statement suggesting "irreparable environmental harm." (*Id.* at 23:1). As was thoroughly addressed above,[10] Plaintiff has not shown that any harm will result to the Tiehm's buckwheat population from Ioneer's exploration activities, let alone irreparable harm.

Where the disturbance to a threatened species[11] is minimal, an injunction is not warranted. *W. Watersheds Project v. Bureau of Land Mgmt.*, 774 F. Supp. 2d 1089, 1103 (D. Nev.), *aff'd*, 443 F. App'x 278 (9th Cir. 2011). Plaintiff does not and cannot allege that even a single plant has been damaged to date. Plaintiff's concern about the proximity of dirt roads to some of the plants is belied by its own supporting exhibit, which observes that the species is growing in the disturbed soil of previous excavations. *See* James D. Morefield, *Current Knowledge and Conservation Status of Eriogonum tiehmii Reveal (Polygonaceae)*, (May 1995), Ex. 5 to Mot. Plaintiff is unable to point to any tangible harm that it would suffer absent an injunction.[12] In short, neither Plaintiff nor the Tiehm's buckwheat will be harmed if an injunction does not issue.

### B.   Ioneer Has a Right Under the Mining Law to Conduct Exploration Activities

Though Ioneer has completed these projects, the Court should consider the precedential effect of enjoining Notice-level exploration projects.  Ioneer's statutory rights would be infringed

---

[10]  *See* s*upra*, Part. III.

[11]  Tiehm's buckwheat is not listed as a threatened or endangered species under the Endangered Species Act.

[12]  *See* s*upra*, Part. III.

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

Lewis Roca
ROTHGERBER CHRISTIE

109935366.1

if it is enjoined from further exploration activities. Interfering with rights granted by statute is a harm to be considered when balancing the equities. *See Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1152 (9th Cir. 2011). In this case, the Mining Act states that "all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase." 30 U.S.C. § 22. As the Ninth Circuit has observed, "Mining has been accorded a special place in our laws relating to public lands." *United States v. Weiss*, 642 F.2d 296, 299 (9th Cir. 1981). Accordingly, "prospecting, locating, and developing of mineral resources in the national [lands] may not be prohibited nor so unreasonably circumscribed as to amount to a prohibition." *Id.* The Mining Act confers upon locators of resources the right to engage in pre-discovery mining activities. *See* 30 U.S.C. §§ 22–28. If an injunction were to issue prohibiting Ioneer from engaging in these pre-discovery mining activities, the purpose of the statute would be thwarted and Ioneer's rights trampled.

**C.    Issuing an Injunction Will Have a Chilling Effect on Ioneer's Future Business**

In balancing the equities, courts must consider the economic harm suffered by the enjoined party. *League of Wilderness Defs.*, 752 F.3d at 765. Indeed, this pecuniary harm can tip the scales in favor of the non-movant. *Earth Island Inst.  v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (holding that an injunction was not warranted where the economic harm "outweighed any harm to environmental interests"). This is especially true where the movant has not shown that irreparable harm is probable, as the U.S. Supreme Court held:

> Here, however, injury to subsistence resources from exploration was not at all probable. And on the other side of the balance of harms was the fact that the oil company petitioners had committed approximately $70 million to exploration to be conducted during the summer of 1985 which they would have lost without chance of recovery had exploration been enjoined.

*Amoco Prod. Co. v. Vill. Of Gambell, AK*, 480 U.S. 531, 545 (1987).

Perhaps in recognition that Ioneer's harm from an injunction greatly exceeds the harm to Plaintiff's interests absent an injunction, Plaintiff sneaks in an incorrect and inflated standard for balancing the equities. Plaintiff alleges that balancing the equities favors an injunction because "Ioneer would not be irreparably harmed." (Mot. at 23:5). But irreparable harm is what <u>Plaintiff</u>

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

Lewis Roca
ROTHGERBER CHRISTIE

20

1 must show under the irreparable harm factor of the test for injunctive relief. There is <u>no</u>

2 requirement that harm to the non-movant must be irreparable to be considered when balancing the

3 equities. *See, e.g.*, *Nat'l Credit Union Admin. Bd. v. Johnson*, 133 F.3d 1097, 1101 (8th Cir. 1998)

4 (considering "*any harm* that granting the injunction will cause to other parties to the litigation"

5 (emphasis added)).

6      Nevertheless, Ioneer will suffer substantial harm if the injunction is issued. Although *these*

7 exploration projects are complete, the precedent created by an injunction here would chill future

8 exploration projects. Ioneer's business model is predicated upon its ability to conduct Notice-level

9 exploration projects to ascertain the potential to mine resources critical to the manufacture of

10 batteries used in a variety of applications, including energy efficient vehicles. Ex. A ¶¶ 5, 8. But if

11 its explorations projects may be subject to injunctions pending full Environmental Assessments,

12 the financial landscape will be forever changed. The risk of such substantial and unpredictable

13 costs may tip the scales against searching for these critical minerals.

