# EXHIBIT I

# EXHIBIT I



United States Department of the Interior
Bureau of Land Management

Battle Mountain District
Tonopah Field Station, Tonopah, Nevada

October 1997



## APPROVED
Tonopah Resource Management Plan and
Record of Decision



# TONOPAH RESOURCE MANAGEMENT PLAN
## and
# RECORD OF DECISION

Prepared by:
Department of the Interior
Bureau of Land Management
Battle Mountain District

Ann J. Morgan
State Director, Nevada

October 6, 1997

The Tonopah Resource Management Plan and Record of Decision outlines decisions for the management of 6.1 million acres of public lands within the Tonopah Planning Area, in Nye and Esmeralda Counties, south-central Nevada. These lands are administered by the Tonopah Field Station of the Bureau of Land Management's Battle Mountain District.

For further information contact: Tonopah Field Station Manager, Bureau of Land Management, Building 102, Military Circle, P.O. Box 911, Tonopah, Nevada 89049, or telephone (702) 482-7800.

# TABLE OF CONTENTS

SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ALTERNATIVES INCLUDING THE PROPOSED ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

MANAGEMENT CONSIDERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

DECISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      WATERSHED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      VEGETATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      VISUAL RESOURCE MANAGEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      WILDLIFE HABITAT MANAGEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      SPECIAL STATUS SPECIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
      RIPARIAN HABITAT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      FORESTRY AND VEGETATIVE PRODUCTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      LIVESTOCK GRAZING MANAGEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      WILD HORSES AND BURROS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      CULTURAL RESOURCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      LANDS AND RIGHTS-OF-WAY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
      RECREATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
      WILDERNESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
      UTILITY CORRIDORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
      FLUID MINERALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
      LOCATABLE MINERALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
      MINERAL MATERIALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
      NONENERGY LEASABLE MINERALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
      FIRE MANAGEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

STANDARD OPERATING PROCEDURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

PLAN IMPLEMENTATION, MITIGATION AND MONITORING, EVALUATION, MAINTENANCE, AND
AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

CONSISTENCY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

PUBLIC INVOLVEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

PREPARERS AND REVIEWERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

GLOSSARY AND ACRONYMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

APPROVAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

## TABLES

Table 1       Summary of Stream Habitat .................................. 11
Table 2       Allotment Categorization .................................. 14
Table 3       Interim Herd Size or Appropriate Management Level ................. 15
Table 4A      List of Preparers ........................................ 43
Table 4B      List of Reviewers ........................................ 45

## APPENDICES

Appendix 1    General List of Desired Plant Community (DPC) Species ............ A-1
Appendix 2    Key Species by Allotment .................................. A-4
Appendix 3    Off-Highway Vehicle Definitions ............................ A-8
Appendix 4    Proposed Range Improvement Projects ........................ A-9
Appendix 5    Current Forage Allocations - Tonopah East .................... A-12
Appendix 6    Current Forage Allocations - Tonopah West .................... A-14
Appendix 7    Methodology for Adjustment of Livestock and Wild Horse & Burro Use ... A-15
Appendix 8A   Wild Horses and Burros by Allotment - TonopahWest ............. A-21
Appendix 8B   Wild Horses and Burros by Allotment - Tonopah East ............. A-23
Appendix 9    Existing Classifications and Withdrawals ..................... A-24
Appendix 10   Recreation Opportunity Spectrum Class Descriptions .............. A-25
Appendix 11   Cultural Resource Management Guidelines ..................... A-27
Appendix 12   RMP Relationship with Esmeralda County Policy for Public Lands ...... A-29
Appendix 13   RMP Relationship with Nye County Policy for Public Lands ......... A-37
Appendix 14   Legal Descriptions for Land Planning/Management Actions .......... A-46
Appendix 15   USFWS Biological Opinion on Proposed RMP .................... A-60
Appendix 16   Livestock Grazing Guidance, Tonopah Management Framework Plan .... A-75
Appendix 17   Livestock Grazing Guidance, Tonopah Grazing Environmental Impact
              Statement Record of Decision ............................. A-81
Appendix 18   Livestock Grazing Guidance, Esmeralda-Southern Nye Resource
              Management Plan ......................................... A-85
Appendix 19   Allotment Resource Management Objectives ..................... A-90

## MAPS

Map  1        Tonopah Planning Area, Eastern Portion (General Location)
Map  2        Tonopah Planning Area, Western Portion (General Location)
Map  3        Watershed Areas - Tonopah East
Map  4        Watershed Areas - Tonopah West
Map  5        Vegetation Types - Tonopah East
Map  6        Vegetation Types - Tonopah West
Map  7        Visual Resource Management - Tonopah East
Map  8        Visual Resource Management - Tonopah West
Map  9        Wildlife - Tonopah East (Antelope and Elk)
Map 10        Wildlife - Tonopah East (Mule Deer and Bighorn Sheep)
Map 11        Wildlife - Tonopah East (Sage Grouse)
Map 12        Wildlife - Tonopah West (Mule Deer, Sage Grouse, Antelope)
Map 13        Wildlife - Tonopah West (Bighorn Sheep)
Map 14        Riparian Areas - Tonopah East
Map 15        Riparian Areas and Desert Tortoise Habitat - Tonopah West
Map 16        Grazing Allotments - Tonopah East
Map 17        Grazing Allotments - Tonopah West
Map 18        Herd Management Area Boundaries - Tonopah East
Map 19        Herd Management Area Boundaries - Tonopah West

Map 20      Land Tenure and Corridors - Tonopah East
Map 21      Land Tenure and Corridors - Tonopah West
Map 22      Right-of-Way Avoidance Areas - Tonopah East
Map 23      Right-of-Way Avoidance Areas - Tonopah West
Map 24      Withdrawals (Proposed) - Tonopah East
Map 25      Withdrawals (Proposed) - Tonopah West
Map 26      Wilderness Study Areas - Tonopah East
Map 27      Wilderness Study Areas - Tonopah West
Map 28      Recreation Opportunity Spectrum - Tonopah East
Map 29      Recreation Opportunity Spectrum - Tonopah West
Map 30      Off-Highway Vehicle Restrictions - Tonopah East
Map 31      Off-Highway Vehicle Restrictions - Tonopah West
Map 32      Fluid Mineral Potential - Tonopah East
Map 33      Fluid Mineral Potential - Tonopah West
Map 34      Mineral Leasing Restrictions - Tonopah East
Map 35      Mineral Leasing Restrictions - Tonopah West
Map 36      Locatable Mineral Potential - Tonopah East
Map 37      Locatable Mineral Potential - Tonopah West
Map 38      Fire Management Zones - Tonopah East
Map 39      Fire Management Zones - Tonopah West
Map 40      Continuing Classifications and Withdrawals - Tonopah East
Map 41      Continuing Classifications and Withdrawals - Tonopah West

# SUMMARY

The Tonopah Resource Management Plan (RMP) provides a comprehensive framework for managing public lands administered by the Tonopah Field Station, Bureau of Land Management (BLM). The RMP replaces the Tonopah Management Framework Plan (1981) and the Esmeralda-Southern Nye RMP (1986), and will guide management for the next 10-20 years. Preparation of this RMP was guided by BLM planning system regulations issued under the authority of the Federal Land Policy and Management Act of 1976 (FLPMA), and Council on Environmental Quality (CEQ) regulations implementing the National Environmental Policy Act of 1969 (NEPA).

Located in south-central Nevada in Nye and Esmeralda Counties, the Tonopah Planning Area encompasses 6.1 million acres of public land and about 165,000 acres of private land. Significant resources and program emphases include locatable minerals, livestock grazing, wild horses and burros, realty, cultural resources and wildlife.

The Tonopah RMP focuses on resolving six major issues identified early in the planning process through public involvement with other Federal, State, and local agencies. These issues are: *Wild Horses and Burros* (determine what intensity of management should be implemented to ensure a thriving natural ecological balance); *Special Management Areas* (determine if lands should be given special management to protect high resource values); *Off-Highway Use* (determine if lands should be limited or closed); *Management of Released Wilderness Study Areas* (determine what objectives to establish for WSAs released by Congress for nonwilderness); *Utility Corridors* (determine lands for preferred routes for utility corridors to minimize conflicts); and *Locatable and Fluid Minerals* (determine lands for closure to leasing or location of minerals, and lands for special considerations).

In addition to planning issues, BLM planning regulations require RMP decisions regarding Special Recreation Management Areas, livestock grazing, cultural resources, firewood harvesting, riparian habitat, special status species, mineral materials, and nonenergy minerals.

Land-use determinations for the Approved Tonopah Resource Management Plan are summarized below by resource category. Complete descriptions of the environmental impacts associated with this land-use plan are presented in the *Proposed Tonopah Resource Management Plan and Final Environmental Impact Statement*, released in October 1994.

Watershed: Watershed management concerns will be incorporated into activity plans for livestock grazing, wildlife, and wild horse and burro management in 15 watersheds where there is a high potential to reduce erosion.

Vegetation: Manage vegetation for desired plant communities.

Visual Resource Management: Manage for Class I: 0 acres; for Class II: 469,170 acres; for Class III: 218,000 acres; and for Class IV: 5,403,931 acres.

Wildlife Habitat Management: Manage big game habitat for best possible condition within the site potential. Seasonal restrictions on 72,400 acres. No new roads to communication sites, and limit vehicles to existing roads and trails on 324,000 acres. No incompatible uses on 17,480 acres and withdrawal on 1,440 acres of bighorn sheep lambing grounds. Augment pronghorn antelope populations, and develop water. Livestock excluded from 11,444 acres. Reintroduce or augment bighorn sheep into potential habitat.

Special Status Species: Protect, restore, enhance, or expand habitat for threatened, endangered, or Nevada BLM Sensitive Species. No Surface Occupancy on 80 acres, and no incompatible land uses. Limit vehicles to existing roads and trails on 70,600 acres.

Riparian Habitat: Manage for proper functioning condition on 32.8 miles of stream. On 9.4 miles of trout stream, acquire minimum water flows and close to vehicle use a 300-ft-wide strip on each side, but allow vehicle use on existing roads and trails.

Forestry and Vegetative Products: Authorize commercial and noncommercial harvest of 1,000 greenwood cords per year in designated areas. Deadwood harvest on all accessible acreage. Authorize harvest of 100 Joshua trees per year until sustained yield determined; no harvest from areas visible from Highway 95 near Goldfield; commercial harvest only incidental to salvage operations. Noncommercial harvest of 1,000 Christmas trees per year in all areas outside Wilderness Study Areas. Collection of common desert plants and seeds permitted.

Livestock Grazing Management: Livestock excluded from 11,444 acres. Manage 22 Category "I", 3 Category "M", and 9 Category "C" allotments.

Wild Horses and Burros: Manage wild horses and burros in 16 herd management areas. Excess horses and burros as determined by monitoring will be removed to a level from which it may take three years to again reach Appropriate Managment Level. Delete Monitor Herd Management Area. Assure sufficient water and forage exists for wild horses and/or burros in herd management areas.

Cultural Resources: No Surface Occupancy on 90 acres. Withdraw 80 acres and limit vehicles to existing roads and trails. Manage 821 acres for information potential and/or public values and withdraw. Manage 1,185 acres for information potential and/or public values and withdraw 886 acres. Maintain closure of Gravel Bar road. Update Class I survey.

Paleontological Resources: Update existing survey.

Lands and Rights-of-Way: Discretionary disposal of 299,140 acres including 32,154 acres for agricultural entry. Acquire 1,200 acres if feasible. Rights-of-way allowed if compatible with values on 148,845 acres. No new roads for communication sites on 324,000 acres. No communication sites authorized on Lone Mountain.

Recreation: Vehicles unrestricted on 77% of Planning Area. Gravel Bar Road closed. Vehicles limited to existing roads and trails in primitive and semiprimitive nonmotorized and semiprimitive motorized areas. Designate seven Special Recreation Management Areas.

Wilderness: Wilderness Study Areas released by Congress returned to multiple use.

Utility Corridors: 668 lineal miles designated for transportation and utility corridors in the Tonopah Planning Area.

Fluid Minerals: 5,360,477 acres open to fluid mineral leasing; 607,799 acres closed; 50,425 acres No Surface Occupancy; and 72,400 acres seasonal No Surface Occupancy.

Locatable Minerals: 6,020,948 acres open to mineral entry; 35,718 acres withdrawn; and 34,435 acres closed.

Mineral Materials: 5,377,850 acres open to disposal of mineral materials; 50,524 acres closed; and 72,400 acres open with seasonal restrictions.

Nonenergy Leasable Minerals: 5,358,817 acres open to leasing; 659,884 acres closed; and 72,400 acres open with seasonal restrictions.

Fire Management: Zone 1 fires contained to 300 acres 90% of time. Life/property fires kept to 5 acres 87% of time. Habitat resource fires kept minimal. Zone 2 fires allowed within prescription.

# TONOPAH RESOURCE MANAGEMENT PLAN
## and
# RECORD OF DECISION

## INTRODUCTION

The Tonopah Resource Management Plan (RMP) provides a comprehensive framework for managing approximately 6.1 million acres of public lands administered by the Tonopah Field Station of the Bureau of Land Management's (BLM) Battle Mountain District. This RMP replaces the Tonopah Management Framework Plan (1981) and the Esmeralda-Southern Nye, Area A, Resource Management Plan (1986); pertinent decisions from those two documents are brought forward into this RMP. This new plan will guide the management of the public land resources for the next 15-20 years for portions of Nye and Esmeralda Counties of south-central Nevada (see Maps 1 and 2). Significant resources and program emphases in the plan include: wildlife habitat, special status species, riparian areas, forestry and vegetative products, livestock grazing, wild horses and burros, lands and rights-of way, cultural resources, recreation, utility corridors, and locatable and leasable minerals.

The development of this land-use plan began early in 1990 when the public was invited to become involved through participating in several scoping meetings. Over the next two years, a Draft Plan and Environmental Impact Statement was developed. It was published and sent to the public for review in mid-1993. Following BLM review of almost 100 comment letters on the Draft Plan, the Proposed Plan and Final Environmental Impact Statement was developed and sent to the public for review in late 1994. Twenty letters of protest to the Proposed Plan were subsequently filed with the BLM Director. The resolution of these protests involved several meetings with both Nye and Esmeralda County Commissioners over a period of several months in 1996. The final resolution of these protests was completed early in 1997. Copies of the protest letters, and of BLM response letters addressing specific points of protest, are available for public review at the BLM Tonopah Field Station. As a result of these protests, it was necessary to withhold the decisions to designate several Areas of Critical Environmental Concern (ACECs) from this Record of Decision (ROD) (see 43 Code of Federal Regulations 1610.5-1(b)). This topic will be readdressed because several points of protest concerning ACECs were found to be valid. Therefore, an ACEC Plan Amendment to the RMP will be prepared over the next two years. The development of this amendment will include extensive involvement by the public.

This Resource Management Plan has been updated to reflect changes since the Proposed RMP was released in October 1994. Corrections and additions have been made where necessary in the following text. Also included is a glossary that provides definitions of the technical terms and acronyms used.

## ALTERNATIVES INCLUDING THE PROPOSED ACTION

Five management scenarios--the Proposed Action and four alternatives--were analyzed in the Proposed Tonopah RMP/Final EIS, released for public review in October 1994. All five managment scenarios are legally feasible and technically possible. The Proposed Action and its alternatives were developed in response to planning issues identified through public scoping at the beginning of the planning process and are designed to conform to BLM's program guidance and current policy.

### ALTERNATIVE 1:

This is the No-Action Alternative. Under this alternative, land-use management would continue as at present and would be guided by the Tonopah Management Framework Plan (in effect since 1981) and the Esmeralda-Southern Nye Resource Management Plan (in effect since 1986). Management direction for resources and uses not addressed in those plans would be derived by extrapolating from past management actions.

***ALTERNATIVE 2:***

This alternative would provide maximum opportunity for private economic development and economic diversity, and maximum utilization of a wide range of resources. Lands would be made available for expansion and development, while still protecting sensitive resource values.

***ALTERNATIVE 3:***

This alternative would provide for private economic development and economic diversity, but with a greater emphasis on environmental safeguards designed for the preservation and enhancement of environmental systems, and for species diversity. Alternative 3 is the "environmentally preferred" alternative.

***ALTERNATIVE 4:***

This alternative is designed to strike a balance between the need for environmental safeguards and the need to provide opportunity for resource utilization, private economic development, and economic diversity. It would provide wide opportunity for the development of renewable and nonrenewable resources while still ensuring the preservation and enhancement of fragile and unique resources.

***PROPOSED ACTION:***

The proposed action as outlined in the 1994 Proposed Tonopah RMP and detailed below is similar in all major respects to Alternative 4. It provides slightly greater protection for riparian habitat, joshua tree forests, and cultural resources, but also provides greater opportunity for livestock grazing, land disposal, and recreation use.

## MANAGEMENT CONSIDERATIONS

Design of the Proposed Plan was guided by the need to provide for a wide range of land uses on the one hand, and the need for environmental safeguards to protect fragile and unique resources and ensure sustained yield on the other. The "environmentally preferred" alternative (Alternative No. 3 above) thus was *not* selected because it would have unduly limited opportunity for private economic development, economic diversity, and resource usage in the Tonopah Planning Area. Provision is made in the Proposed Plan for the disposal of nearly 300,000 acres of public land, for a wide variety of recreation opportunities, for the continued utilization of public grazing lands, and for the harvest of forestry and vegetation products. Environmental safeguards are designed to provide effective protection of cultural resources, riparian areas, special status species, and fish and wildlife habitat, while at the same time allowing broad opportunity for diverse land uses and resource development.

## DECISIONS

The following decisions, listed as RMP Determinations, are presented by resource categories as outlined in the BLM 1620-1625 Manuals, referred to as Supplemental Program Guidance. These decisions read somewhat differently from those listed in the 1994 Proposed Plan and Final Environmental Impact Statement. However, their overall scope and intent have not been changed. The rewording was brought about as a result of editing the Proposed Plan to make it more readable, as requested by both county commissions. In addition, numerous duplications in the RMP Determinations were deleted and are now cross-referenced instead. Also deleted was all reference to the designation of ACECs, seven of which were addressed in the Proposed Plan. Pending the above-mentioned amendment, these seven areas will be managed to protect their special resource values wherever the BLM has discretionary authority to do so.

Readers and users of this document should be aware that the land management decisions discussed herein conform to the principles of multiple use and sustained yield. In practice this means that the management of some resource values affects the conditions under which other resources can be utilized or developed. For example, mitigation to reduce the visual impacts from mineral production is held to higher standards in a Class II Visual Resource Management (VRM) area than in a Class IV area, and the costs of such mitigation conceivably could affect the economic viability of a mining venture. Similarly, exploration and production activities might be restricted in areas of Special Status Species or in areas of Cultural Resources if impacts to these resources cannot successfully be mitigated.

The following are the "Objective" and "Determinations" for each major resource in the planning area.

## WATERSHED

### *Objective:*

To maintain or improve watershed conditions in the Tonopah Planning Area.

### *RMP Determinations:*

1. Prepare and implement activity plans (Allotment Management Plans for livestock grazing, Habitat Management Plans for wildlife, and Herd Management Area Plans for wild horses and burros, or the functional equivalents of these documents) in watersheds where there is a high potential to reduce erosion. Rehabilitation techniques and improvements such as check dams and seedings will be utilized. These watersheds are: Oasis Valley, Wagon Johnnie, Hot Creek, Sand Springs, Stone Cabin, Morey, Ione, Monitor, Ralston, Lower Railroad Valley, Reveille, San Antone, Hunts Canyon, Big Smoky, and Lower Hot Creek (see Maps 3 and 4).

   Additional watershed determinations are in the following sections: Wildlife Habitat Management, Determination 2. Riparian Habitat, Determinations 1., 2., & 3. Fire Management, Determination 3.

## VEGETATION

### *Objective:*

To provide for vegetative and ecological diversity.

### *RMP Determinations:*

1. Manage the vegetation resource for desired plant communities. A general listing of key plant species associated with desired plant communities is shown in Appendix 1 (these key plant species are identified by basic vegetation type and ecological site of occurrence). Descriptions of specific desired plant communities will be developed by allotment at key areas. This will be done in conjunction with grazing permitees and other publics. Descriptions will be based on information collected at the key area sites, including data on ecological potential. Management of the vegetative resource will provide for the physiological needs (such as critical growth periods, biomass production, root reserve increase, and seed production) of the key forage plant species. Key forage plant species are shown by allotment in Appendix 2.

   Additional vegetation determinations are in the following sections: Wildlife Habitat Management, Determinations 1. a., 2., 3., and 6. Special Status Species, Determinations 2. and 3. Riparian Habitat, all Determinations. Forestry and Vegetation Products, all Determinations. Livestock

Grazing Management, Determinations 1. b., 1. c., and 2.  Wild Horses and Burros, Determination 1. b.  Lands and Rights-of-Way, Determinations 1. d., 6. b., and 6. c.  Recreation, Determination 4.  Recreation (Specific to Special Recreation Management Areas), Determination 2.  Utility Corridors, Determination 1.  Fire Management, Determinations 3. and 4.

## VISUAL RESOURCE MANAGEMENT

### Objective:

To designate visual resource management classes and maintain existing scenic qualities.

### RMP Determinations:

1.  Manage the Tonopah Planning Area for the following Visual Resource Management (VRM) classes (see Maps 7 and 8):

**Class I Areas:**                                                                0 acres

This class provides primarily for natural ecological changes; however, it does not preclude limited management activity.  Any contrast created within the characteristic environment must not attract attention.  It is applied to wilderness areas, some natural areas, wild portions of the wild and scenic rivers, and other similar situations where management activities are to be restricted.

**Class II Areas:***                                                         469,170 acres

Changes in any of the basic elements (form, line, color, texture) caused by a management activity should not be evident in the characteristic landscape.  A contrast may be seen but should not attract attention.  Class II VRM areas total 7.7% of the Tonopah Planning Area.

**Class III Areas:***                                                        218,000 acres

Contrasts to the basic elements (form, line, color, texture) caused by a management activity may be evident and begin to attract attention in the characteristic landscape.  However, the changes should remain subordinate to the existing characteristic landscape.  Class III VRM areas total 3.6% of the Tonopah Planning Area.

**Class IV Areas:***                                                       5,403,931 acres

Contrasts may attract attention and be a dominant feature of the landscape in terms of scale; however, the change should repeat the basic elements (form, line, color, texture) inherent in the characteristic landscape.  Class IV VRM areas total 88.7% of the Tonopah Planning Area.

* Structures in the foreground distance zone (0-½ mile) often create a contrast that exceeds the VRM class, even when designed to harmonize and blend with the characteristic landscape. This may be especially true when a distinctive architectural motif or style is designed. Approval by the Area Manager is required on a case-by-case basis to determine whether the structure(s) meet the acceptable VRM class standards and, if not, whether they add acceptable visual variety to the landscape.

(note:  Acreage figures given above assume that Wilderness Study Areas will be released by Congress and returned to multiple-use status)

2. Manage scenic quality along five identified highways as Visual Resource Management Class III areas (State Route 374 between Beatty and Death Valley National Monument, State Route 267 between Scotty's Junction and Death Valley National Monument, State Route 266 between Lida Junction and the California border, State Route 265 between Blair Junction and Silver Peak, and State Route 264 between U.S. 6 and the California border).

3. Manage the Lunar Crater Area (39,680 acres) and all primitive and semiprimitive nonmotorized areas (except for existing roads) as Visual Resource Management Class II areas (see Maps 26, 28, and 29) (also see Appendix 10 for definitions for primitive, semiprimitive nonmotorized, and semiprimitive motorized).

Additional VRM determinations are in the following sections: Recreation (Specific to Recreation Opportunity Spectrums), Determination 1. Wilderness, Determination 3.

## WILDLIFE HABITAT MANAGEMENT

### Objective:

To maintain and enhance wildlife habitat and provide for species diversity.

### RMP Determinations:

1. Continue the following management decisions from previous land use plans:

a. The Toiyabe Bench will continue to be managed in cooperation with the Nevada Division of Wildlife and the U.S. Forest Service in accordance with the *Toiyabe Bench Deer Winter Range Management Plan.* Livestock grazing would be excluded on 9,127 acres of crucial deer winter range until the objectives in the *Toiyabe Bench Deer Winter Range Management Plan* have been met. (The Toiyabe Bench has been managed in cooperation with Nevada Division of Wildlife and the U.S. Forest Service since 1985).

b. Lockes Meadow, Blue Eagle Pond, Big Well, Chimney Springs, Reynolds Spring and North Spring riparian areas (total 2,317 acres) will be excluded from grazing to achieve riparian objectives in accordance with the *Railroad Valley Wildlife Management Plan.* Livestock grazing may be authorized on a temporary, nonrenewable basis to achieve objectives identified in the *Railroad Valley Habitat Management Plan.*

c. Continue to support the augmentation or reintroduction of bighorn sheep by the Nevada Division of Wildlife into potential or existing habitat areas in the Hot Creek, Goldfield, Amargosa, Magruder/Palmetto, Monte Cristo, Montezuma, Silver Peak, Sawtooth, Bare Mountain, and Gold Mountain areas (see Maps 10 and 13).

(*note:* Nevada Division of Wildlife has conducted bighorn sheep releases on lands administered by the U.S. Forest Service in the Hot Creek Range in 1982 (18 bighorn sheep), 1983 (6 bighorn sheep), 1994 (21 bighorn sheep), and 1995 (21 bighorn sheep). The Stone Cabin, Hot Creek, and Reveille Allotment boundaries cross the Hot Creek Range.)

d. Rocky Mountain elk will continue to be managed in cooperation with the Nevada Division of Wildlife and the Forest Service in accordance with the *Monitor Elk Management Plan.* Elk use levels will be determined through monitoring and evaluation.

2. Prepare, revise, or maintain habitat management plans, or their functional equivalent, to enhance the habitat for game and nongame wildlife species, when appropriate. The identification of specific wildlife objectives will be determined when each habitat plan is developed in consultation with affected publics, i.e., range users, interest groups, and county governments. Priorities are as follows:

a. Maintain the *Railroad Valley Wildlife Management Area Habitat Management Plan.*

b. In conjunction with affected publics, revise the *Silver Peak Habitat Management Plan.*

c. In conjunction with affected publics, prepare habitat management plans for the following areas: Bullfrog Hills, Fish Lake Valley (White Mountains), Gold Mountain/Stonewall, Grant/Quinn Range, Hot Creek/Squaw Hills, Ione Valley/Royston Hills, Kawich/Reveille, Magruder/Sylvania/Palmetto, Monte Cristo/Lone Mountain, Montezuma, Pancake Range/Sand Springs, Railroad Valley (except for Wildlife Management Area), Ralston/Monitor Valleys, San Antone/Big Smoky Valley and Stone Cabin/Little Fish Lake Valley.