14      And even if Ioneer's mining operations could continue, enjoining even exploratory

15 projects will create instability and uncertainty. *Id.* ¶ 29. This will substantially drive up the costs of

16 future exploration projects on Ioneer's mining claims. *Id.* It will discourage both customers and

17 investors from purchasing resources and investing in Ioneer's future mining project. *Id.* Capital

18 costs alone could become punitively expensive. *Id.*

19      While it is difficult to quantify the precise economic harm Ioneer would suffer if enjoined

20 from further exploration activities, the losses could equate to tens (if not hundreds) of millions of

21 dollars. This very substantial harm far exceeds any harm to Plaintiff's interests absent an

22 injunction. The Motion should be denied.

23 **V.   INJUNCTIVE RELIEF IS NOT IN THE PUBLIC INTEREST**

24      It is in the public's interest to allow these types of exploration activities. Even where

25 environmental harm is alleged, competing public interests may exist such that the dominant public

26 interest disfavors an injunction. *Amoco Prod. Co.*, 480 U.S. at 546 (holding that the public's

27 interest in the "development of energy resources" weighed against the issuance of an injunction

28 where the subsistence resources were threatened). Exploration activities can benefit the public by

locating valuable mineral resources, at no monetary expense to the taxpayer. Exploration may ultimately benefit the environment by gathering information helpful to assessing the environmental impact of excavation:

> Proceeding with the preliminary activities will make more data available for evaluating the risks of environmental harm at the next phase of oil development. As no danger to the environment stems from the lease sale stage, the public interest in favor of developing oil and gas reserves also weighs on the side of lifting the injunction.

*Tribal Vill. Of Akutan v. Hodel*, 859 F.2d 662, 664 (9th Cir. 1988).

Congress expressly declared that adherence to the Mining Act is "in the national interest." 30 U.S.C. § 21a. Specifically, Congress enumerates a number of public benefits of the policy reflected in the Mining Act, including

> (1) the development of economically sound and stable domestic mining, minerals, metal and mineral reclamation industries, [and]
> (2) the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security and environmental needs.

*Id.*

There can be no doubt that the "orderly and economic development" of the minerals contained in these areas will greatly benefit the public. Ioneer is exploring the area for lithium and boron. Ex. A ¶ 5. Lithium is a critical mineral per the US Department of Interior. *Id.* ¶ 7. Its uses extend to electrical vehicles, storage of renewable energy, cellular phones, and many other products that have exploded in popularity in recent years. *Id.*. As a result, the exploration in this area represents a tremendous opportunity to secure a domestic source of this strategic and valuable commodity. *Id.*

Finally, as demonstrated throughout this brief, Plaintiff is unable to show any harm will occur to the Tiehm's buckwheat, especially considering no harm has occurred in the exploration activities to date. Ioneer's proactive steps to protect the species have worked. The public's interest in protecting this species is not threatened.

## CONCLUSION

Ioneer has terminated the Notice-level projects. Accordingly, the Motion should be denied as moot. Alternatively, because all four factors of the preliminary injunction analysis weigh

Lewis Roca
ROTHGERBER CHRISTIE

3993 Howard Hughes Pkwy, Suite 600
Las Vegas, NV 89169-5996

22

109935366.1

1  decidedly against enjoining the continued exploration activities, Plaintiff's Motion should be

2  denied.

3      DATED this 6th day of December, 2019.

4

5                                        LEWIS ROCA ROTHGERBER CHRISTIE LLP

6                                        By _____ /s/ Josh M. Reid _____

7                                           E. Leif Reid
                                            Nevada Bar No. 5750
8                                           Josh M. Reid
                                            Nevada Bar No. 7497
9                                           Joel D. Henriod
                                            Nevada Bar No. 8492
10                                          LEWIS ROCA ROTHGERBER CHRISTIE LLP
                                            3993 Howard Hughes Pkwy, Suite 600
11                                          Las Vegas, Nevada 89169

12                                          Svend A. Brandt-Erichsen
                                            *Admitted Pro Hac Vice*
13                                          NOSSAMAN LLP
                                            719 Second Avenue
14                                          Suite 1200
                                            Seattle, WA 98104
15                                          Telephone: (206) 395-7630

16                                          *Attorneys for Intervenor*
                                            *Ioneer USA Corporation*
17

18                          **CERTIFICATE OF SERVICE**

19      Pursuant to Fed. R. Civ. P. 5, I hereby certify that service of the foregoing ***Opposition to***

20  ***Plaintiff's Motion for a Preliminary Injunction*** was made through the United States District

21  Court's CM/ECF system electronic mail.

22

23      Dated this 6th day of December, 2019.

24

25             ___ /s/ Annette Jaramillo ___
                An Employee of Lewis Roca Rothgerber Christie LLP
26

27

28

                                  23

109935366.1