3. Manage mule deer habitat for best possible condition within the site potential. On 28,920 acres of mule deer winter range, restrict activities which might be disturbing to mule deer between January 15 and May 15 (see Maps 34 and 35, and Appendix 14).

4. On 26,000 acres of sage grouse habitat, restrict activities which might be disturbing to sage grouse between February 15 and May 15 (see Map 34 and Appendix 14).

5. Maintain or improve existing or potential bighorn sheep habitat areas (324,000 acres) (see Maps 10 and 13). To ensure this occurs, management actions will include 1) prohibiting construction of new roads to communication site facilities; 2) limiting vehicle use to existing roads and trails; 3) prohibiting off-highway vehicle events within one-quarter mile of Specie Spring; 4) restricting, between February 1 and May 15, activities in lambing areas which might be disturbing to bighorn sheep (17,480 acres); and 5) prohibiting land uses that are incompatible with bighorn sheep lambing areas at Stonewall Falls and Little Meadows (see Maps 10 and 13, and Appendix 14).

6. Manage pronghorn antelope habitat for best possible condition within the site potential. In conjunction with Nevada Division of Wildlife and other publics, continue to support the reintro-duction and augmentation of antelope (see Maps 9 and 12). Develop additional water sources.

7. Off-site mitigation may be negotiated during a plan of operations review for locatable mineral actions when an irretrievable loss of critical or crucial habitat is unavoidable, or a significant long-term adverse impact will occur.

(*note:* In the 1994 Proposed RMP, population goals for big game species were derived from "reasonable numbers" established by the BLM and Nevada Division of Wildlife more than ten years ago. The Nevada Division of Wildlife no longer recognizes these numbers as valid and does not currently have population goals, particularly on an allotment basis. Therefore, if monitoring data show that wildlife are overusing the vegetative resources, the Nevada Division of Wildlife will be requested to control the herd sizes at a threshold level which avoids resource damage).

(*note:* In the 1994 Proposed RMP, elk and bighorn sheep habitat were to be managed for good or better condition. The BLM Manual 6630 (NV 6-41, 8/31/82) does not have habitat condition ratings for elk and bighorn sheep, so management of habitat for good or better condition has been eliminated).

(*note:* The Animal Damage Control determination on p. 2-5 of the Proposed RMP has been eliminated because it is not consistent with the 1995 MOU between the BLM and the Department of Agriculture, Animal Plant Health Inspection Service-Animal Damage Control).

Additional Wildlife Habitat determinations are in the following sections: Lands and Rights-of-Way, Determinations 1. b., 1. e., 3., 4., 6. a., 6. b., 6. d., 8., and 10. Recreation (for General Recreation Management), Determinations 2., 3., and 5. Recreation (Specific to Special Recreation Management Areas), Determinations 1. and 2. Utility Corridors, Determination 1. Fluid Minerals, Determinations 3. and 4. Mineral Materials, Determinations 3. and 4. Nonenergy Leasable Minerals, Determinations 2. and 3. Fire Management, Determination 3.

## SPECIAL STATUS SPECIES

### *Objective:*

To protect, restore, enhance, and expand habitat of species identified as threatened, endangered, or Nevada BLM Sensitive Species under the Endangered Species Act.

(The BLM Manual 1622.11A3f, under the heading <u>Threatened or Endangered Species</u>, states: "Determine affirmative conservation measures to improve habitat condition and resolve resource conflicts for listed, proposed, and candidate species. Identify habitat improvement or expansion efforts required to downlist or delist a species").

### *RMP Determinations:*

1. Continue to protect the Railroad Valley springfish and its critical habitat at North Spring and Reynolds Spring (80 acres) through management in accordance with the *Railroad Valley Habitat Management Plan* (see Map 34 and Appendix 14). No land uses will be authorized which are incompatible with the areas' values.

2. Manage desert tortoise Non-Intensive Category III habitat (70,600 acres) to maintain current populations levels (see Map 15). Where new road construction is discretionary, no new roads will be constructed within washes. Livestock grazing will be in accordance with the August 14, 1991 *Biological Opinion for the Proposed Livestock Program Within Desert Tortoise Habitat in Southern Nevada.* Refer to the Livestock Grazing Management determination section for terms and conditions of this Biological Opinion.

3. Habitat for all Federally listed threatened or endangered species or Nevada BLM Sensitive Species (plant and animal) will be managed to maintain or increase current populations of these species. The introduction, reintroduction, or augmentation of Nevada BLM Sensitive Species, as well as Federally listed threatened or endangered species, may be allowed if, in coordination with Nevada Division of Wildlife and the U.S. Fish and Wildlife Service, it is deemed appropriate. Such actions will be considered on a case-by-case basis and will be subject to applicable procedures outlined in the section on Standard Operating Procedures, Environmental Review and Management.

(*note:* The Nevada BLM Sensitive Species List is designated by the BLM State Director in cooperation with the State of Nevada Department of Conservation and Natural Resources. This list consists of species that are not already included as BLM Special Status Species under 1) Federally listed, proposed, or candidate species; or 2) species listed by the State of Nevada because of potential endangerment or extinction.

BLM policy is to provide sensitive species with the same level of protection as is provided for candidate species under BLM Manual 6840.06 D).

Additional Special Status Species determinations are in the following sections:  Livestock Grazing Management, Determination 1. c., 1-7.  Lands and Rights-of-Way, Determinations 6. b. and 10.  Recreation, Determinations 1., 2., and 3.  Utility Corridors, Determination 1. Fluid Minerals, Determination 4.  Mineral Materials, Determination 4.  Nonenergy Leasable Minerals, Determination 2.  Fire Management, Determination 3.

## RIPARIAN HABITAT

### Objective:

To achieve or maintain the presence of adequate vegetation, landform, or large woody debris to dissipate stream energy associated with high water flows for all riparian-wetland areas (proper functioning condition).

### RMP Determinations:

1. Manage for proper functioning condition on all streamside riparian areas, and all springs, seeps, wet meadows and other riparian areas in the Tonopah Planning Area, including the 32.8 miles of streams identified in Table 1 (see Maps 14 and 15).

2. Where streams and riparian areas are functioning but are at risk of deteriorating, manage for an improving trend, as determined using techniques described in current BLM Technical References and/or other BLM guidelines. If needed, and in conjunction with the grazing permittees and other publics, design and implement management practices to achieve an upward trend.  If the desired trend does not occur, the responsible class of animal (where it can be determined) will be reduced or excluded.

3. Where streams and riparian areas are nonfunctional, work with livestock permittees and other publics to modify management.  If the desired trend does not occur, the responsible class of animal (where it can be determined) will be reduced or excluded.

4. Manage the following streams for trout habitat: Barley Creek, Barker Creek, Clear Creek, Corcoran Creek, Jefferson Creek, Moores Creek, Mosquito Creek, Perry Aiken Creek, Pine Creek, Silver Peak Pond Creek, and Troy Creek (9.4 miles) (see Table 1, next page).

Additional Riparian Habitat determinations are in the following sections:  Vegetation, Determination 1.  Wildlife, Determination 1. b.  Lands and Rights-of-Way, Determinations 1. b., 3., 4., 6. b., 7., and 10.  Recreation, Determinations 2. and 3.  Recreation (Specific to Special Recreation Management Areas), Determination 1.  Utility Corridors, Determination 1.  Fluid Minerals, Determination 4.  Mineral Materials, Determination 4.  Nonenergy Leasable Minerals, Determination 2.

**TABLE 1**
**SUMMARY OF STREAM HABITAT IN THE TONOPAH PLANNING AREA**

| STREAM NAME | MILES ON BLM | FISH SPECIES | STREAM NAME | MILES ON BLM | FISH SPECIES |
|---|---|---|---|---|---|
| Amargosa River | 2.0 | Oasis Valley Speckled Dace[1] | Jefferson Creek | 1.0 | Rainbow Trout |
| Barker Creek | 0.5 | Brook and Rainbow Trout | Little Meadow | 1.0 | |
| Barley Creek | 1.0 | Brook, Rainbow, and Brown Trout | Moores Creek | 0.5 | Rainbow, Brook, and Brown Trout |
| Breen Creek | 2.4 | | Mosquito Creek | 0.5 | Rainbow and Brook Trout |
| Clear Creek | 1.0 | Brook and Rainbow Trout* | Ox Springs Wash | 0.3 | |
| Corcoran Creek | 1.0 | Rainbow and Brown Trout* | Perry Aiken Creek | 1.0 | Rainbow and Brown Trout* |
| Cottonwood | 1.0 | | Pine Creek | 0.5 | Rainbow and Brown Trout* |
| Deep Creek | 1.0 | | Rock Creek | 6.2 | |
| Eden Creek | 5.0 | | Silver Peak Pond Creek | 1.4 | Rainbow Trout |
| Hooper Canyon | 1.0 | | South Sixmile | 1.0 | |
| Hunts Canyon | 2.0 | | Troy Canyon | 1.0 | Brook Trout |

[1] Nevada BLM Sensitive Species.     * Indicates unconfirmed occurrence of the species.

## FORESTRY AND VEGETATIVE PRODUCTS

*Objective:*

To provide forest and other vegetation products for consumptive use on a sustained yield basis.

*RMP Determinations:*

1. Authorize the harvest of live trees for firewood, fence posts, and other woodland products in greenwood cutting areas. Limit authorization to 1,000 cords per year. This quantity may be adjusted through monitoring and evaluation. If Kawich and Silver Peak Wilderness Study Areas are released by Congress, greenwood cutting areas may be established within those areas. Establish new greenwood cutting areas at Bellehelen, Montezuma, Hot Creek Mountains, Squaw Hills, and Kawich, and expand cutting areas at Silver Peak, Palmetto and Palmetto Wash (total of 11,850 acres). Newly opened cutting areas may be closed when tree canopy cover is reduced to between 10 and 20 percent. Commercial harvest may be allowed in any of these areas.

2. Pinyon and juniper deadwood may be harvested in all accessible woodland acreage outside wilderness study areas. The removal of dead mahogany, cottonwood or aspen will be prohibited in order to maintain suitable wildlife habitat.

3. The harvest of Joshua trees for landscape uses will not be authorized in the Joshua tree viewing area (100,000 acres) (see Map 31, area 5). Commercial harvest of Joshua trees will be authorized only through salvage operations incidental to surface disturbance. Until a complete inventory is available to determine the sustained yield and a new level of authorization can be calculated, noncommercial authorizations will be limited to 100 trees per year.

4. Authorize cutting of Christmas trees only in areas outside wilderness study areas, and limit harvest to 1,000 trees per year. This quantity may be adjusted through monitoring and evaluation. Authorize only noncommercial harvest.

5. Authorize the collection of common desert plants and seeds. Creosote bush harvest will be authorized only northwest of State Route 267 in Nye County. No sales of live desert plants will remove more than 10 percent of the existing canopy cover. This quantity may be adjusted through monitoring and evaluation.

## LIVESTOCK GRAZING MANAGEMENT

*Objective:*

To create healthy, productive rangelands through implementation of the recommendations of the ongoing rangeland monitoring and evaluation program.

*RMP Determinations:*

1. Continue the following management practices:

   a. The Tonopah MFP and Tonopah Grazing EIS, along with the Esmeralda-Southern Nye RMP/EIS, provide the guidance necessary for the livestock grazing program (see Appendices 16 to 19). The Experimental Stewardship Program and the CRMP Process, however, are not currently the methods used for allotment planning; BLM policy has changed since 1981. The Experimental Stewardship Program was an experimental program to develop Allotment Management Plans (AMPs) coordinated through the CRMP process in order to provide additional involvement in AMP development. These processes have been supplanted by the multiple-use process. All valid guidance from previous documents on grazing management (Appendices 16 to 19) will be incorporated into the multiple-use process, as modified by applicable policy changes.

   b. Manage livestock at initial stocking levels of 134,355 animal unit months for the Tonopah East area and 46,371 animal unit months for the Tonopah West area (see Appendices 5 and 6). Adjustments in use for each allotment will be based on short-term and/or long-term monitoring data methods as outlined in the *Nevada Rangeland Monitoring Handbook* and other BLM technical references. Monitoring will be in consultation with the grazing permittee and other publics. If the desired trend does not occur, the responsible class of animal (where it can be determined) will be reduced or excluded. In allotments where monitoring data do not distinguish individual use between livestock and wild horses and/or burros, the stocking level for livestock will be based on a proportion derived from previous planning documents (see Appendices 16 to 19). Allotment boundaries are shown on Maps 16 and 17.

   c. In accordance with the August 14, 1991 *Biological Opinion for the Proposed Livestock Program Within Desert Tortoise Habitat in Southern Nevada* (see Map 15), the following terms and conditions will be placed in affected Section 15 grazing leases within Non-Intensive Category III desert tortoise habitat (70,600 acres):

      1) Livestock use within desert tortoise habitat may occur from March 1 through October 14; forage utilization shall not exceed 40 percent on key perennial grasses, forbs, and shrubs.

2)  Livestock use in desert tortoise habitat may occur from October 15 through February 28; forage utilization shall not exceed 50 percent on key perennial grasses and 45 percent on key shrubs and perennial forbs.

3)  The key forage species within this habitat include as a minimum: Desert Needlegrass (*Stipa speciosa*), Indian Ricegrass (*Oryzopsis hymenoides*), White Burrobrush (*Hymenoclea salsola*) and Winterfat (*Eurotia lanata*).

4)  Should utilization exceed 40 percent on key perennial grasses, forbs, and shrubs during the period of March 1 through October 14; or 50 percent on key perennial grasses and 45 percent on key shrubs and perennial forbs during the period of October 15 through February 28, the lessee shall have ten (10) calendar days in which to remove all livestock from desert tortoise habitat.  Utilization within each allotment shall not be averaged either among locations or over time.

5)  All vehicle use in desert tortoise habitat associated with the livestock grazing program shall be restricted to existing roads and trails.

6)  Trash and garbage associated with livestock grazing operations, i.e., branding, roundups, etc., shall be removed from each camp site or work location and disposed of off-site in a designated facility.  No trash or garbage shall be buried at work locations within desert tortoise habitat.

7)  Use of hay or grains as a feeding supplement shall be prohibited in desert tortoise habitat to avoid the introduction of nonnative plant species.  Mineral and salt blocks may be authorized in accordance with Title 43, Code of Federal Regulations 4100.

d.  Continue with the "closed to livestock grazing" status of public lands at Columbus Salt Marsh and Emigrant Peak areas (see Map 17).

e.  Develop the proposed range improvement projects, as outlined in the *Tonopah Grazing Environmental Impact Statement* and *Esmeralda-Southern Nye Resource Management Plan*, that have not been completed (see Appendix 4).

2. Manage 22 allotments as ``I'' category (Improve the current resource condition), three allotments as ``M'' category (Maintain the current resource condition), and nine allotments as ``C'' category (Custodially manage the existing resource condition) (see Table 2, next page) (Also, see the Glossary for further definitions of these categories).

Additional livestock determinations are in the following sections: Vegetation, Determination 1. Wildlife Habitat Management, Determinations 1., 3., 4., 5., and 6. Riparian Habitat, Determinations 1., 2., and 3. Cultural Resources, Determinations 2. a. 1) and 2. c. 1).

**TABLE 2**
**ALLOTMENT CATEGORIZATION[1]**

| ALLOTMENT | MGT CATEGORY | ALLOTMENT | MGT CATEGORY | ALLOTMENT | MGT CATEGORY |
|---|---|---|---|---|---|
| Blue Eagle | C | Monitor | I | Silver King | C |
| Butterfield | C | Monte Cristo | I | Silver Peak | M |
| Currant Ranch | C | Montezuma | I | Smoky | I |
| Crater Black Rock | I | Morey | I | Springdale #2 | C |
| Fish Lake Valley | C | Nyala | I | Stone Cabin | I |
| Forest Moon | C | Ralston | I | Wagon Johnnie | I |
| Francisco | I | Razorback | I | White Sage | M |
| Hot Creek | I | Red Springs | I | White Wolf | I |
| Hunts Canyon | I | Reveille | I | Willow Creek | I |
| Ice House | M | San Antone | I | Yellow Hills | C |
| Ione | I | Sand Springs | I | | |
| Magruder Mtns | I | Sheep Mtn | C | | |

[1]  —For additional information on the criteria used to rate each allotment and the results of each rating, see the supporting records in the Tonopah Field Station.

## WILD HORSES AND BURROS

### Objective:

To manage wild horse and/or burro populations within Herd Management Areas at levels which will preserve and maintain a thriving natural ecological balance consistent with other multiple-use objectives.

### RMP Determinations:

1. Continue the following management determinations:

    a.  Manage wild horses and/or burros in 16 herd management areas (HMAs) listed in Table 3 below (see Maps 18 and 19, and Appendices 8A and 8B).

    b.  Manage wild horses and/or burros at appropriate management level (AML) or interim herd size (IHS) for each herd management area as outlined in Table 3 (next page). (These numbers may have been adjusted through court decisions or multiple-use decisions since the October 1994 Proposed RMP.)  Appendices 8A and 8B (as modified by Table 3) show interim herd sizes and appropriate management levels by grazing allotment.  Future herd size or appropriate management levels within each herd management area will be adjusted as determined through short-term and long-term monitoring data methods as outlined in the Nevada Rangeland Monitoring Handbook and BLM technical references (see also Appendix 7).

    c.  Discontinue use of the Monitor Herd Management Area.  In the 1974 census the horses identified as wild horses were actually privately owned.

    d.  Assure sufficient water and forage exist for wild horses and/or burros in herd management areas.

2. When the appropriate management level (or in some cases the interim herd size) is exceeded, remove excess wild horses and/or burros to a point which may allow up to three years of population increase before again reaching the appropriate management level or interim herd size listed in Table 3.

3. Apply for appropriative water rights and/or assert public water reserves on water sources as necessary to ensure a reliable, year-round water source for wild horses and burros in herd management areas.

## TABLE 3

### INTERIM HERD SIZE OR APPROPRIATE MANAGEMENT LEVEL

| Herd Management Area | Interim Herd Size[1] | Appropriate Management Levels[2] | Total HMA Population Size (IHS + AML)[3] |
|---|---|---|---|
| Bullfrog | 12 horses, 142 burros | 53 burros | 12 horses, 195 burros |
| Dunlap | 69 horses | - | 69 horses |
| Fish Lake Valley | 8 horses | 57 horses & burros | 65 horses & burros |
| Gold Mountain | - | 50 horses | 50 horses |
| Goldfield | 227 horses, 71 burros | - | 227 horses, 71 burros |
| Hot Creek | - | 41 horses | 41 horses |
| Little Fish Lake | - | 39 horses | 39 horses |
| Montezuma | 140 horses | 13 horses | 153 horses |
| Palmetto | - | 76 horses | 76 horses |
| Paymaster/Lone Mountain | 48 horses | - | 48 horses |
| Reveille | - | 145-165 horses[4] | 145-165 horses |
| Sand Springs | - | 49 horses | 49 horses |
| Saulsbury | - | 40 horses | 40 horses |
| Silver Peak | 230 horses | 82 horses | 312 horses |
| Stone Cabin | - | 364 horses | 364 horses |
| Stonewall | 13 horses, 34 burros | - | 13 horses, 34 burros |
| total | | | 1,723 horses 300 burros |

[1] Interim herd size is derived from previous planning documents and is the appropriate management level until modified or adjusted by monitoring and evaluation.

[2] The appropriate management level is the maximum number of wild horses and/or burros to be managed in a herd management area and has been or will be set through monitoring and evaluation or by court order.

[3] This number is a combination of Interim Herd Size (IHS--where no multiple-use decision [MUD] has been completed) and the Appropriate Management Level (AML--as determined by a MUD). Where a Herd Management Area (HMA) encompasses two or more allotments, there may be an AML for the allotment(s) in which MUDs have been completed and an IHS number for those in which MUDs have not yet been prepared.

[4] High and low management levels as directed by 1987 Court Decision (Civil R-85-535 BRT) Fallini vs. Hodel.

The Montezuma Grazing Allotment Multiple Use Decision (MUD) of February 11, 1994, is currently under appeal. If Affirmed, 5 HMAs in the above section will change to:

| | | | |
|---|---|---|---|
| Bullfrog | 2 burros | 12 horses, 183 burros | 12 horses, 185 burros |
| Goldfield | - | 125 horses, 50 burros | 125 horses, 50 burros |
| Montezuma Peak | 2 horses | 155 horses | 157 horses |
| Paymaster/Lone Mtn. | 45 horses | 5 horses | 50 horses |
| Stonewall | - | 50 horses, 25 burros | 50 horses, 25 burros |
| Adjusted total of all HMAs | | | 1,664 horses, 260 burros |

**CULTURAL RESOURCES**

*Objective:*

To protect archaeological, historical, paleontological, and sociocultural resources and manage for information potential (useful scientific, historic, or management information), public values (sociocultural, educational, or recreational values), and conservation (overriding scientific or historic importance) in conjunction with other multiple uses (see Appendix 11 for further explanation of these management guidelines).

*RMP Determinations:*

1. Continue the present management practices:

   a.  Manage the Trap Springs-Gravel Bar Complex for information potential by maintaining the existing road closures until the information potential of this complex can be recovered through a comprehensive research and data recovery program.

   b.  The Berlin Town Site (704 acres) will be managed for public values and conservation and its recreation values will be managed in conjunction with the State Park.

   c.  Paleontological resources will be managed to protect specimens and maintain or enhance the following areas for their scientific and educational values: 1) fossiliferous sedimentary rocks and Quaternary alluvium, 2) Ione Valley, 3) Tonopah Flat, and 4) Gabbs Valley.

2. Classify and manage the following cultural resources for their information potential, public values, and conservation.

   a.  Manage for Information Potential.

       Rockshelters; Late Pleistocene/Western Pluvial Lakes Tradition Sites; sites on valley bottoms lacking Pleistocene lake features; historic sites lacking clear association with either established mining districts, locally important ranching operations or major transportation routes; and sites on upper and lower bajada slopes.

       Specific management determinations are as follows:

       1)  Manage the Stormy-Abel Site Complex (12,320 acres) by prohibiting new range improvements or other actions that would increase grazing in the vicinity of Storm, Coyote, and Abel Springs.

       2)  Manage the Trap Springs-Gravel Bar Complex (8,480 acres) to maximize data recovery and salvage of cultural resources, while allowing for oil and gas production. This will be done by developing and implementing a comprehensive data recovery program and prohibiting gravel sales on The Gravel Bar (679 acres).

   b.  Manage for Public Values:

       Rockshelters; Late Pleistocene/Western Pluvial Lakes Tradition Sites; sites on valley bottoms lacking Pleistocene lake features; historic sites lacking clear association with either established mining districts, locally important ranching operations or major transportation routes; and sites on upper and lower bajada slopes.

Specific management determinations are as follows:

1)  Fluid mineral leasing will be allowed with a no-surface occupancy stipulation at Jumbled Rock Petroglyphs (10 acres), Moores Station Petroglyphs (40 acres), and Mountain View Arrastra (40 acres) (see Map 33; also see Appendix 14 for legal descriptions).

2)  Withdraw from mineral entry Moores Station Petroglyphs (40 acres), Mountain View Arrastra (40 acres), and Tybo-McIntyre Charcoal Kilns (80 acres) (see Map 24; also see Appendix 14 for legal descriptions).

3)  No land uses will be authorized which are incompatible with cultural values and limit vehicle use to existing roads and trails at Moores Station Petroglyphs (40 acres) and Mountain View Arrastra (40 acres).

4)  Manage the Rhyolite area (425 acres) to protect historic structures for public uses. Land disposal will not be allowed. No land uses will be authorized which are incompatible with the area's values. Limit vehicle use to existing roads and trails. Provide for signing and barricades to exclude people from unsafe structures. Establish a Special Recreation Managment Area. Allow mineral leasing with a no-surface-occupancy stipulation. Withdraw 126 acres from mineral entry (see Appendix 14 for legal descriptions).

5)  Protect historic structures of the Tybo-McIntyre Charcoal Kilns (80 acres; 20 acres around each set of kilns). Manage historical values for conservation and public values. No land uses will be authorized which are incompatible with the area's special values. Improve access roads and trails. Develop visitor use facilities and establish a Special Recreation Management Area. Allow mineral leasing with a no-surface-occupancy stipulation. Wtihdraw the area from mineral entry. (See Appendix 14 for legal descriptions).

c.  Manage for Conservation:

Rock shelters with datable deposits (sites that contain material that can be assigned to a specific time period); stratified sites (sites that contain layers of materials that can be dated from different time periods); late Pleistocene/western pluvial lakes tradition sites; historic sites associated with established mining districts, locally important ranching operations or major transportation routes; and sites containing paleoenvironmental data.

Specific management determinations are as follows:

1)  Cane Man Hill Area (680 acres) will be managed to protect its prehistoric values (see Map 27). No land uses will be authorized that are incompatible with the area's values. Manage cultural resources for conservation (see Appendix 14).

3.  Prepare a Class I overview of cultural resources for the entire Tonopah Planning Area.

4.  Develop cultural resource activity plans for the following areas: Trap Springs-Gravel Bar Complex, Stormy-Abel Complex, Cane Man Hill Petroglyphs, Tybo-McIntyre Charcoal Kilns, Moores Station Petroglyphs, Jumbled Rock Petroglyphs, Tonopah Lake Complex, Mud Lake Complex, Big Springs Petroglyphs, Fish Lake Valley Petroglyphs, Mountain View Arrastra, Columbus Salt Marsh, Witched Well, Oriental Wash Petroglyphs, Cave Spring, and The Cistern.

5.  Develop a rock-art management plan for the Tonopah Planning Area in consultation with Native American Leaders.

## LANDS AND RIGHTS-OF-WAY

*Objective:*

To make lands available for community expansion and private economic development and to increase the potential for economic diversity.

*RMP Determinations:*

1. Continue the following management determinations:

   a.  Make 43,760 acres of public land available for lease or disposal under the Desert Land Act, the Carey Act, and other applicable authorities (see Appendix 14 and Maps 20, 21, 40, and 41).

   b.  If economically prudent and if the owner is agreeable, acquire the following private lands: Pritchards Station (160 acres) for historic stagecoach station values, Moores Station (160 acres) for historic stagecoach station and riparian and wildlife values, and Lockes Ranch (480 acres) (see Appendix 14 and Map 20).

   c.  Continue the classification of 10,863 acres, as appropriate, for lease or disposal under the following authorities: FLPMA; Recreation and Public Purposes Act; Desert Land Act; Carey Act; Airport Leases, and other applicable authorities (see Appendices 9 and 14, and Maps 20, 21, 40, and 41).

   d.  If Congress does not designate the Pinyon/Joshua Tree Transition Research Natural Area as wilderness, revoke the Natural Area designation. The Research Natural Area designation has been evaluated as inappropriate because no pinyon trees are known to occur within the designated area.

   e.  Continue the existing withdrawal of 6,682 acres: Air Force (619 acres), BLM-Power Site Reserve (17 acres), portions of the Railroad Valley Area (3,040 acres), Department of Energy (2,571 acres), Federal Aviation Administration (418 acres), Forest Service Administration (12 acres), and the BLM Administrative Site (5 acres) (see Appendix 9).

2. Make an additional 255,380 acres of public land available for potential disposal (see Appendix 14, and Maps 20, 21, 40, and 41).

3. Retain for the purposes of multiple-use resource management those public lands previously identified for disposal within the Amargosa-Oasis Area, riparian areas along Perry Aiken Creek and Jefferson Creek, and deer winter range near Chiatovich Creek (total 6,280 acres) (see Appendix 14, and Maps 20 and 21).

4. If economically prudent and if the owner is agreeable, acquire the following private lands through exchange and/or purchase: Amargosa-Oasis Area (280 acres) and Rhyolite Area (120 acres) (see Appendix 14 and Maps 20 and 21).

5. If the original entrant or the entrant's assignee fails to "prove up" under the agricultural land laws, lands clasified for agricultural entry will be disposed of only under the sale and exchange authorities.

6. In rights-of-way avoidance areas, rights-of-way and other discretionary lands actions will be granted only if no feasible alternative routes are available (see Maps 22 and 23). All other lands within the Tonopah Planning Area in which there are no unresolvable conflicts with other resource values will be open to consideration for linear or areal rights-of-way, leases, and land-use permits. Any such grants, leases, or permits will include appropriate stipulations to protect the area's special values. The following rights-of-way restrictions will be established:

   a. Seasonal Restrictions on construction activities (72,400 acres) (see Wildlife Determinations 3., 4., and 5.).

   b. New or amended rights-of-way within the following areas will have to be compatible with the special values of the area: desert tortoise habitat (70,600 acres); bighorn sheep lambing grounds (17,480 acres); Moores Station Petroglyphs (40 acres); Mountain View Arrastra (40 acres); Clayton Valley Sand Dunes Special Recreation Management Area (2,500 acres); Crescent Sand Dunes Special Recreation Management Area (3,000 acres); Lunar Crater (39,680 acres); Amargosa-Oasis (490 acres); Cane Man Hill (680 acres); Lone Mountain (14,400 acres); Railroad Valley (14,720 acres); Rhyolite (425 acres); and Tybo-McIntyre Charcoal Kilns (80 acres), for a total of 148,845 acres. (Some areas overlap, affecting total.)

   c. Communication sites will not be authorized within the Lone Mountain Area (14,400 acres).

   d. On 324,000 acres of bighorn sheep habitat, construction of new roads to communications sites will be prohibited (see Maps 10 and 13, and Appendix 14).

7. Terminate all classifications under the Small Tract Act and Classification and Multiple Use Act (1,992 acres) (see Appendix 9). Termination of Small Tract Classification 148 in T. 12 S., R. 46 E., sec. 16 (Rhyolite bottle house) will be deferred until completion of the Plan amendment addressing ACECs, and will be done only when the land is closed to [withdrawn from] operation of the public land laws, including the mining laws.

8. Reduce the withdrawal to locatable minerals of the Railroad Valley Wildlife Management Area from 14,720 acres to 3,040 acres, if appropriate, pending the outcome of the ACEC amendment to this RMP (see Appendix 14).

9. If Congress does not designate the Pinyon/Joshua Tree Transition Research Natural Area (520 acres) as wilderness, terminate the withdrawal.

10. Withdraw an additional 28,996 acres from mineral entry as follows: bighorn sheep lambing grounds at Stonewall Falls and Little Meadows (1,440 acres); occupancy trespass resolution at Gold Point Townsite (60 acres); portions of Lunar Crater (25,600 acres); Amargosa-Oasis (490 acres); Cane Man Hill (680 acres); portions of the Rhyolite Area (126 acres); Tybo-McIntyre Charcoal Kilns (80 acres); portions of the Railroad Valley Area (440 acres); Mountain View Arrastra (40 acres); and Moores Station Petroglyphs (40 acres) (See Appendix 14 and Maps 24 and 25).

11. Allowance of agricultural entry on any of the lands identified for disposal will segregate the entered lands from mineral entry.

19

**RECREATION**

***Objective:*** ***(for General Recreation Management)***

To encourage safe, public access and recreational use of public lands while ensuring protection of important resource values.

***RMP Determinations:***

1. In order to protect sensitive resource values such as threatened and endangered species and cultural resources, designate 1,250,290 acres as limited to vehicle use (restrictions limiting use to existing roads, trails, and washes; seasonally; or by type of user) and keep 4,840,811 acres open to unrestricted vehicle use. (see Maps 30 and 31 for Off-Highway Vehicles Restrictions; also see Appendix 3 for definitions of Off-Highway Vehicle restrictions and terms).

2. Limit vehicles to existing roads and trails in the following areas to protect sensitive resource values such as threatened and endangered species and cultural resources: Lunar Crater (39,680 acres); Amargosa-Oasis (490 acres); Cane Man Hill (680 acres); Lone Mountain (14,400 acres); Railroad Valley (14,720 acres); Rhyolite (425 acres); Tybo-McIntyre (80 acres); desert tortoise habitat (70,600 acres); bighorn sheep habitat (324,000 acres); Stormy-Abel Prehistoric District until the cultural resource information potential is recovered (12,320 acres); Trap Springs-Gravel Bar Complex until the cultural resource information potential is recovered (8,840 acres); the Sump (1,600 acres); Moores Station Petroglyphs (40 acres); Mountain View Arrastra (40 acres); primitive, semiprimitive nonmotorized and semiprimitive motorized areas (895,215 acres); and areas adjacent to trout habitat (300-foot-wide strip on each side of 9.4 miles of stream - see Riparian Habitat, Determination 5.). Note: Some of the above areas overlap, affecting the overall total.)

3. The following areas will be closed to competitive recreational events to protect sensitive resource values such as threatened and endangered species and cultural resources: Specie Spring (160 acres); Mud Spring (160 acres); Moores Station Petroglyphs (40 acres); Mountain View Arrastra (40 acres); Lunar Crater (39,680 acres); Amargosa-Oasis (490 acres); Cane Man Hill (680 acres); Lone Mountain (14,400 acres); Railroad Valley Area (14,720 acres); Rhyolite (425 acres); Tybo-McIntyre (80 acres); The Sump (1,600 acres); Clayton Valley Sand Dunes (2,500 acres); Crescent Sand Dunes (3,000 acres); and primitive, semiprimitive nonmotorized, and semiprimitive motorized areas until released by Congress from further wilderness consideration (see Wilderness Determinations).

4. Competitive events will be limited to existing roads and trails in the Joshua tree viewing area (see Map 31, area 5).

5. Competitive events are seasonally restricted on 72,400 acres of wildlife habitat (see Wildlife Determinations; also see Appendix 14, VI. No Surface Occupancy Seasonal Restrictions, and Maps 34 and 35).

Additional recreation determinations are in the following sections: Wildlife Habitat Management, Determinations 2., 3., 4., and 5. Cultural Resources, Determination 1.

***Objective:*** ***(Specific to Special Recreation Management Areas)***

To manage as Special Recreation Management Areas (SRMAs) those areas where the presence of high-quality natural resources, and current or potential recreational use, warrant intensive recreation management.

**RMP Determinations:**

1. The following areas will be designated as SRMAs:  Clayton Valley Sand Dunes (2,500 acres); Crescent Sand Dunes (3,000 acres); Lunar Crater (39,680 acres); Railroad Valley Wildlife Area (14,720 acres); Rhyolite (425 acres); Tybo-McIntyre (80 acres); and any acquired lands which have high recreational values and require intensive management of their uses (see Appendix 14).

2. Vehicle use within SRMAs will be limited to existing roads and trails.  Off-highway vehicle use on unvegetated sand areas may be allowed provided that such vehicle use is compatible with the areas' values. Fluid mineral leasing will be allowed subject to a no-surface-occupancy stipulation.

**Objective:     (Specific to Extensive Recreation Management)**

To provide dispersed recreation opportunities on all lands which are not designated as Special Recreation Management Areas.

**RMP Determination:**

1. Designate the Tonopah Extensive Recreation Management Area to include the 6,026,570 acres not within a Special Recreation Management Area.  Develop minimal facilities necessary to meet the needs of dispersed recreational uses and to protect the environment.  Approximately 60 acres will be used in construction of facilities; specific locations are not yet identified.

**Objective:     (Specific to Back Country Byways)**

To establish Back Country Byways to facilitate visitation to less-frequented public lands, and to showcase areas of scenic, wildlife, natural, cultural, and recreational interests.

**RMP Determination:**

1. In conjunction with local government and other publics, designate the Emigrant Pass, Lunar Crater Volcanic Field, and Morey-Hot Creek Back Country Byways.

**Objective:     (Specific to Recreation Opportunity Spectrums)**

To provide a full range of recreational settings, from rural to wilderness, for the pursuit of a wide variety of recreational opportunities.

**RMP Determination:**

1. Manage 465,725 acres for semiprimitive motorized values.  Manage 90,370 acres for primitive and 339,120 acres for semiprimitive nonmotorized recreation opportunity settings. Primitive and semi-primitive nonmotorized lands will be managed for Class II Visual Resource Management (see Maps 28, 29 and Appendix 10).

## WILDERNESS

### Objective:

To manage all lands released from wilderness consideration by Congress as a part of the full spectrum of multiple uses within the Tonopah Planning Area.

### RMP Determinations:

If released by Congress from further wilderness consideration, Wilderness Study Areas will be:

1. Managed as proposed in other resource programs (see Maps 26 and 27).

2. Managed for 90,370 acres of primitive values, 245,780 acres of semiprimitive nonmotorized values, and 268,385 acres of semiprimitive motorized values.

3. Managed as Visual Resource Management Class II areas to comply with BLM policy. No competitive events will be authorized.

## UTILITY CORRIDORS

### Objective:

To facilitate the placement of major transportation and utility systems passing through the Tonopah Planning Area and to minimize conflicts with other resource values.

### RMP Determination:

1. Designate transportation and utility corridors on 668 lineal miles (this includes those previously designated in the Esmeralda-Southern Nye Resource Management Plan, Area A) (see Maps 20 and 21). The following areas will be avoided: all primitive areas (see Maps 28 and 29); Clayton Valley Sand Dunes (2,500 acres); Crescent Sand Dunes (3,000 acres); Amargosa-Oasis (480 acres); Cane Man Hill (680 acres); Rhyolite (425 acres); Tybo-McIntyre Charcoal Kilns (80 acres); Lunar Crater (39,680 acres); Lone Mountain (14,400 acres); and Railroad Valley riparian and wildlife habitat areas (except a portion west of the Grant Range). Refer to Appendix 14 for a legal description of these areas (except the primitive areas).

## FLUID MINERALS

### Objective:

To provide opportunity for exploration and development of fluid minerals such as oil, gas, and geothermal resources, using appropriate stipulations to allow for the preservation and enhancement of fragile and unique resources.

### RMP Determinations:

1. A total of 5,360,477 acres (88% of the Tonopah Planning Area) will be open to fluid mineral leasing subject to standard lease terms and conditions.

2. A total of 607,799 acres will be closed to fluid mineral leasing (Berlin Town Site, 704 acres; Project Faultless, 2,560 acres; and Wilderness Study Areas (WSAs), 604,535 acres (see Map 34 and Appendix 14; for WSAs see also Wilderness Determinations and Maps 26 and 27).

3. A total of 72,400 acres will be open to fluid mineral leasing subject to seasonal restrictions because of crucial wildlife habitat (see Wildlife Determinations 3., 4., and 5.) (see Maps 34 and 35 and Appendix 14). (Some areas overlap, affecting acreage totals.)

4. A total of 50,425 acres will be open to fluid mineral leasing subject to no-surface-occupancy for the following areas: Amargosa-Oasis (490 acres); a portion of the Railroad Valley Area (3,480 acres); Cane Man Hill (680 acres); Rhyolite (425 acres); Tybo-McIntyre Charcoal Kilns (80 acres); Lunar Crater (39,680 acres); Mountain View Arrastra (40 acres); Moores Station Petroglyphs (40 acres); Jumbled Rock Petroglyphs (10 acres); Clayton Valley Sand Dunes (2,500 acres); and Crescent Sand Dunes (3,000 acres) (see Appendix 14).

(*note*: The determinations made for mineral leasing include geophysical exploration. Waivers to these determinations will be considered if the identified resource values can be protected.)

## LOCATABLE MINERALS

### *Objective:*

To provide opportunity for exploration and development of locatable minerals such as gold, silver, copper, lead, zinc, molybdenum, etc., consistent with the preservation of fragile and unique resources in areas identified as open to the operation of the mining laws.

### *RMP Determination:*

1. A total of 6,028,948 acres (99% of the Tonopah Planning Area) will be open to the operation of the mining laws (see Maps 24 and 25).

Additional Locatable Minerals determinations are in the section on Lands and Rights-of-Way, Determinations 1.e., 8., 9., 10., and 11.

## MINERAL MATERIALS

### *Objective:*

Provide for the extraction of mineral materials such as sand, gravel, building stone, cinders, etc., to meet public demand.

### *RMP Determinations:*

1. A total of 5,377,858 acres (88% of the Tonopah Planning Area) will be open to mineral material disposal under standard terms and conditions. Continue to provide mineral materials from existing authorized sources unless closed to meet specific management objectives of other resources. Open new sand and gravel pits as necessary.

2. Black Rock Lava Flow and Easy Chair Crater, a portion of the Lunar Crater Area, will remain closed to mineral material sales.

3. A total of 72,400 acres will be open to the extraction of mineral materials subject to seasonal restrictions because of crucial wildlife habitat (see Wildlife Determinations 3., 4., and 5.) (see Maps 34 and 35 and Appendix 14).

4. Close the following areas to mineral material disposal:  Berlin Town Site (704 acres); Project Faultless (2,560 acres); Mountain View Arrastra (40 acres); Moores Station Petroglyphs (40 acres); Jumbled Rock Petroglyphs (10 acres); Amargosa-Oasis (490 acres); portions of the Railroad Valley Area (3,480 acres); Cane Man Hill (680 acres); Tybo-McIntyre Charcoal Kilns (80 acres); Rhyolite area (425 acres); Lunar Crater (39,680 acres); The Sump (1600 acres); The Gravel Bar (679 acres) (see Appendix 14); recreational facilities in the Extensive Recreation Management Area (estimated to be 60 acres total; however, specific locations have not yet been identified), and Wilderness Study Areas (604,535 acres; see Wilderness Determinations) (see Maps 34 and 35, and Appendix 14).

## NONENERGY LEASABLE MINERALS

### Objective:

To provide opportunity for the leasing and development of solid leasable minerals such as sodium, potassium, phosphate, etc.

### RMP Determinations:

1. A total of 5,481,206 acres (90% of the Tonopah Planning Area) will be open to nonenergy mineral activities under standard terms and conditions.

2. Close the following areas (55,360 acres) to nonenergy mineral leasing:  Berlin Town Site (704 acres); Project Faultless (2,560 acres); Mountain View Arrastra (40 acres); Moores Station Petroglyphs (40 acres); Jumbled Rock Petroglyphs (10 acres); Clayton Valley Sand Dunes (2,500 acres), Crescent Sand Dunes (3,000 acres); The Sump (1600 acres); Lunar Crater (39,680 acres); Amargosa-Oasis (490 acres); portions of the Railroad Valley Area (3,480 acres); Cane Man Hill (680 acres); Tybo-McIntyre (80 acres); Rhyolite (425 acres); and recreational facilities in the Extensive Recreation Management Area (estimated to be 60 acres total; however, specific locations have not been identified) (see Maps 34 and 35, and Appendix 14). (Some areas overlap, affecting acreage total.)   In addition, Wilderness Study Areas (604,535 acres; see Wilderness Determinations) will be closed to nonenergy mineral leasing.  Those areas released by Congress from Wilderness consideration will return to multiple use.

3. A total of 72,400 acres will be open to nonenergy mineral leasing subject to seasonal restrictions because of crucial wildlife habitat (see Wildlife Determinations 3., 4., and 5.) (see Maps 34 and 35 and Appendix 14).

## FIRE MANAGEMENT

### *Objective:*

To protect natural resources from unacceptable damage by fire in a cost-effective manner with a high regard for private property and safety. Promote resource management through prescribed fire to maintain the natural component of the ecosystem.

### *RMP Determinations:*

1. All wildfires in Fire Management Zone 1 will receive aggressive initial attack, to contain all fires in intensity levels 1 through 6, 90 percent of the time to 300 acres or less. All fire zones are shown on Maps 38 and 39.

2. Wildfires that threaten life and property will be kept to five acres or less 90 percent of the time utilizing the most cost-effective and efficient suppression action. This will include town sites, developed mines, ranches, powerlines, and other structures and property.

3. Wildfires that threaten resources such as critical watersheds, riparian areas, desirable range (salt desert shrub), sage grouse strutting grounds, sensitive plant species sites, cultural resource sites, and sensitive forage plant species (bitterbrush and mountain mahogany) will be kept to minimum acres utilizing suppression action which could suppress and/or divert the fire and be cost-effective and efficient.

4. If an approved natural prescribed fire plan is written, some wildfires in Fire Management Zone 2 may be allowed to burn to promote a more natural fire regime. The sagebrush/pinyon-juniper vegetation type is considered a fire-dependent ecosystem, and adverse ecological changes may result by total fire exclusion (e.g., pinyon pine-juniper encroachment of grassy areas or declining grass productivity because of increased sagebrush cover).

   The salt desert shrub vegetation type (i.e., Zone 1) is considered a fire-independent ecosystem that usually maintains vigor and composition without fire.

## STANDARD OPERATING PROCEDURES

The following standard operating procedures will be applied to this plan.

### Environmental Review and Management

In compliance with NEPA and CEQ regulations, BLM will prepare site-specific environmental reviews before actions proposed in this RMP/EIS are implemented, or prior to approval of any project authorized on the public lands. The environmental reviews provide site-specific assessments of the impacts from implementing these actions. As appropriate, these reviews are documented in Categorical Exclusion Reviews, Administrative Determinations, Environmental Assessments and Decision Records, or Environmental Impact Statements and Records of Decision. In addition, the environmental review identifies mitigating measures necessary to reduce adverse impacts of implementing a project or proposed action.

All future authorizations will be in conformance with the RMP. Existing authorizations will be brought into conformance when they are renewed.

Seasonal restrictions on activities which are included in this RMP to prevent disturbing of wildlife will apply to the following authorizations: fluid mineral leasing, nonenergy mineral leasing, mineral material sales geophysical prospecting, right-of-way construction, off-highway vehicle events, construction of range improvements, activities authorized under the Recreation and Public Purposes Act (R&PP Act), and vegetation sales. In general, maintenance of rights-of-way, range improvement projects, and other facilities will not be restricted. Locatable mineral exploration and development activities will be encouraged to abide by seasonal restrictions but cannot be required to do so.

Determinations that state: ``No land uses will be authorized which are incompatible with an area's values" will include such activities as rights-of-way grants, activities authorized under the Recreation and Public Purposes Act, off-highway vehicle events, vegetation sales, range improvement projects, nonenergy mineral leasing, mineral material sales, and geophysical prospecting, except where compatible with, or of benefit to, the resources being protected. Rights-of-way and other discretionary -lands actions will be granted in avoidance areas only if no feasible alternative routes are available. Any such grants, leases, or permits will include appropriate stipulations to protect the area's special values. This will not affect maintenance of existing projects or rights-of-way. Livestock grazing will continue to be authorized unless specifically excluded.

For purposes of range management, the Rangeland Program Summary (RPS) will describe the allotment-specific objectives and management actions planned for livestock, wild horses and burros, and wildlife. It will also discuss the monitoring and range improvement projects needed to meet these allotment objectives. Updates of the RPS will explain and update monitoring efforts and results. The RPS will be issued subsequent to the Record of Decision.

### Air Resources

Air quality is protected by the establishment of mitigation measures designed to prevent deterioration of air quality prior to authorizing actions. This ensures meeting State goals for air quality and limits allowable emissions from existing and new point or nonpoint sources. Common mitigation measures include watering roads and disturbed areas, the use of scrubbers/sprays, covered storage areas, and other measures to reduce emissions and pollutant concentrations to meet or exceed the standards of the Nevada Division of Environmental Protection.

### Soil and Water Resources

Prior to authorizing land-use actions, and also during the allotment monitoring and evaluation process, soil and water resources will be protected by the establishment of mitigation measures designed to maintain or improve soil productivity, and to prevent or minimize soil erosion and floodplain sediment damage. To meet administrative needs the BLM will acquire appropriative water rights by applying for available water rights according to Nevada water law, or by assertion of a public water reserve.

Best Management Practices and appropriate mitigation will be identified during project-level environmental review and applied during project implementation for any ground-disturbing activity that may reduce soil productivity or cause surface erosion.

### Visual Resource Management

Visual Resource Management (VRM) classes are delineated in the RMP based on an inventory conducted in accordance with BLM visual management procedures (Manual 8400). The individual VRM classes provide management objectives to be implemented as a part of all activities authorized in the *Tonopah RMP*. The overall goal is to protect or enhance the visual and natural aspect and attributes of the public lands while minimizing the impacts of authorized activities.

Visual resources will continue to be evaluated, using the Contrast Rating process, as a part of activity and project planning. These evaluations will consider the significance of the proposed project and the visual sensitivity of the affected area. Stipulations will be developed and attached to project authorizations to maintain designated VRM classes. Stipulations may include requirements to locate activity sites behind topographic features to hide them from view, modify access routes, color buildings and equipment to blend in with their surroundings, develop projects in phases, etc. If VRM class objectives cannot be met, the impacts to visual resources will be detailed in the project-level environmental analysis and used by the Authorized Officer as a factor in the decision to authorize or deny a proposed action.

To comply with BLM policy for Wilderness Study Areas (WSAs), as stated in BLM Manual H-8550-1, *Interim Management Policy for Public Lands Under Wilderness Review* (1995), WSAs will be managed as interim VRM Class II areas until Congress makes final wilderness decisions for Nevada BLM WSAs. This will comply with the policy to manage WSAs to avoid impairment of existing wilderness values. As of March 30, 1989, limitations were placed on the authorization of activities which cause surface disturbance that require reclamation to restore an area to a preproject condition. Following Congress' final wilderness decision, designated wilderness areas will be managed as VRM Class I areas. Lands not designated as wilderness will be managed according to the VRM classes designated in the RMP/ROD decisions.

### Fish and Wildlife

Fish and wildlife habitat will continue to be evaluated as part of project-level planning. Such evaluation will consider the significance of the proposed project and the sensitivity of fish and wildlife habitat in the affected area. Stipulations will be attached as appropriate to assure compatibility of projects with management objectives for fish and wildlife habitat. Habitat improvement projects will be implemented where necessary to stabilize or improve unsatisfactory or declining wildlife habitat condition. Such projects will be identified through habitat management plans or other activity plans.

Sufficient forage and cover will be provided for wildlife. Forage and cover requirements will be incorporated into allotment management plans or their functional equivalent and will apply to specific areas of primary wildlife use.

Range improvements generally will be designed to achieve both wildlife and range objectives. Existing fences will be modified and new fences built so as to allow wildlife passage. Water troughs will be constructed to not exclude wildlife and bird ladders will be installed. Proposed projects are listed in Appendix 4.

Guzzlers constructed for wildlife will be designed for protection from domestic livestock and wild horses and burros.

In accordance with BLM guidelines for domestic sheep management in bighorn sheep habitat, no domestic sheep grazing will be authorized within nine miles of bighorn sheep habitat (see Maps 10 and 13).

Habitats for chukar and other upland game will be maintained and expanded through development of wildlife waters. Generally, no land disposal will be allowed within two miles of sage grouse nesting areas.

### Special Status Species

The Endangered Species Act (ESA) of 1973, as amended, declares it the policy of Congress that all Federal Divisions and agencies will conserve endangered species and threatened species and utilize their authorities in furtherance of the purposes of the Endangered Species Act. In accordance with section 7 of the ESA, consultation with the U.S. Fish and Wildlife Service will be conducted on all Federal actions involving threatened or endangered species.

It is BLM policy to carry out the management of Nevada BLM Sensitive Species consistent with multiple-use for conservation of these species and their habitats and ensure that actions authorized or funded do not contribute to the need to list any of these species as threatened or endangered. In order to prevent listing of Nevada BLM Sensitive Species, BLM may enter into Conservation Agreements or Species Management Plans with the U.S. Fish and Wildlife Service.

A desert tortoise inventory may be required prior to any surface-disturbing activity, including plans of operations for locatable minerals, mineral leasing, off-highway vehicle events, rights-of-way, etc., on 70,600 acres of Non-Intensive Category III desert tortoise habitat.

In accordance with the Biological Opinion on livestock grazing in desert tortoise habitat, the following stipulation has been placed in affected grazing licenses: ``Within Non-Intensive Category III desert tortoise habitat, livestock use may occur from March 1 to October 14, as long as forage utilization does not exceed 40 percent on key perennial grasses, forbs and shrubs. Between October 15 and February 28, forage utilization shall not exceed 50 percent on key perennial grasses and 45 percent on key shrubs and perennial forbs.''

### Forestry and Vegetative Products

The areas available for woodland harvest will be subject to the specific restrictions and withdrawals required by this RMP.

Permits will not be issued for the harvest of broadleaf trees, dead or green.

Pinyon nut gathering will be authorized on an individual basis, including within Wilderness Study Areas released by Congress for multiple-use purposes. Personal consumption of up to 25 pounds per year is allowed without permit.

Salvage of vegetative products may be authorized on areas subject to ground-disturbing activities.

**Livestock Grazing Management**

Resource improvement planning will be in accordance with the procedures outlined in BLM Handbook H-1741-1, *Renewable Resource Improvement and Treatment Guidelines and Procedures*.

The grazing management program assigns priorities to management efforts using a selective management approach. Under this approach grazing allotments are categorized into ``I,'' ``M,'' and ``C'' management categories. The objectives for these categories are to: 1) *maintain* (M) the current satisfactory conditions; 2) *improve* (I) the current unsatisfactory conditions; or 3) manage *custodially* (C) while protecting existing resource values. Management priority will be given first to ``I'' allotments, second to ``M'' allotments, and third to ``C'' allotments.

Range improvement projects will be addressed in environmental documents and will be constructed in accordance with BLM Manual 9113. Existing access or temporary roads will be used as much as possible. Temporary roads will be rehabilitated after use is completed.

The clearing of vegetation from project sites will be restricted to the minimum amount necessary to properly and safely complete the project.

All disturbed areas will be rehabilitated, where such action is necessary and/or practical, to replace ground cover and prevent erosion. Fences used to control cattle movement in areas inhabited by resident and migratory populations of deer, horses, and/or antelope will be 42 inches in height. Fences in these areas will consist of three barbed wires and a smooth bottom wire. The spacing of the wires starting from the ground will be 16 inches, 22 inches, 30 inches and 42 inches. Line posts shall be spaced at a distance of 16.5 feet between each post. Fences in bighorn sheep habitat will be a three-strand fence with spacing 20, 35, and 39 inches from the ground with a smooth bottom wire. Special design standards will be in accordance with the *BLM Handbook H-1741-1*. All fences will be designed to assure a minimum of impacts to wildlife, wild horses/burros, recreation, and visual resources.

Developed spring sources may be fenced and water provided for livestock and/or wild horses/burros away from the source. Water will be left at the spring source for wildlife use as required by Nevada Revised Statute 533.367, which states in part that "Before a person may obtain a right to the use of water from a spring or water which has seeped to the surface of the ground, he must ensure that wildlife which customarily uses the water will have access to it".

Maintenance of livestock management structures will be accomplished by the livestock operator through cooperative agreements and range improvement permits as specified in the BLM's 1982 *Rangeland Improvement Policy* (USDI, BLM, Oct. 1982).

Alteration of sagebrush areas either through application of herbicides, prescribed burning, or by mechanical means will be in accordance with procedures specified in the Western States' Sage Grouse Guidelines and the Memorandum of Understanding between the Nevada Division of Wildlife and the Nevada BLM. All vegetation treatment projects will be coordinated with the Nevada Division of Wildlife at least one year in advance of implementation of the project.

Application of herbicides on proposed treatment areas to reduce sagebrush and other plant species will be in accordance with procedures established in BLM Manual 9222 to prevent impairment of nontarget species.

Vegetative manipulation that will alter the potential natural plant composition will not be allowed in riparian areas. This includes the introduction of nonnative species.

**Wild Horse And Burro Management**

It is the intent of the BLM to manage wild horses and/or burros and their habitat within areas occupied in 1971.  Management is to be accomplished in a manner designed to achieve a thriving natural ecological balance and multiple-use relationship with other resource users.  The suitability of some areas to support wild horses and/or burros will be reassessed as appropriate in light of new information from monitoring and emergency gathers.

Management of the wild horses and/or burros will also be guided by Herd Management Area Plans (HMAPs) or their functional equivalent, when appropriate.  The plans will be developed through consultation and coordination with interested parties and will be coordinated with livestock, wildlife, and other resource plans.  The management plans may include, but not be limited to, discussions of seral stages, range trends, habitat requirements, dietary needs, water requirements, and wild horse and/or burro reproductive capabilities.

**Cultural Resources**

The National Historic Preservation Act of 1966, as amended; the Archaeological and Historic Preservation Act of 1974; the Archaeological Resources Protection Act of 1979; the American Indian Religious Freedom Act of 1978; the Native American Graves Protection and Repatriation Act of 1990; FLPMA; and Executive Order 11593 provide for the protection and management of cultural resources. These laws are implemented through the following Federal Regulations: 36 CFR 60, 36 CFR 800, 43 CFR 7, and 43 CFR 8365.1-5, (a)(1).

The BLM is required to identify, evaluate, and protect cultural resources on public lands under its administration and to ensure consideration of cultural resources prior to initiation of proposed BLM-authorized activities.  If an area will be in any way affected by those activities, a cultural resources inventory will be conducted.  In accordance with Section 106 of the National Historic Preservation Act of 1966, as amended, eligibility determinations for listing on the National Register of Historic Places are made in consultation with the Nevada State Historic Preservation Office.  A determination of effects to eligible properties is also made in consultation with the Nevada State Historic Preservation Office.

Avoidance of cultural properties is the preferred mitigation.  However, avoidance is inappropriate if  1) the project will create ongoing activity in the area, or 2) the project will greatly increase access to the area.   Either of these conditions could lead to increased vandalism and/or accidental damage. Significant cultural properties to be protected through avoidance will be marked in the field and monitored on a periodic basis.

If eligible properties cannot be avoided, appropriate mitigating measures will be developed in consultation with the Nevada State Historic Preservation Office and the President's Advisory Council on Historic Preservation.  No action will be authorized until these agencies are consulted.

Cultural properties without National Register eligibility determinations will be treated as eligible properties until such determinations can be made.

Federal agencies are required to consider the views of Native Americans when a proposed undertaking may be in conflict with traditional lifeways or religious values.  The American Indian Religious Freedom Act requires consultation with Native American religious and secular leaders to identify geographic areas which may be associated with traditional lifeways and religious practices.

**Lands**

Land tenure adjustments are discretionary.  No lands will be disposed of unless they are identified in the RMP.

Public lands identified for disposal may be made available for sale, exchange, agricultural entry, lease, or patent for recreation or public purposes.  Some lands identified for disposal may not be sold due to lack of interest, and some may be retained in Federal ownership as a result of site-specific application of the land-ownership adjustment criteria.

Exchanges are authorized under Section 206 of the Federal Land Policy and Management Act (FLPMA) of 1976.  Exchanges are the preferred method of acquisition when other methods, such as conservation easements or management agreements, will not protect special value areas or resources.  Exchanges must be in the public interest.  The selected public land must be identified in an approved land-use plan for disposal, and the offered private land may be identified in an approved land-use plan for acquisition.

There are three authorities for the disposal of public land specifically for agricultural purposes:  the Desert Land Act, the Carey Act, and the General Allotment Act.  Disposal of public land for agricultural purposes must meet the requirements of one of the three acts listed above and have a supporting permanent water source permitted by the Nevada State Engineer.

In order for public land to be sold, it must meet one of the following criteria set forth in Section 203(a) of the *Federal Land Policy and Management Act of 1976*:

--the land is difficult or uneconomic to manage as a part of the public lands, and it is not suitable for management by another Federal Department or agency.

--the land was acquired for a specific purpose: and it is no longer required for that, or any other, Federal purpose; or

--disposal of the land will serve important public objectives that can be achieved prudently or feasibly only if the land is removed from public ownership; and these objectives outweigh other public objectives or values that will be served by maintaining the land in Federal ownership.

Site-specific decisions regarding land ownership adjustments within the Tonopah Planning Area are to be based on whether the lands are needed for BLM programs, or whether or not they are considered more valuable for other purposes.  The following criteria are applied to site-specific determinations for lands that are within areas identified for disposal or acquisition:

A.    Public resource values, including, but not limited to:

--threatened, endangered, or sensitive species habitat

--sites or places listed or eligible for inclusion on the National Register of Historic Places

--mineral potential

--wilderness areas and areas being studied for wilderness

--riparian areas, including springs and seeps

--nesting/breeding habitat for game birds/animals

31

--big game seasonal habitat

--recreation potential

--visual resources

--other designations authorized by law

B.     Manageability

C.     Suitability for development

D.     Accessibility of the land for public use

E.     Encumbrances

F.     Social and economic impacts of land tenure adjustments

G.     Consistency with other agency/governmental entity plans and policies.

H.     Sites that contain hazardous materials.

These land-ownership adjustment criteria are considered in environmental analyses and decisions prepared for specific adjustment proposals.

In addition, no disposals are allowed within two miles of sage grouse strutting grounds, and no disposals for agricultural purposes are allowed on lands with agricultural soil ratings of Class IV or higher, or with soils having a high susceptibility to erosion. The disposal of land will not be allowed if it would fragment ownership patterns.

Public lands within areas which have not been identified for disposal are retained in Federal ownership and are managed by BLM. Unless these lands are dedicated to a specific use or uses, or are included within avoidance or exclusion areas, they are available for rights-of-way, FLPMA leases, and airport leases. Because color-of-title and mineral entry patents are nondiscretionary actions, all public lands meeting specific regulatory criteria may be patented by these methods.

Land use permits and leases are granted under the authority of Section 302(b) of the Federal Land Policy and Management Act of 1976. Permits are issued for short-term, low-impact uses of the public lands. Leases are a long-term management tool used particularly where future disposal or dedication to another particular land use is contemplated. In general, all lands within the Tonopah Planning Area which have not been dedicated to a specific use or uses are open to consideration for land-use permits and nonmajor leases. Permit and lease applications are evaluated on an individual basis. The same public resource values considered prior to disposal are considered prior to the issuance of a permit or lease. Major leases must be identified in an approved land-use plan.

It is BLM policy to identify, abate, and prevent unauthorized use of the public lands. Existing unauthorized uses of the public lands are resolved through termination, short-term permit, lease, sale, exchange, or by other appropriate means.

Since the passage of the Federal Land Policy and Management Act in 1976, the BLM has been in the process of reviewing all withdrawals and classifications of public lands. All new proposed withdrawals must be identified in an approved land-use plan.

Unless the land has been dedicated to a specific use or uses, public land within the Tonopah Planning Area is available for consideration for linear rights-of-way for access, and for utility transportation and distribution purposes. Such land is also available for areal rights-of-way purposes.

Prior to issuance of a right-of-way authorization, a site-specific environmental analysis is performed which considers, among other things, habitats of threatened, endangered, or Nevada BLM Sensitive Species; sites or places listed or eligible for inclusion on the National Register of Historic Places; wilderness areas and areas being studied for wilderness; riparian areas; nesting/breeding habitat for animals; big game seasonal habitat; visual resources; and other considerations mandated by law.

Designated right-of-way corridors within the Tonopah Planning Area are three miles wide except where topographic constraints exist. Grants for rights-of-way are still required for facilities placed within designated corridors. Designation of a corridor does not necessarily mean that future rights-of-way are restricted to corridors, nor does it mean that there is a commitment by the BLM to approve all right-of-way applications within corridors. Proposed disposals of land within corridors are analyzed to determine the impacts that these proposed disposals might have on future right-of-way activities.

### Recreation

A broad range of outdoor recreation opportunities will continue to be provided on all segments of the public land, subject to the demand for such opportunities and the need to protect other resources. Special Recreation Management Areas, areas of concentrated use, and existing facilities will receive first priority for operation and maintenance funds. Investment of public funds for new recreation developments will be permitted only on land identified to remain in public ownership.

Recreation resources will continue to be evaluated on an individual basis as part of activity and project-level planning. Such evaluations will consider the sensitivity of, and the impacts on, recreation resources in the affected area. Stipulations will be attached as appropriate to assure the compatibility of projects with recreation management objectives.

Special recreation use permits will be authorized on an individual case basis.

Decisions regarding the designation of areas open, limited (restricted), and closed to motorized vehicle access have been made in the RMP. An exception to designations in the RMP is emergency actions which may be necessary due to:

1. The need to minimize damage to soil, watershed, vegetation or other resource values.

2. The need to minimize harassment of wildlife or the degradation of wildlife habitat, especially habitat for threatened, endangered, or Nevada BLM sensitive species.

3. The need to promote user safety and protect the visiting public from hazardous situations.

Areas which are not designated as limited or closed will remain open for motorized vehicle use.

Existing mines will be closed to off-highway vehicle use by the public. The areas will remain closed until they have been reclaimed and the reclamation bond has been released.

Public land within areas closed to motorized vehicle use will be closed year-long to all forms of motorized vehicle use except for emergency or authorized vehicles.

Vehicle use in Wilderness Study Areas (WSAs) is currently managed as limited to existing (1980 inventory) roads, trails and ways. This is a temporary designation which overrides the decisions in the RMP, pending final decisions by Congress with regard to WSAs. Following final Congressional action,

those areas designated as wilderness will be closed to motorized vehicle use, subject to valid existing rights and authorized nonconforming uses.  Motorized vehicle use on lands which are not designated as wilderness will be managed according to the decisions in this RMP and ROD.

The BLM, Nevada State Office has published a camping stay limit (effective November 5, 1993) for the public lands it manages:  "A person or persons may not occupy undeveloped public lands or designated sites or areas for more than fourteen days within a twenty-eight consecutive day interval. Following the fourteen days, the persons and personal property must relocate to a site outside of at least a twenty-five mile radius from the occupied site or non-BLM administered land for a period of fourteen days".

In order to protect resources, or for administrative purposes, an Authorized Officer may, by posting notification, close a given site to occupancy, even if the same person or persons have not occupied the site for fourteen consecutive days."

All BLM lands that are not limited in the RMP are open to all individual, commercial, and competitive outdoor recreation uses.  Opportunities for exploring the back-country by vehicle, hunting, camping, sightseeing, and hiking are encouraged.  There are no nationally significant river segments, as defined in the National Wild and Scenic Rivers Act of 1964, in the Tonopah Planning Area.

### Areas-of Critical Environmental Concern

Decisions to designate ACECs will be prepared during the next two years as a Plan Amendment to the Tonopah RMP.  A plan of operations will be required for any proposed mechanized disturbance in a designated ACEC during the search for, or the exploitation of, locatable minerals.  No mineral material sales will be allowed within any ACEC unless specified otherwise in the Plan Amendment.

### Wilderness

BLM policy requires that all Wilderness Study Areas (WSAs) be managed in accordance with the provisions of Section 603 (c) of the Federal Land Policy and Management Act and the BLM *Interim Management Policy for Lands Under Wilderness Review* (IMP) so as not to impair their suitability for preservation as wilderness.  The IMP provides management policies for WSAs between the time of WSA designation (11/15/80) and final decisions by Congress regarding these areas.  The IMP contains specific management direction for activities in WSAs which may occur or be authorized.

The specific management determinations identified in the RMP are those that may take place if the WSAs are released from wilderness consideration by Congress.  Some of the determinations are compatible with the IMP and can be implemented at any time, whereas others must await Congress' final determinations.  Also some RMP determinations may not comply with the IMP's nonimpairment requirements.  These decisions may not be implemented until after Congress' final decision releasing the nonwilderness lands from the requirements and restrictions included in the IMP Policy.

Should Congress designate wilderness areas, the RMP will be maintained to include these new designations, and to modify determinations which conflict with wilderness management objectives. Management of areas designated as wilderness will be guided by the requirements of the Wilderness Act of 1964, specific enabling legislation, and the BLM's wilderness management procedures.  While site-specific management objectives for wilderness areas will be included in future wilderness management plans, certain actions are nondiscretionary, including closure to motorized vehicle use (except for valid existing rights and approved nonconforming uses by permit) and segregation from mineral entry and fluid-mineral leasing.

## Fluid Minerals

Oil and gas leases and geothermal leases grant the right to the operator to explore for, and to produce oil and gas, and geothermal energy. Leases are subject to certain terms and conditions which provide for compliance with applicable laws, ordinances, and regulations pertaining to fire, sanitation, conservation, water pollution, fish and wildlife, safety, protection of property, and reclamation.

In addition to the terms and conditions of the leases, stipulations may be applied to site-specific applications to provide for stringent environmental protection of conflicting resources. These stipulations are developed by a multidisciplinary team as part of the environmental analysis process.

Since the passage of the Federal Oil and Gas Leasing Reform Act of 1987, all Wilderness Study Areas (WSAs) have been closed to mineral leasing.

Geophysical exploration for oil and gas, and for geothermal resources may take place before or after the leasing of the lands. These actions will be reviewed by a multidisciplinary team in the Tonopah Planning Area to identify and mitigate resource-related conflicts.

BLM actively encourages and facilitates the private development of public land mineral resources in a manner that satisfies national and local needs, and provides for economically and environmentally sound exploration, extraction and reclamation practices.

Land-use plans and multiple-use management decisions of the BLM will recognize that mineral exploration and development can occur concurrently or sequentially with relation to other resource uses.

Consultation with the U.S. Fish and Wildlife Service is required per section 7 of the Endangered Species Act prior to approval of an Application for Permit to Drill (APD) or other lease operations, if a proposed listed or listed threatened or endangered species, or its critical habitat, is likely to be affected by project activities. If there is deemed to be any adverse impact the proposal would be modified or the request denied.

Actions which would adversely impact a Nevada BLM sensitive plant or animal species will be modified in order to prevent possible future listing of these species as threatened or endangered.

## Locatable Minerals

BLM provides for mineral entry, exploration, location, and operations pursuant to the mining laws in a manner that 1) will not unduly hinder the mineral activities, and 2) assures that these activities are conducted in a manner which will prevent undue or unnecessary degradation of the public land.

Notification to the Authorized Officer is required on all operations in project areas in which surface disturbance will be five acres or less.

A Plan of Operations and a Reclamation Plan are required in situations in which there will be more than five acres of cumulative unreclaimed surface disturbance in a project area. These two plans are also required for any mining activity on special category lands, such as ACECs and areas closed to off-highway vehicles. Appropriate off-site mitigation may be negotiated during a plan of operations review for locatable mineral actions when an irretrievable loss of important habitat is unavoidable, or a significant long-term adverse impact will occur. The preferred alternatives to off-site mitigation are avoidance of critical and crucial habitat and reclamation of disturbed habitat to approximate pre-disturbance productivity.

The Authorized Officer may require modifications of Plans of Operations to meet the requirements of the regulations and to prevent undue or unnecessary degradation of public land.

Plans of Operations cannot be approved until Section 106 of the National Historic Preservation Act, and Section 7 of the Endangered Species Act, and the National Environmental Policy Act have been complied with.

Reclamation of disturbed areas to meet BLM standards is required for all levels of activity: Casual Use, Notice, or Plan of Operations.

Additional regulatory requirements will be enforced in WSAs through regulations (43 CFR 3802) and through the Interim Management Policy (IMP) for WSAs.

All operations shall comply with Federal and State laws, including those relating to air quality, water quality, solid wastes, fisheries, wildlife and plant habitat, and archaeological and paleontological resources.

The BLM will conduct validity examinations, reviewing the validity of mining claims to determine if a discovery has been made, under the following conditions:

1) Where a mineral patent application has been filed and a field examination is required to verify the validity of the claim(s).

2) Where there is a conflict with a disposal application, and it is deemed in the public interest to conduct a validity examination; or where the statute authorizing the disposal requires the removal of mining claims that are not valid. If the validity examination made in the latter case were to show that the mining claim was valid, the disposal action could not be completed.

3) Where the land is needed for a Federal program.

4) When a mining claim is occupied under the guise of the mining law and flagrant or questionable misuse of the land is observed, the BLM will undertake a review of the occupancy based on current regulations. If it is found, in fact, that such use is not necessary for, and reasonably incident to, mineral development, BLM will act to terminate the use and seek compensation for damages. Validity of the claim would not be relevant in this case.

Withdrawals from mineral entry will be enacted only in cases in which there are significant resource values that cannot be adequately protected under the regulations concerning surface management. Such withdrawn acreage may include areas recommended for wilderness designation, sensitive species habitat, riparian areas, areas possessing important historical and cultural resources, and areas set aside for recreational development.

Bonding will be required for all notices and plans of operations to ensure that satisfactory reclamation takes place. All operations using cyanide will follow the requirements in BLM's Nevada Cyanide Management Plan.

The BLM will coordinate each mine plan and mine closure in conjunction and consultation with the Bureau of Reclamation and Regulation of the Nevada Division of Environmental Protection. This coordination ensures that the State of Nevada reclamation laws are implemented on Federal and private lands, and that all necessary State permits will be issued and followed.

### Mineral Materials

Mineral material disposal will not occur in Wilderness Study Areas.

All mineral material disposals are discretionary.  Appropriate terms and conditions are applied to ensure that the permittee will comply with all applicable laws and environmental safeguards.

Disposal to State, county, and municipal governments will generally be processed through the issuance of free-use permits (FUPs).

In all mineral material disposals the BLM will strive, wherever possible, to use existing mineral material pits.

Disposal of such common-variety mineral materials as sand and gravel may not be made from mining claims, unless the date of the mineral materials contract or permit precedes the date of the location of the claim.  This policy applies to all types of mining claims including placer, lode, millsite, and tunnel site claims.  Mining claimants may not sell mineral materials which are on their unpatented mining claims.

### Nonenergy Leasable Minerals

An environmental analysis will be conducted on the exploration phase of each prospecting permit and on any production activities associated with a lease.  The environmental analyses are prepared by a multidisciplinary team and are used to determine any special stipulations necessary for the protection of surface resources.

### Fire Management

The fire management program is guided by the approved Battle Mountain District Fire Management Activity Plan and this RMP.

Every wildfire within the Tonopah Planning Area will have an appropriate action taken.  The action will be planned and executed in such a way as to minimize the loss of resources and the costs of suppression.  Such actions must also be consistent with resource management objectives.

There will be no use of fire retardant in riparian areas, WSAs, sensitive visual resource management areas, and structure archaeology sites, unless such use is authorized by the Authorized Officer.

All wildfires, after they are declared out, will be evaluated by a rehabilitation team to determine the actual needs related to the rehabilitation.  Corrective measures will be taken to prevent erosion and future resource degradation when it is feasible to rehabilitate areas damaged by actual suppression action.  The rehabilitation team will also determine if any fire rehabilitation, including protection from grazing, is needed to revegetate the burned area, and to protect the site from erosion and invasion by undesirable plant species. Emergency fire rehabilitation will follow procedures outlined in *BLM Handbook H-1742-1* and the Battle Mountain District approved Normal Fire Rehabilitation Plan.

When identified as the least costly and/or most effective method, prescribed fire techniques will be used as a resource tool to meet vegetative objectives as stated in this RMP.  Prescribed fire can be used to improve wildlife habitat, watershed improvement and other types of vegetative manipulation to meet vegetative objectives.  In addition it can be used solely, or in combination with other fuel/vegetative manipulation techniques.  When fire is used as a management tool, an approved prescribed burn plan and wildfire prescription must be prepared in advance of planned or unplanned ignition in accordance with *BLM Manual 9214*.

*Integrated Pest Management*

It is the policy of the BLM that all alternatives available through integrated pest management will be explored before any pest-control program decision is implemented. This includes all pest-control programs done under BLM proposals, cooperative projects, or on lands under permit or lease. Integrated pest-control methods include, but are not limited to, biological, cultural, and chemical methods. In choosing methods, due consideration will be given to economics, efficacy, and the environment. All integrated pest-management activities will follow policies established in (a) BLM Manual 9011, Chemical Pest Control Sections .06B through .12D; (b) BLM Manual 9015, Integrated Weed Management Sections .2 through .4, .8 through .83, and Appendix 1; (c) BLM Handbook H-9011-1, Chemical Pest Control Sections I-B 1-3; and (d) other sources as appropriate.

*Hazardous Materials*

The BLM will not authorize the disposal of hazardous materials on public lands. When hazardous materials are located on public lands, the following sequence of actions will occur: reporting, necessary site security, coordination of procedural cleanup, and monitoring results of cleanup. Actions taken by the BLM can also include prosecution of those responsible for illegal dumping.

The BLM ensures that the initiators of actions which use hazardous materials on public land have the necessary permits from the State of Nevada and, if necessary, the Environmental Protection Agency, which are designed to protect the environment. These permits become conditions-of-approval by the BLM for proposed actions on Federal lands.

# PLAN IMPLEMENTATION, MITIGATION AND MONITORING, EVALUATION, MAINTENANCE, AND AMENDMENT

Implementation of some determinations will begin immediately upon approval of this RMP. An Implementation Schedule will be developed within a reasonable timeframe (90 days) for the remaining determinations. This schedule will establish priorities and give a basis for short-term and long-term budget requests.

The Tonopah RMP is intended to be a dynamic document which must be routinely monitored and maintained, and periodically amended, to remain viable. The intent of monitoring is to document the effect on the environment from implementing the RMP to ensure that management actions are meeting their intended purpose. The environmental effect of any future changes or additions to the RMP will be formally monitored as well.

The Standard Operating Procedures section of this document explains most of the monitoring procedures and mitigation measures in common use. Progress in implementing the RMP will be monitored yearly through an Implementation Plan, and the RMP itself will be re-evaluated every five years to address how well it continues to serve as a guide to effective land management. The evaluation process serves to judge the success of RMP maintenance (described below) in keeping the plan current, and to assess the need for plan amendments. Additional monitoring and mitigation measures will be enacted as needed in response to environmental analyses for specific projects, and will be identified in such documents as environmental impact statements for proposed mining ventures, habitat management plans for wildlife management, allotment-management plans for livestock grazing, etc.

Routine RMP maintenance consists of making minor changes in data, including posting of new data and information, and posting of corrections where errors have been found. In general, plan maintenance does not change the scope or effect of any of the RMP determinations, but by keeping the plan current it extends its useful life.

A plan amendment, in contrast to plan maintenance, changes a part of the existing RMP or adds to it, or allows new proposals to be considered and incorporated. The need for a plan amendment is identified through plan implementation and through monitoring and evaluation findings, or in response to internally or externally initiated proposals which do not conform to the RMP, but which do warrant consideration. Other events which could require a plan amendment include 1) changes in BLM policy, such as statutory requirements; 2) new data or information becomes available; 3) changes in management emphasis; and 4) court orders. Plan amendments adapt the RMP to new and changing values, thereby making the plan more useful and extending its life.

## CONSISTENCY

Under Section 202 of the Federal Land Policy and Management Act of 1976 (FLPMA), all BLM plans must be consistent, insofar as possible, with resource-related plans officially approved or adopted by State and local agencies. The Division of State Lands was directed by the 1983 State Legislature (Senate Bill 40) to "prepare, in cooperation with appropriate State and local agencies and local governments throughout the State, plans or policy statements concerning the use of lands in Nevada which are under Federal management." The purpose of the plans is to provide public land-management policies developed by State and local agencies to the various Federal agencies for their use in managing public lands in Nevada. The Esmeralda County Board of Commissioners on April 16, 1985, adopted the Esmeralda County Policy Plan for Public Lands. The Board of Commissioners of Nye County on April 3, 1985, unanimously-approved the Nye County Policy Plan for Public Lands. The relationship between the RMP and the Esmeralda County Policy Plan for Public Lands is discussed in Appendix 12. The relationship between the RMP and the Nye County Policy Plan for Public Lands is discussed in Appendix 13.

In 1994, the Nye County Board of Commissioners approved the Nye County Comprehensive Plan. The stated purpose of the Comprehensive Plan is to serve as a guide to the Nye County Board of Commissioners on all matters of growth and development. The public lands portion of the Comprehensive Plan has not yet been developed. Thus, no meaningful comparison of the RMP and the Comprehensive Plan can be made at this time.

## PUBLIC INVOLVEMENT

### *Scoping*

Once the determination was made to prepare a new land-use plan for the Tonopah Planning Area, an involved process of preparatory activities occurred. These activities included assembly of existing resource data; developing a public participation plan, which included how to involve other Federal agencies, State and local governments, interests groups, Indian Tribes, and the general public in the preparation of this RMP; preparation of an analysis of the management situation; a discussion of the existing environment and any related concerns and problems with the management of the natural resources; and assembly of a multidisciplinary team to write the document.

The public participation process began in February, 1990, with the publication of a "Notice of Intent" to prepare a resource management plan for the Tonopah Planning Area in the Federal Register (Vol. 59, No. 29, February 12, 1990). On February 13, 1990, a scoping letter was sent to more than 400 individuals, including State and Federal agencies, units of local government, interest groups, and members of the public. This letter invited comment on planning issues, planning criteria, management, and resource concerns identified by BLM managers and resource specialists. The letter also announced three informal public workshops to be held in March, 1990, in Tonopah, Carson City, and Las Vegas, to receive public input. The public was encouraged to become involved in the planning process, and to submit comments at any time during plan development. Announcement of the public workshops was also made through local newspapers.

The first scoping meeting was held on March 1, 1990, in Tonopah, Nevada; the second on March 6, 1990, in Carson City, Nevada; and the third on March 8, 1990, in Las Vegas, Nevada.  BLM personnel assigned to prepare the RMP were present at each meeting to outline the planning process, to explain planning issues and planning criteria, and to discuss the concerns of those in attendance.  More than 80 people attended the three meetings.  During the scoping period, 74 comment letters were received.

On June 1, 1990, a letter was sent to approximately 190 interested individuals, agencies, and groups who had responded to the scoping letter.  The letter summarized the results of the scoping process, identified the final planning criteria to be used in the development of the RMP, and identified the issues to be addressed in the Draft Plan. An update letter was mailed to all interested parties on May 3, 1991 to inform them that work was progressing on development of the alternatives to be considered in the Draft Plan.

### Draft RMP/Draft EIS

The Draft Tonopah RMP/EIS was published and made available to the public on June 4, 1993 for a 90-day public comment period which ended on October 1, 1993.  Approximately 200 individuals and organizations had expressed an interest in the use and management of public land for this area.  All were sent copies of the Draft RMP/EIS.  Included in this group were all grazing permittees and lessees within the planning area, Nevada Congressional Delegation, appropriate members of advisory councils and boards, and various libraries.

The Notice of Availability was published in the Federal Register on Thursday, June 24, 1993 (FR Vol. 58, No. 120).  Public meetings to obtain public comment were held in Carson City, Nevada on August 17, 1993; in Las Vegas, Nevada on August 19, 1993; in Beatty, Nevada on August 24, 1993; in Goldfield, Nevada on August 25, 1993; and in Tonopah, Nevada on August 26, 1993.  There were 13 attendees at the Carson City meeting, nine at the Las Vegas meeting, 12 at the Beatty meeting, 28 at the Goldfield meeting, and 41 at the Tonopah meeting.

### Proposed RMP/Final EIS

A total of 93 timely comment letters were received during the 90-day comment period for the Draft Plan.  Each letter was reviewed and evaluated for substantive comments which addressed the content of the plan and the analysis of its management actions.  Comments from these letters, as well as oral comments made at the public meetings, were used to develop the Proposed Tonopah Resource Management Plan and Final Environmental Impact Statement.

Copies of most of the comment letters were printed in the Proposed RMP, along with a response to each of the substantive issues identified during comment review.  To save printing costs, letters over 10 pages in length, and attachments to letters, were not printed in this document.  All materials received during the comment period are available for review at the Tonopah Field Station.

Each issue identified for response in the comment letters was assigned a number in the left margin.  The response to each issue, with corresponding number, follows in the response section of the same chapter in the Proposed RMP.  In addition, eight other letters were received after the close of the comment period.  Comments in these letters were duly considered in developing the Proposed RMP; however, they were not reproduced in that document.

On December 9, 1993, a letter was sent to each timely respondent acknowledging receipt of his or her comment letter. This particular letter informed the respondents how their comments would be evaluated and incorporated into the Proposed RMP/Final EIS.

Formal consultation was conducted with the U.S. Fish and Wildlife Service in accordance with the Endangered Species Act.  The Biological Opinion on Implementation of the Proposed Plan is reproduced in Appendix 15.

The Proposed Plan was made available to the public on October 21, 1994 for review and a 30-day protest period (see Environmental Protection Agency's Federal Register "Notice of Availability" of October 21, 1994). The protest period ended on November 21, 1994, with all protests having to be postmarked by that date. Twenty protests were filed with the BLM Director by that date.

The twenty protest letters were forwarded to the BLM Washington Office (WO) for review of substantive comments and for final WO decisions on revisions to the RMP. Following extensive WO review and consideration, response letters were drafted to each of the protestors. The last of these letters was mailed on April 9, 1997.

As noted previously, the major effect of these protests was to withhold decisions concerning designation of Areas of Critical Environmental Concern. Resolution of this issue will be developed in a Plan Amendment to the RMP. Some of the protest letters also guided efforts to make the RMP Determinations more readily understood, as reflected in the amended wording of some of the Determinations in this Approved RMP.

This RMP and Record of Decision are being distributed to approximately 300 addresses, including Federal, State, and local agencies; various interest groups and organizations; and political entities. Copies of the complete mailing list, including individuals, are on file at the Tonopah Field Station.

### Mailing List

The following is a listing of groups that are on the Tonopah Resource Management Plan mailing list. The Draft RMP and the Proposed RMP, as well as this document, were sent to each entity or individual on the list. This mailing list was updated continually throughout the development of this plan.

### Congressional Delegations

Honorable Richard H. Bryan
Honorable Harry Reid
Honorable Jim Gibbons
Honorable John E. Ensign

### Federal Agencies

Advisory Council on Historic Preservation
Department of Agriculture
    Forest Service
    Soil Conservation Service
Department of Defense
    TFWC/DA Nellis AFB
Department of the Interior
    Bureau of Indian Affairs
    Bureau of Mines
    Fish and Wildlife Service
    Geological Survey
    National Park Service
    Office of Environmental Affairs
    Environmental Protection Agency

### State Agencies

Nevada Department of Wildlife
Nevada Department of Minerals
Nevada State Clearing House

### State Agencies (cont.)

Nevada Commission for the Preservation of
   Wild Horses
Office of the Governor

### Local Government

Beatty Town Board
City of Gabbs
Nye County Commissioners
Nye County Planning Department
Esmeralda County Commissioners
Tonopah Town Board

### Native American Councils

Las Vegas Colony Council
Lovelock Tribal Council
Reno Sparks Indian Council
Shoshone Paiute Business Council
Summit Lake Paiute Council
Tribal Council of the Te-Moak Western
   Shoshone Indians of Nevada
Washoe Tribal Council
Wells Indian Council
Yerington Tribal Council
Yomba Tribal Council

## Public Libraries

Beatty Community Library
Clark County Library
Elko County Library
Esmeralda County Library
Gabbs Library
Lander County Library
Lincoln County Library
Manhattan Town Library
Mineral County Library
Nye County Library
Round Mountain Public Library
Silver Peak Library
State of Nevada Library
University of Nevada Library, Las Vegas
University of Nevada Library, Reno
White Pine County Library

## Private Individuals

Approximately 220
(This includes: livestock permittees, members of various boards or councils, etc.)

## Interest Groups and Organizations

Animal Protection Institute of America
American Rivers
Audubon Society
Best in the Desert Racing Association
Central Nevada Historical Society
Desert Bighorn Council
High Desert Racing Association
Humane Equine Rescue and Development
  Society
The Nature Conservancy
Natural Resources Defense Council
Nevada Cattlemen's Association
Nevada Council of Professional Archaeologists
Nevada Land Action Association
Nevada Mining Association
Nevada Miner's and Prospector's Association
Nevada Off-Highways Users Council
Nevada Outdoor Recreation Association
Nevada Sportsman and Outdoorsman
  Association
Nevada State Rifle and Pistol Association
Nevada Trappers Association
Nevada Wildlife Federation
Nevada Wild Horse Commission
Sierra Club
U.S. Humane Society
Wilderness Impact Research Foundation
The Wilderness Society

## Bureau of Land Management Offices

All Nevada BLM offices

## PREPARERS AND REVIEWERS

The Tonopah RMP was prepared by a multi-disciplinary team of resource specialists from the Tonopah Field Station in extensive consultation with resource and management staff from the Battle Mountain District Office and the Nevada State Office of the BLM. Table 4-A lists the names and experience of each team member.

The Tonopah RMP was reviewed by resource specialists and planning and management staff within the Tonopah Field Station, the Battle Mountain District Office, and the Nevada State Office of the BLM. Reviewers and review responsibilities are listed in Table 4-B.

| TABLE 4-A LIST OF PREPARERS | | | |
|---|---|---|---|
| Name | Responsibility | Education | Experience |
| Theodore Angle | Policy Guidance and Decision Making, Editorial Support | B.S. Wildlife Management | 21 years BLM |
| Mike Baskerville | Cultural Resources | B.A. Anthropology | 7 months BLM 7 years other Government |
| Mark Biddlecomb | Wildlife, Special Status Species, Riparian, Forestry and Vegetative Products (from 7/1/92 to 7/95) | B.S. Fisheries and Wildlife Management M.S. Wildlife Management | 2 years BLM |
| Lance Brown | Wildlife, Special Status Species, Forestry and Vegetative Products | B.S. Wildlife Management | 16 months BLM |
| Larry Brown | Geology and Minerals | B.S. Physical Science, M.S. Geology | 5 years BLM 15 years other Government 5 years Industry |
| Kevin Finn | Lands, Utility Corridors (from 10/1/93) | B.A. Government History | 1 year BLM 10 years Industry 10 years other Government |
| Lee Grover | Wildlife, Special Status Species, Riparian, Forestry and Vegetative Products (to 11/91) | B.S. Wildlife Conservation | 25 years BLM 12 years Industry |
| Jack Hamby | Wild Horses and Burros (from 4/13/97) | B.S. Natural Resources Management (Range Mgmt.) | 7 years BLM |
| Patricia A. Hicks | Cultural Resources | B.A. Anthropology M.A. Anthropology Archaeology | 1 year BLM 17 years Industry |
| Tom Hilken | Fire Management | B.S. Biology M.S. Range Management | 3 years BLM 10 years other Government |
| Ron Huntsinger | Policy Guidance and Decision Making | B.A. Biology Graduate work, Aquatic Resources and Watershed Management | 20 years BLM 5 years Academia |
| Doris Kleinheitz | Wild Horses and Burros | B.S. Wildlife Management | 2 years BLM |

## TABLE 4-A
### (continued)
### LIST OF PREPARERS

| Name | Responsibility | Education | Experience |
|------|---------------|-----------|------------|
| Chip Kramer | Visual Resource Management, Recreation, Wilderness | High School | 12 years BLM 6 years USFS |
| June Manhire | Administrative Support | High School | 9 years BLM |
| Pat McCoy | Cultural Resources | B.A. History M.A. Anthropology | 7 years BLM 8 years other Government 2 years Industry |
| Valerie Metscher | Watershed, Vegetation, Riparian Habitat | B.S. Range Science | 18 years BLM |
| Paul Myers | Social Economics | B.S. Economics | 14 years BLM |
| Terry Neumann | Hazardous Materials | B.S. Geology B.A. Sociology | 2 years BLM 18 years other Government |
| John Noneman | Administrative Support | B.S. Environmental Sciences | 5 years BLM |
| Roger Oyler | Livestock Grazing Management, Fire Management (to 10/92) | B.S. Range Science | 16 years BLM |
| Gordon Pine | Geology and Minerals | B.A., M.S., Ph.D. Geology | 7 years BLM 22 years Industry |
| Tom Pogacnik | Recreation, Wilderness, ACECs, Visual Resources (to 6/91) | B.S. Wildlife Management, M.S. Range Management | 8 years BLM |
| Diane Ross | Lands, Utility Corridors (to 4/92) | B.A., M.A., Ph.D. English | 13 years BLM |
| Victor Ross | Geology and Minerals (to 4/92) | B.S. Mining Engineer | 12 years BLM |
| Allesa Sparks | Editorial Assistance, Administrative Support, Typing | High School | 18 years BLM |
| Michael Stewart | RMP Team Leader (10/1/93 to 6/8/94) | B.S. Range Management | 8 years BLM 4 years other Government |
| Mark Swinney | Livestock Grazing Management, Fire Management (from 5/1/93) | B.S. Wildlife Management | 4 years BLM 17 years other Government |
| Earl Verbeek | RMP Coordinator | B.S. Geology Ph.D. Geology | 2 years BLM 21 years other Government |
| Margaret Waski | Cultural Resources (to 8/91) | B.A. Anthropology | 7 years BLM |
| Nicholas Williams | Lands and Rights-of-Way, Utility Corridors | High School | 7 years BLM 23 years other Government |
| Dave Wolf | Recreation, Wilderness, Visual Resources (to 4/92) | B.S. Wildlife Biology B.S. Outdoor Recreation | 16 years BLM |
| Hal Zabriskie | RMP Team Leader (to 9/30/93) | B.S. Agriculture | 23 years BLM |

| TABLE 4-B<br>LIST OF REVIEWERS | | | |
|---|---|---|---|
| **Name** | **Program/Title** | **Office** | **Review Responsibility** |
| Eldon Allison | Geologist | Battle Mountain District Office | Fluid Minerals, Locatable Minerals, Mineral Materials, Nonenergy Leasable Minerals |
| Theodore Angle | Area Manager | Tonopah Field Station | Complete Document |
| Pat Barker | Archaeologist | Nevada State Office | Cultural Resources |
| Neal Brecheisen | Geologist | Nevada State Office | Oil and Gas |
| Osborne Casey | Fisheries Biologist | Nevada State Office | Fisheries, Woodland Management |
| Mary Craggett | Realty Specialist | Battle Mountain District Office | Lands & Realty, Utility Corridors |
| Duane Crimmons | Range Conservationist | Battle Mountain District Office | Range and Riparian |
| James Currivan | District Manager | Battle Mountain District Office | Entire Document |
| Dave Davis | District Forester | Battle Mountain District Office | Woodland Management |
| Jess Dingman | Fire Management Officer | Nevada State Office | Fire Management |
| Lee Douthit | Associate District Manager | Battle Mountain District Office | Complete Document |
| Genivieve Hannon | Natural Resource Specialist | Battle Mountain District Office | Riparian |
| Tom Hilken | Fire Management Officer | Battle Mountain District Office | Fire Management |
| Brad Hines | Range Conservationist | Nevada State Office | Livestock Grazing Management |
| Richard Hoops | Geologist | Nevada State Office | Geothermal Resources |
| Wayne King | Associate District Manager, Nonrenewable Resources | Battle Mountain District Office | Nonrenewable Resources |
| Jim McLaughlin | Soil Scientist | Nevada State Office | Soil, Air, Water |
| Roberta McGonagle | Archaeologist | Battle Mountain District Office | Cultural Resources |
| Michael Mitchel | Associate District Manager | Battle Mountain District Office | Complete Document, Battle Mountain Review Team Leader |
| Tracey Pharo | Recreation Planner | Battle Mountain District Office | Recreation |
| Tom Pagacnik | Wild Horse and Burro Specialist | Nevada State Office | Wild Horses and Burros |
| Ned Slagle | Geologist | Battle Mountain District Office | Geology and Minerals |

| TABLE 4-B (continued) LIST OF REVIEWERS | | | |
|---|---|---|---|
| Name | Program/Title | Office | Review Responsibility |
| Gerald Smith | District Manager | Battle Mountain District Office | Complete Document |
| Steve Smith | Recreation Planner | Nevada State Office | Recreation, Visual Resource Management, Wilderness |
| Christopher Stubbs | Planning and Environmental Coordinator | Battle Mountain District Office | Entire Document |
| John Snow | Geologist | Nevada State Office | Fluid Minerals |
| Larry Steward | Geologist | Nevada State Office | Locatable Minerals |
| Ken Stowers | Realty Specialist | Nevada State Office | Land & Realty, Utility Corridors |
| Neil Talbot | Regional Planner | Nevada State Office | Review Team Leader, Complete Document |
| Curtis Warrick | Wildlife Biologist | Nevada State Office | Wildlife Habitat, Sensitive Plant and Animal Species |
| Jeff Weeks | Associate District Manager, Renewable Resources | Battle Mountain District Office | Renewable Resources |
| John Winnepenninkx | Wild Horse and Burro Specialist | Battle Mountain District Office | Wild Horses and Burros, Wildlife, Sensitive Plant and Animal Species |

# GLOSSARY, INCLUDING ACRONYMS

Accelerated Erosion:  Much more rapid than normal, natural, or geologic erosion, primarily as a result of the influence of the activities of man or, in some cases, of animals or natural catastrophies that expose bare surface; for example, fires.

Area of Critical Environmental Concern (ACEC):  Places within the public lands where special management attention is required to protect and prevent irreparable damage to important historic, cultural or scenic values, fish and wildlife resources, other natural systems or processes or to protect life and safety from natural hazards.

Allotment Categorization:  The grazing management program has assigned priorities to management efforts using a selective management approach.  Under this approach, grazing allotments are categorized into "I", "M", and "C" management categories.  The objectives for these categories are to: 1) *Improve* (I) current unsatisfactory conditions; 2) *Maintain* (M) current satisfactory conditions; or 3) Manage *custodially* (C) while protecting existing resource values.  Proposed actions for managing allotments within each category are designed to meet these objectives.

Allotment:  An area of land designated and managed for grazing of livestock.

AML:  Appropriate Management Level.  The maximum number of wild horses and/or burros to be managed for in a herd management area.  The Population number has been set through evaluation of monitoring data.

AMP:  Allotment Management Plan.  A documented program which prescribes the manner in which livestock operations will be conducted to meet multiple-use sustained yield, economic and other objectives.

APD:  Application for Permit to Drill.  A written application for the purpose of drilling for oil and gas.

Appropriative Water Right:  The right to use water in accordance with the appropriation doctrine, obtained by making application under State law and administrative claims procedures.

ARPA:  Archaeological Resources Protection Act of 1979.  The purposes of this Act are to secure, for the present and future benefit of the American people, the protection of archaeological resources and sites which are on public lands and Indian lands, and to foster increased cooperation and exchange of information between governmental authorities, the professional archaeological community, and private individuals having collections of archaeological resources and data which were obtained before the date of this Act.

AUM:  Animal Unit Month.  The amount of forage necessary for the sustenance of one cow or its equivalent for a period of one month.

Bajada:  A broad, continuous alluvial slope or gently inclined detrital surface extending from the base of mountain ranges out into and around an inland basin, formed by the lateral coalescence of a series of separate but confluent alluvial fans, and having an undulating character due to the convexities of the component fans.  It occurs most commonly in semiarid and desert regions, as in the southwest U.S.

BOPD:  Barrels of oil per day.

"C" Category:  A grazing allotment category where the objective is to Custodially manage the existing resource values.

Candidate Species:  System of categorization provided by the Endangered Species Act. Category 1 (C1) are plant and animal species for which the U.S. Fish and Wildlife Service has on file substantial information to support a proposal to list as threatened or endangered.  Category 2 (C2) are plant and animal species for which current information indicates that a proposal to list as threatened or endangered is possibly appropriate, but for which more information is needed to support a listing proposal.

Carey Act:  The Act of August 18, 1894, which enables the Federal government to grant lands to eligible states which may in turn make grants to entrymen who irrigate and reclaim said lands (see 43 U.S.C. 641).

Casual Use:  Any short-term noncommercial activity which does not cause appreciable damage or disturbance to the public lands, their resources or improvements, and which is not prohibited by closure of the lands to such activities.

CFR:  Code of Federal Regulations.

Charcoal Kiln:  An historic structure made of rock or brick in which charcoal is produced through the burning of wood.

Class I Cultural Inventory:  An inventory of the existing literature and a profile of the current data base for cultural resources, frequently utilized to guide field inventories.

Class II Cultural Inventory:  A sample-oriented field inventory which is representative of the range of cultural resources within a finite study area.

Class III Cultural Inventory:  An intensive field inventory designed to locate and record, from surface and exposed profile, all cultural resources within a specified area.

Common Desert Plants:  Common desert plants are those plants occurring throughout most of the Tonopah Planning Area and/or that are not classified as a special status species.

Conservation:  Refers to cultural resources which have overriding scientific and/or historic importance and which are to be maintained in their present condition and protected from conflicting land or resource use.

Critical Habitat:  Any air, land, or water area, including elements thereof, which has been determined (and published in the *Federal Register*) to be essential to the survival of wild populations of an endangered or threatened species or to be necessary for their recovery to a point at which the measures provided pursuant to the Endangered Species Act are no longer necessary.

CRMP:  Coordinated Resource Management Planning.  Through the CRMP process livestock operators, interested members of the public, organization representatives, and officers of State and Federal resource management agencies formulate activity plans for the management of wildlife, wild horses/burros, and livestock.

Cultural Resources:  Fragile and nonrenewable elements of the environment including archaeological remains (evidence of prehistoric or historic human activities) and sociocultural values traditionally held by ethnic groups (sacred places, traditionally utilized raw materials, etc.).

Cultural Resources Property:  Any physical evidence of former human presence more than 50 years old. Examples can include anything from a single isolated artifact (stone flake, projectile point, bottle fragment, etc.) to vestiges of an old trail, historic period dump or 19th-century mining operation, to a large aboriginal village or historic townsite.

DLE:  Desert Land Entry.  An entry of irrigable, arid, agricultural public land under the Act of March 3, 1877, which the entryman must reclaim, irrigate and cultivate.  An individual may file and receive patent to a maximum of 320 acres [no residency requirement in Nevada].

Ecological Site:  A distinctive kind of rangeland that differs from other kinds of rangeland in its ability to produce a characteristic natural plant community.  An ecological site is the product of all environmental factors responsible for its development.  It is capable of supporting a native plant community typified by an association of species that differs from that of all other ecological sites in kind or production of species or in total production.

Endangered Species:  Any animal or plant species in danger of extinction throughout a significant portion of its range.  These species are listed by the U.S. Fish and Wildlife Service.

Ephemeral Range:  Range on which the principal plants are self-perpetuating annual, herbaceous species.

ERMA:  Extensive Recreation Management Area.  The portion of the Tonopah Planning Area which is not within an SRMA.  ERMAs are areas where recreation is dispersed and unstructured and where minimal recreation-related investments are required.

Erosion:  The wearing away of the land surface by running water, wind, ice, or other geological agents, including such processes as gravitational creep.

ESA: Endangered Species Act of 1973 (as amended).  Federal laws to ensure that no Federal action will jeopardize the continued existence of Federally listed or proposed threatened or endangered species of plant or animal.

Experimental Stewardship:  A program authorized by Section 12 of the Public Rangelands Improvement Act of 1978.  The goal of the program is effective resource management by grazing permittees whose stewardship results in improved range conditions.

Fire Intensity Level:  An expression of fireline intensity, based on typical flame length of a fire behavior condition, used in the analysis to reflect differences in difficulty of suppression and fire effects on resource output:

| Flame Length (feet) | Fire Intensity Level |
| --- | --- |
| 0-2 | 1 |
| 2-4 | 2 |
| 4-6 | 3 |
| 6-8 | 4 |
| 8-12 | 5 |
| 12+ | 6 |

FLPMA:  Federal Land Policy and Management Act.  Public Law 94-579, October 21, 1976.  Often referred to as the BLM "Organic Act," which provides the majority of the BLM's legislative authority, direction, policy, and basic management guidance.

Fluid Minerals:  Includes both oil and gas and geothermal resources.  Established by the Mineral Leasing Act of 1920 and the Geothermal Steam Act of 1970.

FMAP:  The approved Battle Mountain Fire Management Activity Plan.

Functional - At Risk:  Riparian-wetland areas that are in functional condition but an existing soil, water, or vegetation attribute makes it susceptible to degradation.

Herd Area:  The geographic area identified as having provided habitat for a herd of wild horses/burros in 1971.

HMA:  Wild Horse/Burro Herd Management Area.  Geographic units within herd areas which are managed for wild horses and burros.

HMAP:  Herd Management Area Plan.  A plan for management of wild horses/burros in a geographical unit.

HMP:  Habitat Management Plans.  Activity-level plans for wildlife habitat management.  They are written in coordination with other resource plans and in accordance with the RMP.

"I" Category:  A grazing allotment category where the objective is to improve the current resource condition.

IMP:  Interim Management Policy and Guidelines.  Guidelines for managing Wilderness Study Areas so as not to impair their suitability for preservation as wilderness until the decision is made to designate an area as wilderness or to release it for multiple-use purposes.

Information Potential:  Refers to archaeological resources capable of contributing useful scientific, historic, or management information.

Interim Herd Size:  The interim herd size for wild horses and/or burros is the AML until modified or adjusted by monitoring and evaluation.

Issue:  A concern or controversy about existing and potential resource allocations, levels of resource use, production and protection, and related management practices.

KGRA:  Known Geothermal Resource Area.  Lands that have known value for geothermal resources.

Livestock:  Domestic livestock including cattle, sheep, horses, burros and goats.  In the Tonopah Planning Area cattle, sheep, and horses are the only domestic livestock licensed.

Livestock Carrying Capacity:  The maximum stocking rate possible without inducing damage to vegetation or related resources.

Locatable Minerals:  Any valuable mineral that is not salable or leasable including gold, silver, molybdenum, tungsten, uranium, etc.

Long-Term Monitoring:  Includes "(1) frequency, (2) percent composition by weight of the vegetation, (3) key forage plant utilization, (4) resource value ratings, (5) photography (photo plots), and (6) evaluation of permanent exclosures."

"M" Category:  A grazing allotment category where the objective is to maintain the current resource condition.

MFP:  Management Framework Plan.  A planning decision document prepared before the effective date of the regulations implementing the land-use planning provisions of FLPMA.

Mineral Materials:  Common varieties of sand, building stone, gravel, clay, moss rock, etc., obtainable under the Mineral Act of 1947, as amended.

MLRA:  Major Land Resource Areas.  A method used by the Soil Conservation Service (U.S. Department of Agriculture) for classifying areas suitable for potential uses.

MMBO:  Million barrels of oil.

Monitoring:  The orderly collection and analysis of data to evaluate progress in meeting resource management objectives.

Multidisciplinary Approach:  Consultation and analysis among individuals representing two or more disciplines to "insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision making, which may have an impact on man's environment" [NEPA 102(2)(A)].

Multiple Use:  Management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, fish and wildlife, and natural scenic, scientific, and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

NDOT:  State of Nevada Department of Transportation.

NDOW:  State of Nevada Division of Wildlife.

NEPA:  National Environmental Policy Act of 1969.  A law enacted on January 1, 1970 that established a national policy to maintain conditions under which man and nature can exist in productive harmony and fulfill the social, economic and other requirements of present and future generations of Americans.  It established the Council on Environmental Quality for coordinating environmental matters at the Federal level and to serve as advisor to the President on such matters.  The law made all Federal actions and proposals which could have a significant impact on the environment subject to review by Federal, State and local environmental authorities.

NHPA:  National Historic Preservation Act of 1966.  This Act required Federal agencies to give consideration to historic properties determined significant (properties listed on or determined to be eligible for the National Register of Historic Places) prior to expending funding for, authorizing, or licensing a Federal project or permit.  It sets a procedure of consultation with the State Historic Preservation Officer (SHPO), as established by the Act, and includes the establishment of the Advisory Council on Historic Preservation (ACHP).  The ACHP is an independent agency which reviews those cases for which the Federal agency and the SHPO cannot come to an agreement, and those cases where adverse effects will occur to significant cultural properties.  This consultation process is to assure significant cultural properties are not unnecessarily destroyed but are protected and considered to the extent possible and practical.

National Natural Landmark Register:  A program which seeks to identify and encourage the preservation of areas that illustrate the ecological and geological character of the United States.

NOI:  Notice of Intent.  (1) A notice printed in the Federal Register announcing that the agency is going to prepare an RMP and/or EIS.  (2) A form submitted by an exploration company to the BLM prior to conducting geophysical data acquisition for evaluation of oil and gas potential.

Nonenergy Leasable Minerals:  Solid minerals such as phosphate, sodium and potassium which may be acquired under the Mineral Leasing Act of 1920, as amended.

Nonfunctional: Riparian-wetland areas that clearly are not providing adequate vegetation, landform, or large woody debris to dissipate stream energy associated with high flows and thus not reducing erosion, improving water quality, etc., as listed in the definition of proper functioning condition. The absence of certain physical attributes such as a floodplain where one should be are indicators of nonfunctioning conditions.

Notice: Notification to the BLM that a party intends to conduct mineral exploration or mining activities that will result in surface disturbance of no more than five acres. Refers to 43 CFR 3809 activities.

NSO: No Surface Occupancy. A fluid minerals leasing stipulation that prohibits occupancy or disturbance on all or part of the lease surface in order to protect special values.

OHV: Off-Highway Vehicles. Any motorized vehicle designed for cross-country travel over any type of natural terrain.

OHV Designations: Open: An area where all types of vehicle use are permitted at all times, anywhere in the area, subject to operating regulations and vehicle standards set forth in law. Limited: An area restricted at certain times, in certain areas, and/or to certain vehicular use. These restrictions may be of any type, but can generally be accommodated within the following type of categories: numbers of vehicles; types of vehicles; time or season of vehicle use; permitted or licensed use only; use on existing roads and trails; use on designated roads and trails; and other restrictions. Closed: An area where off-highway vehicle use is prohibited.

Oil play: The prospective target based on extrapolation of geologic features.

Order 3 Soil Survey: A general soil survey normally conducted by the USDA, Soil Conservation Service, adequate for general planning purposes to determine land-use restrictions.

Petroglyph: A figure, design, or indentation carved, abraded, or pecked into a rock surface.

Pictograph: A figure or design painted onto a rock surface.

Plan of Operations: A plan submitted by an operator in compliance with 43 CFR 3802 or 43 CFR 3809, which outlines in detail proposed exploration or mining activities for BLM approval. Can apply to solid leasable minerals or locatable minerals.

Planning Criteria: The constraints and guides for planning purposes as outlined in 43 CFR 1610.4-2. Planning criteria state what will or will not be done during the planning process.

Pluvial Lake bed: A lake bed that was formed during a climatic wet cycle.

PNC: Potential Natural Community: The climax or final vegetation community that emerges after a series of successive vegetational stages. The climax community perpetuates itself indefinitely unless disturbed by outside forces.

Proper Functioning Condition: Riparian-wetland areas are functioning properly when adequate vegetation, landform, or large woody debris is present to dissipate stream energy associated with high water flows, thereby reducing erosion and improving water quality; filter sediment, capture bedload, and aid floodplain development; improve floodwater retention and groundwater recharge; develop root masses that stabilize streambanks against cutting action; develop diverse ponding and channel characteristics to provide the habitat and the water depth, duration, and temperature necessary for fish production, waterfowl breeding, and other uses; and support greater biodiversity. The functioning condition of riparian-wetland areas is a result of interaction among geology, soil, water, and vegetation.

Public Lands: Any land owned by the United States and administered by the Secretary of the Interior through the BLM.

Public Values: Cultural Resources to be managed for public values include those properties which possess identified sociocultural, educational, recreational and/or interpretational potential.

Public Water Reserve: A tract of public land reserved under 43 U.S.C. Section 141 et seq. (Pickett Act) or 43 U.S.C. Section 300 (Stock-Raising and Homestead Act of 1916), containing a spring and/or waterhole, which by law or executive action was withdrawn to preserve the water for certain limited public purposes.

R&PP: Recreation and Public Purposes Act. The Act allows the disposal of public lands to any State, local, Federal or political instrumentality or any nonprofit organization for any recreational or public purpose, provided there is no other public land law that is applicable.

Reclamation: The prevention of unnecessary erosion and return of disturbed land to a productive habitat or use by regrading, smoothing, applying topsoil, and seeding.

RFD: Reasonably Foreseeable Development scenarios. The projection of activities associated with a particular action which can be reasonably foreseen to occur within the near future, based on existing trends and economic factors. RFDs are used to provide a base line for impact comparison of alternatives in an economic analysi .

Riparian Area: An area of land directly influenced by permanent water. It has visible vegetation or physical characteristics reflective of permanent water influence. Lakeshores and streambanks are typical riparian areas. Excluded are such sites as ephemeral streams or washes that do not exhibit the presence of vegetation dependent upon free water in the soil.

RMP/EIS: Resource Management Plan/Environmental Impact Statement. A land use plan as described by the FLPMA; combined with a written analysis of the impacts on the environment caused by the plan.

RNA: Research Natural Area. An area which contains natural resource values of scientific interest and is managed primarily for research and educational purposes.

ROD: Record of Decision. a) States what the decisions are. b) Identifies the alternatives considered in reaching the decision and which were considered to be environmentally preferable. c) States whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted.

ROS: Recreation Opportunity Spectrum. A system to identify recreation opportunities available on public lands.

ROW: Right-of-Way. The legal right of use, occupancy, or access across land or water areas for a special purpose or purposes.

SCS: U.S.D.A., Soil Conservation Service.

Section 7 Consultation: Section 7 of the Endangered Species Act requires consultation with the U.S. Fish and Wildlife Service if the habitat of a threatened or endangered plant or animal may be affected by a Federally authorized action.

Section 106 Procedure: Refers to Section 106 of the National Historic Preservation Act, which requires consideration of historic and cultural resources prior to initiation of proposed BLM-authorized activities.

Sensitive Species:  Plant and animal species occurring on public lands and requiring special management attention in order to protect them and in order to prevent irreparable damage to the important resources or other natural systems or processes on which it depends.  The sensitive list is made up of species listed in category 3c in the Federal Register, Vol. 50, No. 188, September 27, 1985, page 39526.

Short-Term Monitoring:  Includes "(1) grazing use records, (2) weather information, (3) use maps, and (4) key forage plant utilization using cages for comparison."

SOP:  Standard Operating Procedures.  Management guidance which applies to, and is part of, the proposed management.

Special Status Species:  Wildlife and plant species either Federally listed or proposed for listing as endangered or threatened (also see Candidate Species).

SPG:  BLM Manual 1620, Supplemental Program Guidance.

SRMA:  Special Recreation Management Area.  Areas where the presence of high-quality natural resources and current or potential demand warrants intensive-use practices to protect the area for its scientific, educational and/or recreational values.

Surveillance:  Intensive monitoring of areas where human activity is damaging cultural resources. Surveillance may be a scheduled on-site visit, a reconnaissance flight or by observations taken while doing other work.

Threatened Species:  Any animal or plant species likely to become endangered within the foreseeable future throughout all or a significant part of its range.  These species are listed by the U.S. Fish and Wildlife Service.

Trend:  The direction of change over time, either toward or away, from desired management objectives.

Unauthorized Use:  Any use, occupancy, or development of the public lands, other than casual use, without proper authorization.

Utility Corridors:  A parcel of land designated through the land-use planning process as a preferred location for existing and future right-of-way grants.  Designation criteria are set forth in Section 503 of FLPMA, 43 CFR 2806.2 and BLM Manual Section 2801.11.

Utilization:  The percentage of forage that has been consumed by animals during a given time period.

Vegetation Type:  A classification of the plant community on a site based on the dominant plant species in the community.

Vested Water Right:  A right supported by law that settles the use of water by an individual without contingency; a right complete and consummated, and of such character that it cannot be diverted without the consent of the person to whom the right belongs; it is fixed or established and no longer open to controversy.

VRM:  Visual Resource Management.  A rating system outlined in BLM Manual 8410, designed for inventorying and managing visual resources.

Wild Horses/Burros:  Unbranded and unclaimed horses/burros and their progeny that have occupied the public lands on or after December 15, 1971, or that use these lands as all or part of their habitat.

Withdrawal:  Withholding an area of Federal land from settlement, sale, location, or entry under some or all of the general land laws for the purpose of limiting activities under those laws to maintain other public values.

WSA:  Wilderness Study Area.  An area which has been inventoried and found to be *wilderness in character,* as described in Section 603 of the FLPMA and section 2(c) of the Wilderness Act.

**APPROVAL**

The approval of this Record of Decision for the Tonopah Resource Management Plan completes the planning and environmental analysis process for this planning effort. An amendment to this management plan concerning the ACECs nominated during this planning effort will be initiated shortly. It will begin with a "Notice of Intent" published in the <u>Federal Register</u> and a letter being sent to all entities on the mailing list. It is anticipated that this amendment will be completed within a two-year period following its initiation.


_____
**Ann J. Morgan**
**State Director, Nevada**


10-2-97
**Date**

# APPENDIX 1
## GENERAL LIST OF KEY PLANT SPECIES

| VEGETATIVE TYPE | ASSOCIATED ECOLOGICAL SITES | KEY SPECIES |
|---|---|---|
| SALT DESERT SHRUB | 29-12 Sandy, 5-8" Precipitation Zone (p.z.) | Indian ricegrass<br>Sand dropseed<br>Fourwing saltbush<br>Winterfat |
| | 29-16 Loamy Upland, 5-8" p.z. | Indian ricegrass<br>Galleta<br>Spiny hopsage<br>Nevada ephedra<br>Fourwing saltbush<br>Winterfat |
| | 29-17 Loamy, 5-8" p.z. | Indian ricegrass<br>Galleta<br>Shadscale<br>Bud sagebrush<br>Winterfat |
| | 29-20 Silty, 5-8" p.z. | Indian ricegrass<br>Winterfat<br>Bud sagebrush |
| | 29-22 Sodic Hill, 5-8" p.z. | Galleta<br>Indian ricegrass<br>Shadscale<br>Bud sagebrush<br>Winterfat<br>Nevada ephedra |
| | 29-34 Sandy, 3-5" p.z. | Indian ricegrass<br>Fourwing saltbush<br>Cooper wolfberry<br>Nevada dalea |
| | 29-36 Cobbly Loam, 5-8" p.z. | Indian ricegrass<br>Galleta<br>Spiny menodora<br>Bailey greasewood<br>Shadscale<br>Nevada ephedra |
| | 29-42 Coarse Silty, 5-8" p.z. | Indian ricegrass<br>Galleta<br>Squirreltail<br>Winterfat<br>Bud sagebrush<br>Fourwing saltbush |
| | 29-46 Sandy Loam, 5-8" p.z. | Indian ricegrass<br>Galleta<br>Fourwing saltbush<br>Winterfat<br>Bud sagebrush<br>Spiny hopsage |

Continued on next page

## APPENDIX 1 (Continued)
## GENERAL LIST OF KEY PLANT SPECIES

| VEGETATIVE TYPE | ASSOCIATED ECOLOGICAL SITES | KEY SPECIES |
|---|---|---|
| SALT DESERT SHRUB (continued) | 29-48 Outwash, 5-8" p.z. | Basin wildrye<br>Fourwing saltbush |
| | 29-87 Gravelly Loam, 5-8" p.z. | Indian ricegrass<br>Galleta<br>Bailey greasewood<br>Shadscale<br>Bud sagebrush |
| SAGEBRUSH | 29-3 Loamy Bottom, 8-12" p.z. | Basin wildrye<br>Creeping wildrye<br>Basin big sagebrush |
| | 29-6 Loamy, 8-10" p.z. | Indian ricegrass<br>Needleandthread<br>Big sagebrush (Wyo.)<br>Fourwing saltbush |
| | 29-8 Shallow Calcareous Loam 8-10" p.z. | Indian ricegrass<br>Needleandthread<br>Black sagebrush<br>Cliffrose<br>Bitterbrush |
| | 29-10 Loamy Slope, 8-10" p.z. | Needleandthread<br>Indian ricegrass<br>Big sagebrush (Wyo.)<br>Nevada ephedra |
| | 29-29 Shallow Calcareous Slope 12-14" p.z. | Beardless wheatgrass<br>Black sagebrush<br>Cliffrose<br>Bitterbrush |
| ALKALINE MEADOWS AND BOTTOMS | 29-2 Saline Meadow, 3-8" p.z. | Alkali sacaton<br>Inland saltgrass<br>Baltic rush<br>Basin wildrye |
| | 29-4 Saline Bottom, 3-8" p.z. | Basin wildrye<br>Alkali sacaton<br>Inland saltgrass<br>Black greasewood<br>Rabbitbrush |

Continued on next page

## APPENDIX 1 (Continued)
## GENERAL LIST OF KEY PLANT SPECIES

| VEGETATIVE TYPE | ASSOCIATED ECOLOGICAL SITES | KEY SPECIES |
|---|---|---|
| MOUNTAIN MAHOGANY | 29-27 Mahogany Thicket, 16-20" p.z. | Needlegrasses<br>Basin wildrye<br>Mountain big sagebrush<br>Snowberry<br>Curlleaf mountain mahogany |
|  | 29-40 Limestone Hill, 10-14" p.z. | Needlegrasses<br>Indian ricegrass<br>Littleleaf mountain mahogany<br>Black sagebrush<br>Ephedra |
| RIPARIAN | 29-1 Wet Meadow, 8-12" p.z. | Sedge<br>Rush<br>Nevada bluegrass<br>Meadow barley |
| WOODLANDS | 29-66 Woodland, 12-16" p.z. | Pinyon pine<br>Utah juniper<br>Mountain big sagebrush<br>Cliffrose<br>Needlegrasses |
|  | 29-69 Woodland, 12-16" p.z. | Pinyon pine<br>Utah juniper<br>Black sagebrush<br>Cliffrose<br>Bluegrass |

# APPENDIX 2
## KEY FORAGE PLANT SPECIES BY ALLOTMENT [1]

| Allotment | Key Species | Allotment | Key Species |
|---|---|---|---|
| Blue Eagle | | Hot Creek | |
| | Winterfat | | Indian ricegrass |
| | Indian ricegrass | | Winterfat |
| | Bud sagebrush | | Galleta |
| | Fourwing saltbush | | Needleandthread |
| | Basin wildrye | | Fourwing saltbush |
| | Inland saltgrass | | Bitterbrush |
| | Alkali sacaton | | |
| | Sand dropseed | Hunts Canyon | |
| | | | Indian ricegrass |
| Butterfield | | | Winterfat |
| | Indian ricegrass | | Galleta |
| | Alkali sacaton | | Fourwing saltbush |
| | Galleta | | Needleandthread |
| | Inland saltgrass | | Squirreltail |
| | Squirreltail | | |
| | | Ice House | |
| Crater-Black Rock | | | Winterfat |
| | Winterfat | | Indian ricegrass |
| | Indian ricegrass | | Shadscale |
| | Galleta | | Alkali sacaton |
| | Needleandthread | | Inland saltgrass |
| | Fourwing saltbush | | |
| | | Ione | |
| Currant Ranch | | | Indian ricegrass |
| | Bluebunch wheatgrass | | Winterfat |
| | Bitterbrush | | Sandberg bluegrass |
| | | | Galleta |
| Forest Moon | | | Nevada ephedra |
| | Bluebunch wheatgrass | | Black sagebrush |
| | Bitterbrush | | Squirreltail |
| | | | |
| Francisco | | Magruder Mountain | |
| | Sand dropseed | | Indian ricegrass |
| | Galleta | | Winterfat |
| | Indian ricegrass | | Crested wheatgrass |
| | Winterfat | | Galleta |
| | Fourwing saltbush | | Alkali sacaton |
| | Squirreltail | | Squirretail |
| | Nevada ephedra | | |
| | Basin wildrye | | |
| | Inland saltgrass | | |

Continued on next page

A-4

# APPENDIX 2 (Continued)

| Allotment | Key Species | Allotment | Key Species |
|---|---|---|---|
| Monitor | | Nyala | |
| | Basin wildrye | | Indian ricegrass |
| | Indian ricegrass | | Winterfat |
| | Winterfat | | Galleta |
| | Inland saltgrass | | Sand dropseed |
| | Crested wheatgrass | | Alkali sacaton |
| | Squirreltail | | Squirreltail |
| | Mat muhly | | Inland saltgrass |
| | Baltic rush | | Needleandthread |
| | Sedge | | Fourwing saltbush |
| Monte Cristo | | Ralston | |
| | Indian ricegrass | | Winterfat |
| | Galleta | | Indian ricegrass |
| | Fourwing saltbush | | Shadscale |
| | Winterfat | | Galleta |
| | Nevada ephedra | | Fourwing saltbush |
| | Shadscale | | Sand dropseed |
| | | | Squirreltail |
| Montezuma | | Razorback | |
| | Indian ricegrass | | Desert needlegrass |
| | Winterfat | | Nevada ephedra |
| | Galleta | | Winterfat |
| | Desert needlegrass | | Fourwing saltbush |
| | Fourwing saltbush | | Indian ricegrass |
| Morey | | Red Spring | |
| | Winterfat | | Indian ricegrass |
| | Bitterbrush | | Winterfat |
| | Fourwing saltbush | | Fourwing saltbush |
| | Basin wildrye | | Squirreltail |
| | Needleandthread | | Galleta |
| | Galleta | | |
| | Indian ricegrass | | |
| | Shadscale | | |

Continued on next page

# APPENDIX 2 (Continued)

| Allotment | Key Species | Allotment | Key Species |
|---|---|---|---|
| Reveille | | Silver King | |
| | Indian ricegrass | | Indian ricegrass |
| | Winterfat | | Galleta |
| | Fourwing saltbush | | |
| | Galleta | Silver Peak | |
| | Green Molly Kochia | | Needleandthread |
| | Squirreltail | | Baltic rush |
| | Sand dropseed | | Inland saltgrass |
| | Bud sagebrush | | Alkali sacaton |
| | Needleandthread | | Winterfat |
| | | | Black sagebrush |
| San Antone | | | Indian ricegrass |
| | Indian ricegrass | | Basin wildrye |
| | Winterfat | | Sandberg bluegrass |
| | Galleta | | Shadscale |
| | Sand dropseed | | Galleta |
| | Shadscale | | |
| | Green Molly Kochia | Smoky | |
| | Nevada ephedra | | Indian ricegrass |
| | Fourwing saltbush | | Alkali sacaton |
| | Squirreltail | | Basin wildrye |
| | | | Alkali bluegrass |
| Sand Springs | | | Squirreltail |
| | Indian ricegrass | | Galleta |
| | Winterfat | | Sand dropseed |
| | Squirreltail | | Baltic rush |
| | Galleta | | Alkali cordgrass |
| | Thickspike wheatgrass | | Nevada ephedra |
| | Black sagebrush | | Inland saltgrass |
| | Needleandthread | | Bud sage |
| | Sand dropseed | | |
| | Sandberg bluegrass | Springdale #2 | |
| | | | Indian ricegrass |
| Sheep Mountain | | | Inland saltgrass |
| | Indian ricegrass | | Winterfat |
| | Galleta | | |

Continued on next page

## APPENDIX 2 (Continued)

| Allotment | Key Species | | Allotment | Key Species |
|---|---|---|---|---|

**Stone Cabin**

Indian ricegrass
Galleta
Winterfat
Fourwing saltbush
Bitterbrush
Needleandthread
Baltic rush
Squirreltail
Inland saltgrass
Sandberg bluegrass
Nevada ephedra

**Wagon Johnnie**

Indian ricegrass
Crested wheatgrass
Winterfat
Basin wildrye
Sandberg bluegrass
Squirreltail
Needleandthread
Baltic rush
Alkali cordgrass
Inland saltgrass
Alkali bluegrass
Mat Muhly

**Willow Creek**

Needleandthread
Indian ricegrass
Bitterbrush

**White Sage**

Indian ricegrass
Winterfat

**White Wolf**

Indian ricegrass
Winterfat
Fourwing saltbush
Alkali sacaton
Inland saltgrass

**Yellow Hills**

Indian ricegrass
Galleta
Winterfat
Fourwing saltbush

[1] The list of key species provided by allotment is general in nature.  Additions or deletions may be made as determined necessary.

# APPENDIX 3
## OFF-HIGHWAY VEHICLE DEFINITIONS

1.  "Off-Highway vehicle" - any motorized vehicle capable of, or designed for, travel on or immediately over bare land or other natural terrain, excluding: (1) any military, fire, search and rescue, or law enforcement vehicle while being used for emergency purposes; (2) any vehicle use expressly approved by the Authorized Officer; (3) vehicles in official use; and (4) any combat support vehicle when used in times of national defense emergency.

2.  "Official use" - use by an employee, agent or designated representative of the Federal government or one of its contractors, in the course of carrying out duties.

3.  "Trail" - an unmaintained way.  For example, a jeep 2-track or an ATV/motorcycle track.

4.  "Open area" - an area where motorized vehicle use is permitted both on and off-road.

5.  "Closed area" - an area where motorized vehicle use is prohibited.  Use of vehicles in closed areas may be approved by the Authorized Officer for special purposes or legal requirements.

6.  "Off-road" - any motorized vehicle use not on an existing road or trail.  This refers to cross-country travel.

7.  "Road" - a way that is improved by mechanical means to ensure relatively regular and continuous use by vehicles.  A way maintained solely by the passage of vehicles does not constitute a road.

8.  "Roadless" - the absence of roads which have been improved and maintained by mechanical means to ensure relatively regular and continuous use.

9.  "Improved and maintained" - actions taken physically by man to keep the road open to vehicular traffic.  Improved does not necessarily mean formal construction.  Maintained does not necessarily mean annual maintenance.

10. "Limited to existing roads and trails" - motorized vehicle use permitted on all roads and trails in the area unless otherwise signed as closed.  Motorized vehicle use is not permitted on roads and trails that have been physically closed through reclamation actions.  BLM will not prepare an activity plan/map for areas that are limited to existing roads and trails.  All authorized public land users who hold a permit or license (i.e. grazing permittees, wood permits, hunting license, right-of-way holders, mining claim, etc.) may drive off-road if required to fulfill requirements of their permit or license.  Motorized vehicles must park within 100 yards of an existing road or trail for camping.  All off-road vehicle use must be limited to the minimum necessary to accomplish the task and to prevent undue or unnecessary degradation to the area.  Organized events, wood cutting and land treatment projects will be handled on a case-by-case basis.  Emergency services and/or law enforcement activities are exceptions to these policies.

# APPENDIX 4
## PROPOSED RANGE IMPROVEMENT PROJECTS[1]

| ALLOTMENT | | TYPE OF IMPROVEMENT | UNITS |
|---|---|---|---|
| NAME | NUMBER | | |
| Blue Eagle | 0089 | Fence<br>Cattleguard | 18 miles<br>2 each |
| Butterfield | 0073 | Fence<br>Cattleguard<br>Spring Development<br>Trough<br>Pipeline | 18 miles<br>2 each<br>3 each<br>5 each<br>1 mile |
| Crater-Black Rock | 0087 | Fence<br>Cattleguard<br>Well<br>Trough | 26 miles<br>3 each<br>2 each<br>2 each |
| Francisco | 0075 | Spring Development<br>Trough<br>Pipeline<br>Vegetation Manipulation | 2 each<br>4 each<br>2 miles<br>1,400 acres |
| Hot Creek | 0084 | Fence<br>Cattleguard<br>Trough<br>Pipeline | 20 miles<br>4 each<br>4 each<br>10 miles |
| Hunts Canyon | 0078 | Fence<br>Cattleguard<br>Spring Development<br>Trough<br>Pipeline<br>Vegetation Manipulation | 13 miles<br>1 each<br>2 each<br>2 each<br>5 miles<br>4,660 acres |
| Ice House | 0095 | Well<br>Fence | 1 each<br>3.2 miles |
| Ione | 0071 | Fence<br>Cattleguard<br>Well<br>Spring Development<br>Trough<br>Pipeline<br>Vegetation Manipulation | 81 miles<br>7 each<br>4 each<br>2 each<br>11 each<br>13 miles<br>2,400 acres |
| Magruder Mountain | 0099 | Pipeline<br>Fence<br>Cattleguard<br>Vegetation Manipulation | 7.5 miles<br>9 miles<br>2 each<br>1,195 acres |

Continued on next page

## APPENDIX 4 (Continued)
## PROPOSED RANGE IMPROVEMENT PROJECTS[1]

| ALLOTMENT NAME | NUMBER | TYPE OF IMPROVEMENT | UNITS |
|---|---|---|---|
| Monitor | 0077 | Fence | 41 miles |
| | | Cattleguard | 7 each |
| | | Well | 1 each |
| | | Trough | 3 each |
| | | Pipeline | 3 miles |
| | | Vegetation Manipulation | 8,725 acres |
| Monte Cristo | 0104 | Well | 2 each |
| | | Pipeline | 6 miles |
| | | Trough | 4 each |
| Montezuma | 0094 | Well | 2 each |
| | | Pipeline | 5 miles |
| | | Trough | 5 each |
| | | Fence | 2 miles |
| Morey | 0083 | Fence | 12 miles |
| | | Cattleguard | 3 each |
| | | Spring Development | 1-each |
| | | Trough | 2 each |
| | | Pipeline | 2 miles |
| Nyala | 0088 | Fence | 38 miles |
| | | Cattleguard | 5 each |
| | | Well | 3 each |
| | | Trough | 6 each |
| | | Pipeline | 9 miles |
| | | Earthen Reservoirs | 2 each |
| Ralston | 0076 | Fence | 113 miles |
| | | Cattleguard | 10 each |
| | | Well | 3 each |
| | | Trough | 7 each |
| | | Pipeline | 17 miles |
| Razorback | 0093 | Well | 1 each |
| Red Springs | 0091 | Pipeline | 2.5 miles |
| | | Trough | 1 each |
| | | Fence | 6.5 miles |
| Reveille | 0085 | Fence | 140 miles |
| | | Cattleguard | 14 each |
| | | Well | 2 each |
| | | Trough | 4 each |
| | | Pipeline | 5 miles |
| San Antone | 0073 | Fence | 85 miles |
| | | Cattleguard | 16 each |
| | | Spring Development | 5 each |
| | | Trough | 12 each |
| | | Pipeline | 35 miles |

Continued on next page

## APPENDIX 4 (Continued)
## PROPOSED RANGE IMPROVEMENT PROJECTS[1]

| ALLOTMENT | | TYPE OF IMPROVEMENT | UNITS |
|---|---|---|---|
| NAME | NUMBER | | |
| Sand Springs | 0086 | Fence | 63 miles |
| | | Cattleguard | 7 each |
| | | Well | 2 each |
| | | Trough | 2 each |
| | | Earthen Reservoir | 3 each |
| | | Vegetation Manipulation | 10,000 acres |
| Silver Peak | 0097 | Pipeline | 1.25 miles |
| | | Spring Development | 5 each |
| | | Trough | 5 each |
| | | Fence | 21.5 miles |
| Smoky | 0074 | Fence | 52 miles |
| | | Cattleguard | 2 each |
| | | Spring Development | 1 each |
| | | Trough | 1 each |
| | | Pipeline | 3 miles |
| Stone Cabin | 0082 | Fence | 87 miles |
| | | Cattleguard | 19 each |
| | | Well | 2 each |
| | | Spring Development | 4 each |
| | | Trough | 11 each |
| | | Pipeline | 13 miles |
| | | Vegetation Manipulation | 14,080 acres |
| White Wolf | 0092 | Well | 1 each |

[1] Includes projects for livestock, wild horses/burros, wildlife, and watershed proposed in the Tonopah Grazing EIS and Esmeralda/Southern Nye RMP.

A-11

## APPENDIX 5
## CURRENT FORAGE ALLOCATIONS-TONOPAH (EAST)

| ALLOTMENT | ALLOTMENT ACRES | CURRENT STOCKING LEVELS FOR LIVESTOCK[6] | INITIAL HERD SIZES FOR WILD HORSES AND BURROS |
|---|---|---|---|
| Blue Eagle | 45,499 | 2,024 AUMs | 0 AUMs |
| Butterfield | 122,080 | 4,779 AUMs | 0 AUMs |
| Crater-Black Rock | 97,859 | 4,637 AUMs[1] | 0 AUMs |
| Currant Ranch | 501 | 282 AUMs | 0 AUMs |
| Forest Moon | 297 | 253 AUMs | 0 AUMs |
| Francisco | 16,896 | 1,206 AUMs[1] | 0 AUMs |
| Hot Creek | 154,483 | 6,363 AUMs[2] | 492 AUMs for 41 horses[2] |
| Hunts Canyon | 93,558 | 2,237 AUMs[1] | 360 AUMs for 30 horses |
| Ione | 189,099 | 10,476 AUMs[1] | 0 AUMs |
| Monitor | 92,463 | 3,862 AUMs[1] | 0 AUMs |
| Morey | 72,806 | 1,304 AUMs[2] | 0 AUMs |
| Nyala | 321,274 | 16,157 AUMs[1] | 0 AUMs |
| Ralston | 368,682 | 14,695 AUMs[1] | 120 AUMs for 10 horses[5] |
| Reveille | 657,520 | 25,730 AUMs[1] | 1,980 AUMs for 145 to 165 horses[3] |
| San Antone | 442,555 | 13,580 AUMs[1] | 0 AUMs |
| Sand Springs | 203,868 | 5,727 AUMs[1] | 588 AUMs for 49 horses[4] |
| Smoky | 125,247 | 5,523 AUMs[1] | 0 AUMs |
| Stone Cabin | 389,499 | 13,963 AUMs[1] | 4,368 AUMs for 364 horses[4] |

Continued on next page

## APPENDIX 5 (Continued)
## CURRENT FORAGE ALLOCATIONS-TONOPAH (EAST)

| ALLOTMENT | ALLOTMENT ACRES | CURRENT STOCKING LEVELS FOR LIVESTOCK[6] | INITIAL HERD SIZES FOR WILD HORSES AND BURROS |
|---|---|---|---|
| Wagon Johnnie | 28,157 | 1,219 AUMs[2] | 468 AUMs for 39 horses[4] |
| Willow Creek | 12,691 | 338 AUMs | 54 AUMs for 6 horses for 9 months |

[1] From the 12/88 Rangeland Program Summary.

[2] The AUMs shown here have been adjusted as a result of the "National Forest and Public Lands of Nevada Enhancement Act of 1988." The information shown is for the portion of the allotments remaining in BLM control. The Act transferred administration of approximately 26.9% of the lands in the Morey Allotment, 13.6% of the lands in the Hot Creek Allotment, and 72.1% of the lands in the Wagon Johnnie Allotment to the U.S. Forest Service.

[3] Directed by 1987 Court Decision (Civil R-85-535 BRT) Fallini vs. Hodel.

[4] The number of horses allowed within these HMA's was established by the consent decision issued by Administrative Law Judge, David Torbett, on May 11, 1992.

[5] Wild horses drift onto public lands from the Monitor Wild Horse Territory, which is administered by the U.S. Forest Service.

[6] The AUMs authorized for stocking levels may be adjusted through data gathered in accordance with monitoring methods described in the Nevada Rangeland Monitoring Handbook, dated September 1994.

# APPENDIX 6
## CURRENT FORAGE ALLOCATIONS-TONOPAH (WEST)

| ALLOTMENT | ALLOTMENT ACRES | CURRENT STOCKING LEVELS FOR LIVESTOCK[3] | INITIAL HERD SIZES FOR WILD HORSES AND BURROS[2] |
|---|---|---|---|
| Fish Lake Valley | 1,482 | 52 AUMs | 0 AUMs |
| Ice House | 43,143 | 229 AUMs[1] | 456 AUMs for: 34 horses in Silver Peak HMA; 4 horses in Fish Lake Valley HMA. |
| Magruder Mountain | 625,015 | 12,348 AUMs | 1,716 AUMs for: 76 horses in Palmetto HMA; 50 horses in Gold Mountain HMA; 13 horses in Montezuma HMA; 4 horses in Silver Peak HMA. |
| Monte Cristo | 496,018 | 9,352 AUMs | 936 AUMs for 69 horses in Dunlop HMA; 8 horses in Paymaster/Lone Mountain HMA; 1 horse in Fish Lake Valley HMA. |
| Montezuma | 538,297 | 10,668 AUMs | 7,656 AUMs for: 12 horses and 140 burros in Bullfrog HMA; 227 horses and 71 burros in Goldfield HMA; 138 horses in Montezuma HMA; 13 horses and 34 burros in Stonewall HMA; 3 horses in Paymaster/Lone Mountain HMA. |
| Razorback | 72,880 | 959 AUMs | 636 AUMs for 53 burros in Bullfrog HMA. |
| Red Springs | 137,267 | 2,641 AUMs[1] | 1,020 AUMs for: 57 horses and burros in Fish Lake Valley HMA; 28 horses in Silver Peak HMA. |
| Sheep Mountain | 88,435 | 1,740 AUMs | 336 AUMs for 28 horses in Paymaster/Lone Mountain HMA. |
| Silver King | 8,969 | 150 AUMs | 0 AUMs |
| Silver Peak | 283,907 | 5,699 AUMs | 2,352 AUMs for: 193 horses in Silver Peak HMA, 3 in Fish Lake Valley HMA. |
| Springdale | 1,466 | 24 AUMs | 24 AUMs for 2 burros in Bullfrog HMA. |
| White Sage | 10,315 | 600 AUMs | 0 Silver Peak HMA. |
| White Wolf | 59,310 | 697 AUMs | 600 AUMs for 30-50 horses in Silver Peak HMA. |
| Yellow Hills | 62,203 | 1,212 AUMs | 48 AUMs for: 2 horses in Montezuma HMA; 2 horses in Paymaster/Lone Mountain HMA. |

[1] The AUMs shown have been adjusted as a result of the "National Forest and Public Lands of Nevada Enhancement Act" of 1988. This Act transferred 5% of the Red Springs Allotment, 0.5% of the Silver Peak Allotment, and 11% of the Ice House Allotment to the Inyo National Forest. The Act also transferred 20% of the Fish Lake Valley Herd Management Area to the Inyo National Forest.

[2] Herd size has been apportioned among allotments within the HMAs based on data as shown in Appendix 8.

[3] The AUMs authorized for stocking levels may be adjusted through data gathered in accordance with monitoring methods described in the Nevada Rangeland Monitoring Handbook, dated September 1994.

# APPENDIX 7

### METHODOLOGY FOR ADJUSTMENT OF LIVESTOCK AND WILD HORSE/BURRO USE

Future adjustments in livestock active preference and wild horse/burro appropriate management level (AML) will be based on short- and long-term monitoring data. In cases where use by livestock and wild horses/burros overlap and individual use is indistinguishable, the adjustments will be based on the proportional relationship between livestock and wild horses/burros as established through previous land use plans as shown in Appendices 5 and 6. Examples are provided to illustrate.

SITUATION ONE: Wild horse/burro use exceeds the "thriving natural ecological balance" level and no overlap with livestock use occurs or is expected to occur with a proposed change in management.

Example: Herd Management Area A has 100 wild horses which inhabit the area 12 months of the year. Total actual use is 1,200 animal unit months (AUMs). Monitoring data show the area to be sustaining a weighted average utilization on key forage plants of 65 percent. Desired utilization is 50 percent.

Calculation of Carrying Capacity:

| Formula: |
| --- |
| $$\frac{\text{Existing Actual Use}^1}{\text{Weighted Average Utilization}^2} \ \ X \ \text{Desired Average Utilization}^3 \ = \ \text{Calculated Capacity}^4$$ |
| Solve for calculated capacity and adjustment in AML: |
| $\frac{1,200 \text{ AUMs}}{.65}$ X .50 = 923 AUMs (calculated capacity for an AML of 77 wild horses for 12 months) |

| | |
| --- | --- |
| [1] | Existing actual use is the number of livestock and/or wild horses actually grazing on an area expressed as AUMs. |
| [2] | Weighted average utilization is the average utilization of the forage in the area (moderate and above). |
| [3] | The desired average utilization is the degree of utilization that will meet the short- and long-term vegetative objectives for the area. |
| [4] | Calculated capacity is the level of use, or number of animals expressed as AUMs, which could graze the area and achieve the desired average utilization. |

Conclusion:

The wild horses would be reduced from 100 animals to an AML of 77 horses.

Continued on next page

# APPENDIX 7 (Continued)

### METHODOLOGY FOR ADJUSTMENT OF LIVESTOCK AND WILD HORSE/BURRO USE

**SITUATION TWO:** Livestock use exceeds the desired average utilization level and there are no wild horses in the allotment.

Example: Allotment B has 1000 cattle grazing for 12 months of the year. Total actual use is 12,000 AUMs. Results of monitoring show Allotment B to be sustaining a weighted average utilization on key forage plants of 70 percent. The desired average utilization is 50 percent.

Calculation of Carrying Capacity:

---

*Formula:*

$$\frac{\text{Existing Actual Use}^1}{\text{Weighted Average Utilization}^2} \quad \text{X} \quad \text{Desired Average Utilization}^3 \;=\; \text{Calculated Capacity}^4$$

*Solve for calculated capacity and adjustment in active preference:*

$$\frac{12{,}000 \text{ AUMs}}{.70} \text{ X } .50 = 8{,}571 \text{ AUMs (calculated capacity for active preference)}$$

| | |
|---|---|
| 1 | Existing actual use is the number of livestock and/or wild horses actually grazing on an area expressed as AUMs. |
| 2 | Weighted average utilization is the average utilization of the forage in the area (moderate and above). |
| 3 | The desired average utilization is the degree of utilization that will meet the short- and long-term vegetative objectives for the area. |
| 4 | Calculated capacity is the level of use, or number of animals expressed as AUMs, which could graze the area and achieve the desired average utilization. |

---

Conclusion:

The livestock use would be reduced from 12,000 AUMs to 8,571 AUMs.

Continued on next page

# APPENDIX 7 (Continued)

## METHODOLOGY FOR ADJUSTMENT OF LIVESTOCK AND WILD HORSE/BURRO USE

SITUATION THREE:  Wild horse use and livestock use overlap.  Monitoring data indicate both wild horse and livestock use are contributing to the utilization measured.  The combination of both uses exceeds the desired average utilization level.

Example: Allotment C has 1,000 cattle grazing for 12 months of the year.   Total actual use by livestock is 12,000 AUMs.  Allotment C also contains a Wild Horse Herd Management Area with boundaries that correspond to the boundary of Allotment C.  An average population of 100 wild horses has been using the area for 12 months of the year.  Total actual use by wild horses is 1,200 AUMs.  The total actual use by livestock and wild horses is 13,200 AUMs.  Results of monitoring show the area to be sustaining a weighted average utilization on key forage plants of 70 percent.  The desired average utilization level is 50 percent.

Calculation of carrying capacity (Step 1):

---

Formula:

$$\frac{\text{Existing Actual Use}[1]}{\text{Weighted Average Utilization}[2]} \ \ X \ \ \text{Desired Average Utilization}[3] \ = \ \text{Calculated Capacity}[4]$$

Solve for calculated capacity:

$$\frac{13,200 \text{ AUMs}}{.70} \ \ X \ .50 = \ 9,429 \text{ AUMs (calculated capacity for livestock and wild horses)}$$

[1]   Existing actual use is the number of livestock and/or wild horses actually grazing on an area expressed as AUMs.

[2]   Weighted average utilization is the average utilization of the forage in the area (moderate and above).

[3]   The desired average utilization is the degree of utilization that will meet the short- and long-term vegetative objectives for the area.

[4]   Calculated capacity is the level of use, or number of animals expressed as AUMs, which could graze the area and achieve the desired average utilization.

---

The land use plan previously established an initial stocking level or active preference for livestock of 12,000 AUMs and an initial herd size or AML for wild horses of 50 animals or 600 AUMs for a total allocation of 12,600 AUMs.  The Calculated adjustment is a reduction of **3,171 AUMs** in the combined use of livestock and wild horses.  The calculation of the new allocations for livestock and wild horses are shown in the following formulas.

                                    Continued on next page

# APPENDIX 7 (Continued)

### METHODOLOGY FOR ADJUSTMENT OF LIVESTOCK AND WILD HORSE/BURRO USE

**SITUATION 3 (Continued)**

**Calculation of New Allocation to Livestock (Step 2):**

*Formula:*

$$\text{Initial Stocking Level} - \left( \frac{\text{Initial Stocking Level}}{\text{Total Allocation}} \quad \text{X} \quad \text{Calculated Adjustment} \right) = \text{New Allocation to Livestock}$$

*Solve for New Allocation (active preference) for livestock:*

$$12{,}000 \text{ AUMs} - \left( \frac{12{,}000 \text{ AUMs}}{12{,}600 \text{ AUMs}} \quad \text{X} \quad 3{,}171 \text{ AUMs} \right) = 8{,}980 \text{ AUMs}$$

**Calculation of New Allocation to Wild Horses (Step 3):**

*Formula:*

$$\text{Initial Herd Size} - \left( \frac{\text{Initial Herd Size}}{\text{Total Allocation}} \quad \text{X} \quad \text{Calculated Adjustment} \right) = \text{New Allocation to Wild Horses}$$

*Solve for New Allocation (AML) to Wild Horses:*

$$600 \text{ AUMs} - \left( \frac{600 \text{ AUMs}}{12{,}600 \text{ AUMs}} \quad \text{X} \quad 3{,}171 \text{ AUMs} \right) = 449 \text{ AUMs}$$

**Conclusion:**

The new allocation for the Allotment C would be:

| | |
|---|---|
| Livestock | = 8,980 AUMs active preference. |
| Wild Horse | = 449 AUMs for an AML of 37 wild horses. |
| | 9,429 AUMs calculated capacity. |

Continued on next page

## APPENDIX 7 (Continued)

### METHODOLOGY FOR ADJUSTMENT OF LIVESTOCK AND WILD HORSE/BURRO USE

SITUATION FOUR:  Wild horse use and livestock use overlap.  Monitoring data indicate wild horse and livestock use  contribute to the utilization measured.  The combination of both uses is less then the desired average utilization level.  Monitoring data indicate that additional forage is permanently available on a sustained yield basis and land use objectives can be met.

Example:  Allotment D has 1,000 cattle grazing for 12 months.  Total actual use by livestock is 12,000 AUMs.  Allotment D also contains a Wild Horse Management Area with boundaries that correspond to the boundary of Allotment D.  An average population of 50 wild horses has been using the area for 12 months. Total actual use by wild horses is 600 AUMs.  The total actual use by livestock and wild horses is 12,600 AUMs.  Results of monitoring show the area to be sustaining an average overall utilization level of 30 percent.  Desired average utilization is 50 percent.

Calculation of carrying capacity (Step 1):

| Formula: |
|---|
| $\dfrac{\text{Existing Actual Use}^1}{\text{Weighted Average Utilization}^2}$  **X** Desired Average Utilization$^3$ = Calculated Capacity$^4$ |
| Solve for calculated capacity: |
| $\dfrac{12{,}600 \text{ AUMs}}{.30}$ **X** .50 = 21,000 AUMs (calculated capacity for livestock and wild horses) |
| [1]   Existing actual use is the number of livestock and/or wild horses actually grazing on an area expressed as AUMs. |
| [2]   Weighted average utilization is the average utilization of the forage in the area (moderate and above). |
| [3]   The desired average utilization is the degree of utilization that will meet the short- and long-term vegetative objectives for the area. |
| [4]   Calculated capacity is the level of use, or number of animals expressed as AUMs, which could graze the area and achieve the desired average utilization. |

The land use plan previously established an initial stocking level or active preference of 12,000 AUMs for livestock and an initial herd size or AML for wild horses of 50 animals, or 600 AUMs, for a total allocation of 12,600 AUMs.  The calculated adjustment is an increase of 8,400 AUMs which could be allocated to livestock and wild horses. The calculation of the new allocations to livestock and wild horses are shown in the following formulas.

Continued on next page

# APPENDIX 7 (Continued)

### METHODOLOGY FOR ADJUSTMENT OF LIVESTOCK AND WILD HORSE/BURRO USE

**SITUATION 4 (Continued)**

**Calculation of New Allocation to Livestock (Step 2):**

Formula:

$$\text{Initial Stocking Level} + \left( \frac{\text{Initial Stocking Level}}{\text{Total Allocation}} \times \text{Calculated Adjustment} \right) = \text{New Allocation to Livestock}$$

Solve for New Allocation (active preference) to Livestock:

$$12,000 \text{ AUMs} + \left( \frac{12,000 \text{ AUMs}}{12,600 \text{ AUMs}} \times 8,400 \text{ AUMs} \right) = 20,000 \text{ AUMs}$$

**Calculation of New Allocation to Wild Horses (Step 3):**

Formula:

$$\text{Initial Herd Size} + \left( \frac{\text{Initial Herd Size}}{\text{Total Allocation}} \times \text{Calculated Adjustment} \right) = \text{New Allocation to Wild Horses}$$

Solve for New Allocation (AML) to Wild Horses:

$$600 \text{ AUMs} + \left( \frac{600 \text{ AUMs}}{12,600 \text{ AUMs}} \times 8,400 \text{ AUMs} \right) = 1,000 \text{ AUMs}$$

**Conclusion:**

The new allocation for Allotment D would be:

|  |  |
|---|---|
| Livestock | = 20,000 AUMs active preference. |
| Wild Horse | = 1,000 AUMs or an AML of 83 wild horses. |
|  | 21,000 AUMs calculated capacity. |

# APPENDIX 8 A
## WILD HORSES AND BURROS BY ALLOTMENT-TONOPAH (WEST)
### (FORMERLY ESMERALDA-SOUTHERN NYE RMP AREA)

| HERD MANAGEMENT AREA (HMA) H = horse B = burro | Bullfrog | Dunlap | Fish Lake Valley | Gold Mountain | Goldfield | Montezuma Peak | Palmetto | Paymaster/ Lone Mountain | Silver Peak | Stonewall | Allotment Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **ALLOTMENT** | | | | | | | | | | | |
| Emigrant Peak | | | | | | | | | 3 H (IHS) | | 3 H |
| Fish Lake Valley | | | 0 H (IHS) | | | | | | | | 0 H |
| Ice House | | | 4 H (IHS) | | | | | | 34 H (IHS) | | 38 H |
| Magruder Mountain ¹ | | | | 50 H (AML) | | 13 H (AML) | 76 H (AML) | | 4 H (AML) | | 143 H |
| Monte Cristo | | 69 H (IHS) | 1 H (IHS) | | | | | 8 H (IHS) | | | 78 H |
| Montezuma ³ | 12 H 140 B (IHS) | | | | 227 H 71 B (IHS) | 138 H (IHS) | | 3 H (IHS) | | 13 H 34 B (IHS) | 393 H 245 B |
| Razorback ³ | 53 B (AML) | | | | | | | | | | 53 B |
| Red Springs ⁴ | | | 57 H & B (AML) | | | | | | 28 H (AML) | | 85 H & B |
| Sheep Mtn. | | | | | | | | 28 H (IHS) | | | 28 H |
| Silver Peak | | | 3 H (IHS) | | | | | | 193 H (IHS) | | 196 H |
| Springdale #2 | 2 B (IHS) | | | | | | | | | | 2 B |

¹ Proposed Multiple Use Decision (PMUD) September 9, 1994

² The Proposed MUD of February 11, 1994, is currently under appeal. If affirmed, AML changes will be as follows: Bullfrog HMA = 12 H & 183 B, Goldfield HMA = 125 H & 50 B, Montezuma HMA = 155 H, Paymaster/Lone Mtn. = 5 H, Stonewall HMA = 50 H & 25 B.

³ Final MUD June 8, 1994

⁴ Final MUD January 19, 1995

## APPENDIX 8 A (Continued)
## WILD HORSES AND BURROS BY ALLOTMENT-TONOPAH (WEST)
### (FORMERLY ESMERALDA-SOUTHERN NYE RMP AREA)

| HERD MANAGEMENT AREA (HMA) H = horse B = burro | Bullfrog | Dunlap | Fish Lake Valley | Gold Mountain | Goldfield | Montezuma Peak | Palmetto | Paymaster/ Lone Mountain | Silver Peak | Stonewall | Allotment Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ALLOTMENT | | | | | | | | | | | |
| White Wolf [5] | | | | | | | | | 30-50 H (AML) | | 30-50 H |
| Yellow Hills | | | | | | 2 H (IHS) | | 2 H (IHS) | | | 4 H |
| Unallocated | | | | | | | | 7 H (IHS) | | | 7 H |
| | | | | | | | | | | | |
| HMA Total | 12 H 195 B | 69 H | 65 H & B | 50 H | 227 H 71 B | 153 H | 76 H | 48 H | 312 H | 13 H 34 B | 1,025 H 300 B |

AML = Appropriate Management Level is the maximum number of wild horses and/or burros to be managed within a herd management area and has been set through monitoring and evaluation or by court order.

IHS = Interim Herd Size is derived from previous planning documents and is the appropriate management level until modified or adjusted by monitoring and evaluation.

---

[5] Final MUD February 9, 1995

## APPENDIX 8 B
## WILD HORSES AND BURROS BY ALLOTMENT - TONOPAH (EAST)
### (FORMERLY TONOPAH MFP AREA)

| HERD MANAGEMENT AREA (HMA)> H = horses B = burros | Hot Creek | Little Fish Lake | Reveille | Sand Springs | Saulsbury | Stone Cabin | Allotment Total |
|---|---|---|---|---|---|---|---|
| **ALLOTMENT** | | | | | | | |
| Hot Creek* | 41 H (AML) | | | | | | 41 H |
| Hunts Canyon' | | | | | 30 H (AML) | | 30 H |
| Ralston* | | | | | 10 H (AML) | | 10 H |
| Reveille' | | | 145-165 H (AML) | | | | 145-165 H |
| Sand Springs* | | | | 49 H (AML) | | | 49 H |
| Stone Cabin* | | | | | | 364 H (AML) | 364 H |
| Wagon Johnnie* | | 39 H (AML) | | | | | 39 H |
| Willow Creek | | | | | | (54 AUMs of Stone Cabin 364 AMLs) (IHS) | |
| | | | | | | | |
| HMA Total | 41 H | 39 H | 145-165 H | 49 H | 40 H | 364 H | 698 H 0 B |

AML = Appropriate Management Level is the maximum number of wild horses and/or burros to be managed within a herd management area and has been set through monitoring and evaluation or by court order.

IHS = Interim Herd Size is derived from previous planning documents and is the appropriate management level until modified or adjusted by monitoring and evaluation.

* = AML was set in a May 11, 1992 Court Agreement.

# APPENDIX 9

## EXISTING CLASSIFICATIONS AND WITHDRAWALS

I.   CLASSIFICATIONS

| TYPE | NUMBER | ACRES |
|------|--------|-------|
| Small Tract | 2 | 8.92 |
| Classification and Multiple Use | 4 | 1,984.00 |
| Recreation and Public Purposes | 19 | 1,534.09 |
| Desert Land Entry | 18 | 5,725.89 |
| Carey Act | 4 | 3,316.42 |
| Airport Leases | 3 | 126.20 |
| Total | | 12,695.52 |

II.  WITHDRAWALS

| TYPE[1] | NUMBER | ACRES |
|---------|--------|-------|
| Air Force | 2 | 619.32 |
| BLM-Power Site Reserve | 1 | 17.00 |
| BLM-Protective (Railroad Valley) | 1 | 14,710.33 |
| BLM-Administrative | 1 | 5.00 |
| Department of Energy | 3 | 2,571.29 |
| Federal Aviation Administration | 3 | 417.77 |
| Forest Service Administrative | 2 | 11.40 |
| BLM-Protective (Natural area) | 1 | 520.00 |
| Total | | 18,872.11 |

[1] Does not include nonadministrative site lands withdrawn to Forest Service

# APPENDIX 10

## THE RECREATION OPPORTUNITY SPECTRUM CLASS DESCRIPTIONS

| OPPORTUNITY CLASS | EXPERIENCE OPPORTUNITY | SETTING OPPORTUNITY |
|---|---|---|
| Primitive | Opportunity for isolation from the sights and sounds of man, to feel a part of the natural environment, to have a high degree of challenge and risk, and to use outdoor skills. | Area is characterized by essentially unmodified natural environment of fairly large size (2,500 acres). Concentration of users is very low and evidence of other users is minimal. The area is managed to be essentially free from evidence of man-induced restrictions and controls. Only facilities essential for resource protection are used. No facilities for comfort or convenience of the user are provided. Spacing of groups is informal and dispersed to minimize contacts between groups. Motorized use within the area is not permitted. |
| Semiprimitive Nonmotorized | Some opportunity for isolation from the sights and sounds of man, but not as important as for primitive opportunities. Opportunity to have high degree of interaction with the natural environment, to have moderate challenge and risk, and to use outdoor skills. | Area is characterized by a predominantly unmodified natural environment of moderate to large size (2,500 acres). Concentration of users is low, but there is often evidence of other area users. On-site controls and restrictions may be present, but are subtle. Facilities are provided for the protection of resource values and the safety of users only. Spacing of groups may be formalized to disperse use and limit contacts between groups. Motorized use is not permitted. |
| Semiprimitive Motorized | Some opportunity for isolation from the sights and sounds of man, but not as important as for primitive opportunities. Opportunity to have high degree of interaction with the natural environment, to have moderate challenge and risk, and to use outdoor skills. Explicit opportunity to use motorized equipment while in the area. | Area is characterized by a predominantly unmodified natural environment of moderate to large size (2,500 acres). Concentration of users is low, but there is often evidence of other area users. On-site controls and restrictions may be present, but are subtle. Facilities are provided for the protection of resource values and safety of users only. Spacing of groups may be formalized to disperse use and limit contacts between groups. Motorized use is permitted. |
| Roaded Natural | About equal opportunities for affiliation with other user groups and for isolation from sights and sounds of man. Opportunity to have a high degree of interaction with the natural environment. Challenge and risk opportunities are not very important except in specific challenging activities. Practice of outdoor skills may be important. Opportunities for both motorized and nonmotorized recreation are present. | Area is characterized by a generally natural environment with moderate evidence of the sights and sounds of man. Resource modification and utilization practices are evident, but harmonize with the natural environment. Concentration of users is low to moderate with facilities sometimes provided for group activity. On-site controls and restrictions offer a sense of security. Rustic facilities are provided for user convenience as well as for safety and resource protection. Conventional motorized use is provided for in construction standards and design of facilities. |

Continued on next page

# APPENDIX 10 (Continued)

## THE RECREATION OPPORTUNITY SPECTRUM CLASS DESCRIPTIONS

| OPPORTUNITY CLASS | EXPERIENCE OPPORTUNITY | SETTING OPPORTUNITY |
|---|---|---|
| Rural | Opportunities to experience affiliation with individuals and groups are prevalent as is the convenience of sites and opportunities. These factors are generally more important than the natural setting. Opportunities for wildland challenges, risk taking, and testing of outdoor skills are unimportant, except in those activities involving challenge and risk. | Area is characterized by substantially modified natural environment. Resource modification and utilization practices are obvious. Sights and sounds of man are readily evident, and the concentration of users is often moderate to high. A considerable number of facilities are designed for use by a large number of people. Facilities are often provided for specific activities. Developed sites, roads, and trails are designed for moderate to high use. Moderate densities are provided far away from developed sites. Facilities for intensive motorized use are available. |

# APPENDIX 11

## CULTURAL RESOURCE MANAGEMENT GUIDELINES

Manage for Information Potential

Cultural resources included under this management objective are capable of contributing useful scientific, historic, or management information.  This information potential is to be protected to the extent needed, by physical or administrative means until the potential has been realized through appropriate study.  The following resource types, and/or areas, will be managed for information potential: prehistoric lithic scatters, prehistoric ceramic scatters, historic archeological sites without architectural features, sites in upland pinyon-juniper forests and sites in riparian areas.

Resources to be managed for information potential can be studied, utilized, or included in data recovery projects to mitigate adverse effects after compliance with the BLM 8100 Manual Series and section 106 of the National Historic Preservation Act.

Manage for Public Values

Cultural resources included under this objective possess identified sociocultural, educational, recreational, or other public values.  Their locations are to be managed in a manner that gives adequate consideration to these values.  Resources managed for public values will have those values realized through activity plans.  The following resource types and/or areas will be managed for public values: rock art alignments (geoglyphs) will be managed to preserve their sociocultural values for Native Americans,  historic town sites, mining or milling sites, ranching or agricultural sites, or other historic sites with architectural features will  be managed for educational and recreational values. Cultural resources can be released from public value after a representative sample has been preserved.

Manage for Conservation

Cultural resources to be conserved are those with overriding scientific or historic importance.  They are managed to maintain them in their present condition and to protect them from potentially conflicting land or resource uses.  Resources managed for conservation will have those values realized through resource and/or area specific activity plans.

For conservation and protection of cultural resources, activity plans may provide for fencing, monitoring, purchase of claims, stabilization, establishment of parks with full time rangers, limited data recovery/collection, public education/interpretation, or other protective measures.  In addition, it is important that representative samples of all classes of sites in the Tonopah Planning Area be preserved for the enjoyment and scientific benefit of future generations.  Cultural resources can be released from conservation after a representative sample has been preserved.

Activity Plans

Cultural resources in the Tonopah Planning Area will be allocated to specific uses in subsequent activity plans.  Activity plans containing detailed management prescriptions for selected cultural properties will be developed after use allocations have been made.

Continued on next page

## APPENDIX 11 (Continued)

## CULTURAL RESOURCE MANAGEMENT GUIDELINES

Cultural resource activity plans will be developed for the following areas: Trap Springs-Gravel Bar Complex, Stormy-Abel Complex, Cane Man Hill Petroglyphs, Tybo-McIntyre Charcoal Kilns, Moores Station Petroglyphs, Jumbled Rock Petroglyph, Tonopah Lake Complex, Mud Lake Complex, Big Springs Petroglyphs, Fish Lake Valley Petroglyphs, Mountain View Arrastra, Columbus Salt Marsh, Witched Well, Oriental Wash Petroglyphs, Cave Spring and The Cistern.

A rock art management plan will be developed for the Tonopah Planning Area in consultation with Native American Leaders.

Monitoring

Archaeological Resource Protection Act (ARPA) surveillance points will be established in the following areas: Silver Peak Range, Clayton Valley, Fish Lake Valley, Hot Creek Range, Railroad Valley, all valleys with late Pleistocene lake features.

ARPA law enforcement and monitoring plans will be written for the following areas: Rhyolite, Trap Springs, Gravel Bar, and Stormy-Abel prehistoric districts, Fish Lake Valley Petroglyphs, Cave Spring, Cane Man Hill, Big Springs Petroglyphs and Fish Lake Valley Salt Marsh.

# APPENDIX 12

## RELATIONSHIP WITH THE ESMERALDA COUNTY POLICY FOR PUBLIC LANDS

This Appendix compares the actions of the Tonopah RMP with the provisions of the Esmeralda County Policy for Public Lands. The County policy is shown in the left-hand column and the corresponding actions of the Tonopah RMP are shown in the right-hand column. Each column is continued on following page.

### ESMERALDA COUNTY POLICY FOR PUBLIC LANDS (April, 1985)

### TONOPAH RMP

FEDERAL LANDS  Manage and utilize public lands on the basis of multiple use and sustained yield concepts, and in a manner that will conserve natural resources; protect and preserve the quality of the environment, and ecological, scenic, historical and archeological values; protect and preserve wildlife habitat, and certain lands in their natural condition; and provide for long term benefit, including economic benefits, for the people of Esmeralda County and future generations.

### DISPOSAL OF PUBLIC LANDS

### DISPOSAL OF PUBLIC LANDS

### POLICIES

1. Increase opportunities for local economic development by selectively increasing the amount of privately owned and locally managed land within the county.  a)  Lands with high recreational, wildlife, mineral and other public values should continue to remain as public lands.  b)  Public lands within the municipal service area of existing communities should continue to be made available for housing and industrial sites.  These lands should be transferred only when local governments agree that the transfer is opportune and would not be a burden to local governments.  Growth should be directed to these areas to the extent that it can be accommodated in a manner compatible with each area's character and without burdening public facilities and services.  c)  Residential and commercial development should be concentrated in the existing communities of Goldfield and Silver Peak, where public facilities can most economically concentrated.  Disposals should also be

1.  The RMP provides for community expansion and for private economic development through disposal of 299,140 acres of public lands.  This includes lands near Goldfield, Silver Peak, Coaldale Junction, Gold Point and west of Tonopah.  Land tenure adjustments are discretionary.  No lands will be disposed of unless they are identified in this RMP.  In order for public land to be sold, it must meet one of the following criteria set forth in Section 203(a) of the Federal Land Policy and Management Act of 1976:--the land is difficult or uneconomic to manage as a part of the public lands; and it is not suitable for management by another Federal department or agency.--the land was acquired for a specific purpose: and it is no longer required for that, or any other, Federal purpose; or--disposal of the land will serve important public objectives that can be achieved prudently or feasibly only if the land is removed from public ownership; and these objectives outweigh other public objectives or

## ESMERALDA COUNTY POLICY FOR PUBLIC LANDS

## TONOPAH RMP

permitted at Coaldale Junction, Gold Point, and just west of Tonopah.  d)  Public lands should continue to be made available for State and local government purposes.  Land identified for public purposes should receive preference over disposal for private purposes.  e)  Public land disposal should be in conformance with local land use plans.  The general public and State and local governments should be involved in public land disposals.

2.-Public land should be disposed of for private agricultural needs.  a)  Those lands disposed of for farm land would have to have adequate water, for irrigation and appropriate soil, as determined by a soil study.  b)  Before public lands are disposed of adverse impacts on existing and future uses should be considered. Adverse impacts could include important wildlife habitat, key seasonal grazing rights, municipal watershed, flood prone areas, access, mining (including potential), and recreational use of these lands.

3.  Whenever the public lands are disposed of, existing access to adjoining and nearby public lands should be retained for recreational or other multiple use needs or alternative routes of access should be made available.

4.  Promote the increased use of, and adherence to, comprehensive planning among all government entities in Nevada.  a)  The State and local governments should continue to develop land use plans to identify lands that should remain in public ownership.  b)  Local involvement and the use of Coordinated Resource Management Planning (CRMP) techniques should be encouraged in the Federal planning process.  c)  Adequate public notice shall be given for all public hearings and meetings regarding Federal, State, and local planning and land management matters in

values that will be served by maintaining the land in Federal ownership.  Site-specific decisions regarding land ownership adjustments within the Tonopah Planning Area are to be made based on whether the lands are needed for Bureau programs, or whether or not they are considered more valuable for other purposes.

Public lands identified for disposal may be made available for sale, exchange, agricultural entry, lease, or patent for recreation or public purposes.  Some lands identified for disposal may be retained in Federal ownership as a result of site- specific application of the land ownership adjustment criteria.

2.  There are three authorities for the disposal of public land specifically for agricultural purposes:  the Desert Land Act, the Carey Act, and the General Allotment Act.  Disposal of public land for agricultural purposes must meet the requirements of one of the three acts listed above and have a supporting permanent water source permitted by the Nevada State Engineer.

3.  All proposed developments will be reviewed for environmental impacts and effects on other land uses.

4.  The BLM adheres to comprehensive land use plans which have been approved by local government, to the extent they are compatible with Federal law and policies, and to the extent that it is practical to do so.  Proper notification of the public's opportunity to comment on Federal planning efforts is mandated by law.

**ESMERALDA COUNTY POLICY FOR PUBLIC LANDS**                    **TONOPAH RMP**

Esmeralda County. In addition to required legal notices, it is recommended that information news articles be published along with posted notices at the Courthouse, post offices, and libraries in the County.

5. Corridors for communications, utilities and transportation need to be planned for in harmony with other multiple uses on the public lands.

5. Designated right-of-way corridors within the Tonopah Planning Area will be three miles wide except where topographic constraints exist. Grants for rights-of-way are still required for facilities placed within designated corridors. Designation of a corridor does not mean that future rights-of-way are restricted to corridors, nor does it mean that there is a commitment by the BLM to approve all right-of-way applications within corridors.

6. To provide maximum management flexibility, disposals should be by the most appropriate authority available. a) Land exchanges that block up high value public purpose lands and make private lands more manageable should be given a high priority in Federal real estate actions.

6. BLM land tenure adjustments will be done in accordance with the most appropriate Federal laws and policies. Exchanges are the preferred method of acquisition when other methods such as conservation easements or management agreements will not protect special value areas or resources. Exchanges must be in the public interest. Blocking up of public and private lands in a mixed land ownership situation will normally be in the public interest.

AGRICULTURE  Recognize that agricultural production in Nevada will be necessary to help meet the requirements of future state populations and is important to Esmeralda County. Preserve agricultural lands and promote continuation of agricultural pursuits in Nevada.

AGRICULTURE

POLICIES

1. Formally recognize the value of and necessity for the retention and expansion of agricultural land by all levels of government.

1. In order to provide for community expansion and private economic development, the RMP identifies 299,140 acres for disposal. Site-specific decisions regarding land tenure adjustments will be determined using criteria outlined in the Standard Operating Procedures under "Lands". The only lands available for agricultural entry are those lands identified for disposal in the RMP.

| ESMERALDA COUNTY POLICY FOR PUBLIC LANDS | TONOPAH RMP |
|---|---|
| 2. The Federal government should continue to make the public rangelands economically and realistically available for livestock grazing, where compatible with other multiple use objectives. | 2. Livestock grazing will continue to be authorized in accordance with the principles of multiple use and sustained yield and 43 CFR 4100. Increases or decreases in livestock grazing will be based on vegetation monitoring and periodic allotment evaluations. |
| 3. Through State, Federal or other research institutions, promote a project to study the feasibility of harnessing the brackish water and playa areas of the county as shrimp (prawn) farms. | 3. This policy is not within the scope of an RMP/EIS and, therefore, has not been considered. |
| 4. Existing grazing permits should be continued and additional permits should be issued where appropriate to provide increased employment and revenue. | 4. See number 2 above. |

MINERAL RESOURCES  Recognize that the development of Nevada's mineral resources is desirable and necessary to the nation, the State and Esmeralda County. Retain existing mining areas and promote the expansion of mining operations and areas.

MINERAL RESOURCES

POLICIES

| | |
|---|---|
| 1. There should be access to land where the mineral estate is in Federal ownership. | 1. BLM provides for mineral entry, exploration, location, and operations pursuant to the mining laws in a manner that, 1) will not unduly hinder the mineral activities, and 2) assures that these activities are conducted in a manner which will prevent undue or unnecessary degradation of the public land. |
| 2. The entire county should be kept open for prospecting, mining and related activities. | 2. Under previous land-use plans, 99.4 percent of the Tonopah Planning Area was open to mineral entry. In the present RMP, 98.8 percent of the Planning Area is open to mineral entry. |
| 3. The Federal Mining Law of 1872 should remain in effect as the basic law relating to mining activities. | 3. The RMP is in compliance with applicable Federal laws and policies and does not analyze their merits. If the mining law is changed, the changes will be incorporated into the RMP through routine maintenance. |

| ESMERALDA COUNTY POLICY FOR PUBLIC LANDS | TONOPAH RMP |
|---|---|

WILDERNESS  The Esmeralda County Commissioners have adopted a resolution "deeming all areas of Esmeralda County to be inappropriate and unsuitable for wilderness designation by the Bureau of Land Management."

WILDERNESS

POLICIES

1. The resolution adopted on May 15, 1984, regarding all lands of Esmeralda County deemed inappropriate and unsuitable for wilderness designation by the Bureau of Land Management is still supported.

1 & 2.  The RMP does not change any recommendations the BLM has sent to the Secretary of the Interior on wilderness. Management of Wilderness Study Areas (WSAs) will continue under the "Interim Management Policy for Lands Under Wilderness Review". Those areas designated by Congress as Wilderness will be managed in accordance with the Wilderness Act and the specific enabling legislation requirements.  A Wilderness Management Plan detailing management objectives and actions for all resources will be prepared for each area after designation.

2. The economic values that may be derived from retention of the Bureau of Land Management lands in multiple use outweigh the values of wilderness designation in Esmeralda County.

3. Wilderness study areas should be returned to multiple use as soon as possible.

3. As stated in this RMP, should all or part of any WSA be released by Congress from wilderness study, resource management would be returned to multiple use management and would come under the scope of this RMP/EIS.

RECREATION  Conserve and protect scenic, historical and recreation resources where not in conflict with economic resource development.

RECREATION

POLICIES

1. Dispersed recreation opportunities on public lands should be encouraged.  Opportunities for unstructured recreation such as camping, fishing, hunting and four-wheeling in Esmeralda County on public lands should continue to be made available.

1. A broad range of outdoor recreation opportunities will continue to be provided on all segments of the public land, subject to the demand for such opportunities and the need to protect other resources. Special Recreation Management Areas, areas of concentrated use and existing facilities will receive first priority for operation and maintenance funds.

2. Recreational use of off-highway vehicles should be substantially restricted to existing roads and trails in Fish Lake Valley.

2. All other BLM lands that are not limited in the RMP are open to all individual, commercial and competitive outdoor recreation uses.  Most

| ESMERALDA COUNTY POLICY FOR PUBLIC LANDS | TONOPAH RMP |
|---|---|

of the Silver Peak Range which borders Fish Lake Valley on the east side is limited to existing roads and trails.

WILD HORSES AND BURROS   Manage wild horses and burros to minimize detrimental impacts on other multiple uses and pursue resource enhancement where needed to correct wild horse and burro damage.

WILD HORSES AND BURROS

POLICIES

1. Wild horse and burro herds should be managed at reasonable levels to be determined with public involvement and managed with consideration on needs of other wildlife species and livestock grazing.

1. The Wild Free-Roaming Horse and Burro Act of 1971 requires the BLM to provide for the protection, management, and control of all wild horses and burros on lands administered by the BLM.  Management is to be accomplished in a manner designed to achieve a thriving natural ecological balance and multiple-use relationship with other resource users.  The initial herd size for each HMA was defined in previous land use plans, which were developed with public participation.  Appropriate management levels will be established through the monitoring and evaluation process.

2. The Coordinated Resource Management and Planning (CRMP) process and/or Heil funds should be used to solve wild horse and burro problems.

2. The CRMP process is not specifically identified for use in this RMP.  However, it is one of the activity planning tools which may be utilized to resolve wild horse and burro problems.  Funds may be requested from the Nevada Commission for the Preservation of Wild Horses to assist in implementing the RMP.

3. Wild horse and burro impacts on private lands and waters should be mitigated.

3. Consistent with the Wild Free-Roaming Horse and Burro Act, the BLM is required to remove wild horses and burros from private land at the request of the land owner.

4. Any withdrawal of lands for wild horse or burro preserves is opposed.

4. No withdrawals are proposed for wild horse or burro preserves.

5. In those areas where there is a conflict between cattle and wild horses and burros, a reasonable harvest of wild horses and burros should be permitted.  A similar harvest of wild horses and burros is recommended where there is a conflict with deer and bighorn sheep.

5. The management prescribed in this RMP for wild horses and burros is to be accomplished in a manner designed to achieve a thriving natural ecological balance and multiple use relationship with other resource users in accordance with the Wild Free-Roaming Wild horse and Burro

**ESMERALDA COUNTY POLICY FOR PUBLIC LANDS**

**TONOPAH RMP**

Act. Wild horses and burros will be removed when the balance is exceeded.

6. Authority for wild horse and burro management should be returned to local governments.

6 & 7. These policy statements are beyond the scope of this RMP.

7. Laws and regulations on wild horses should be amended to allow greater flexibility for the disposal and adoption of wild horses and burros.

WILDLIFE  Identify, protect and preserve wildlife species and habitats in Esmeralda County.

WILDLIFE

POLICIES

1. Identify habitat needs of wildlife species and provide for those needs so as to, in time, attain reasonable population levels compatible with other multiple uses as determined by public involvement. a) Known critical wildlife habitats, such as streams, riparian zones, and wetlands, should receive special management. b) Wildlife habitat improvement projects such as guzzlers should be continued as appropriate. The projects should take into consideration impacts on other uses.

1. Fish and wildlife habitat will be maintained or improved. These habitats will continue to be evaluated on a case-by-case basis as part of project-level planning. Such evaluation will consider the significance of the proposed project and the sensitivity of fish and wildlife habitat in the affected area. Habitat Management plans will be prepared as funds are available. Habitat improvement projects will be implemented where necessary to stabilize or improve unsatisfactory or declining wildlife habitat condition. Sufficient forage and cover will be provided for wildlife. Range improvements will be designed to achieve both wildlife and range objectives. Important wildlife habitat such as streams and wetlands will be retained in Federal ownership.

2. Public wetlands should be retained and restored for wildlife values, except where they adversely affect geothermal drilling.

2. In general, wetlands will not be disposed of in this RMP. Efforts will be made in riparian areas around streams, springs and seeps to restore them for wildlife values. Riparian areas will be managed to achieve Proper Functioning condition as defined in this RMP.

The impacts of geothermal drilling will be examined on a case-by-case basis for effects on riparian habitat. Mitigation of potential adverse impacts will be incorporated as determined necessary.

3. Adequate and sufficient habitat to support the reintroduction of bighorn sheep and elk in Esmeralda County should be provided on the public lands. These mountain ranges have been identified for the reintroduction of bighorn sheep: Lone Peak, Monte Cristo Mountains, and Silver Peak. The reintroduction should only be made where they do not interfere or jeopardize other multiple uses of the land especially mining.

3. The reintroduction or augmentation of bighorn sheep into potential habitat areas of Goldfield, Magruder/Palmetto, Monte Cristo, Montezuma, Silver Peak and Gold Mountain habitat areas will continue to be supported in this RMP. No elk introductions are proposed. All reintroduction proposals will be examined to determine impacts on other land uses.

A-36

# APPENDIX 13

## RELATIONSHIP WITH THE NYE COUNTY POLICY FOR PUBLIC LANDS

This Appendix compares the actions of the Tonopah RMP with the provisions of the Nye County Policy for Public Lands. The County policy is shown in the left-hand column and the corresponding actions of the Tonopah RMP are shown in the right-hand column. Each column is continued on following page.

### NYE COUNTY POLICY FOR PUBLIC LANDS (April, 1985)

### TONOPAH RMP

FEDERAL LANDS   Manage and utilize public lands on the basis of multiple use and sustained yield concepts, and in a manner that will conserve natural resources; protect and preserve the quality of the environment, and ecological, scenic, historical and archeological values; protect and preserve wildlife habitat, and certain lands in their natural condition; and provide for long-term benefit, including economic benefits, for the people of Nye County and future generations.

### POLICIES

1.   Increase opportunities for local economic development by selectively increasing the amount of privately owned and locally managed land within the county.   a)   Lands with high recreational, wildlife, mineral and other public values should continue to remain as public lands. b)   Public lands within the municipal service area of existing communities should continue to be made available to the private sector for housing and economic activity.   These lands should be transferred only when local governments agree that the transfer is opportune and would not be a burden to local governments.   Growth should be directed to these areas to the extent that it can be accommodated in a manner compatible with each area's character and without burdening public facilities and services.   c)   Public lands should continue to be made available for State and local government purposes.   Land identified for public purposes should receive preference over disposal for private purposes.   d)   Public land disposal should be in conformance with local land use plans.   The general public and State and local governments should be involved in public land disposals.   e)   Public lands should be made available to local governments at a discounted price and then those local governments should be allowed to develop and dispose of the lands to private interests.

1.   This RMP provides for community expansion and for private economic development through disposal of 299,140 acres of public lands.   Land tenure adjustments are discretionary.   No lands will be disposed of unless they are identified in this RMP.   In order for public land to be sold, it must meet one of the following criteria set forth in Section 203(a) of the Federal Land Policy and Management Act of 1976:--the land is difficult or uneconomic to manage as a part of the public lands; and it is not suitable for management by another Federal department or agency.--the land was acquired for a specific purpose: and it is no longer required for that, or any other, Federal purpose; or--disposal of the land will serve important public objectives that can be achieved prudently or feasibly only if the land is removed from public ownership; and these objectives outweigh other public objectives or values that will be served by maintaining the land in Federal ownership.   Site-specific decisions regarding land ownership adjustments within the Tonopah Planning Area are to be made based on whether the lands are needed for Bureau programs, or whether or not they are considered more valuable for other purposes.

Public lands identified for disposal may be made available for sale, exchange, agricultural entry,